UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

--------------------------------------------------------

|  |  |  |
|---|---|---|
| | : | |
| JOHN WEBB, | : | Case No.: |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| QUINTAIROS, PRIETO, BOYER & WOOD, | : | |
| P.A., MAXSON MAGO & MACAULAY, LLP, | : | |
| MICHAEL COHEN, ESQ., ANTHONY | : | |
| SCHUMANN, ESQ., SARA ELIZABETH | : | |
| DILL, ESQ., STEVEN A. WOOD, ESQ., | : | |
| ADVANCED INVENTORY MANAGEMENT, | : | |
| INC. d/b/a ESUTURES.COM, ANTHONY | : | |
| IADEROSA JR., FRED SYLVESTER, and | : | |
| HUSSEIN ALI YASSINE, | : | |
| | : | |
| Defendants. | | |

----------------------------------------------------------

## **COMPLAINT**

Plaintiff, JOHN WEBB, by and through undersigned counsel, sues Defendants, QUINTAIROS, PRIETO, BOYER & WOOD, P.A., MAXSON MAGO & MACAULAY, LLP, ANTHONY SCHUMANN, ESQ., MICHAEL COHEN, ESQ., SARA ELIZABETH DILL, ESQ., STEVEN A. WOOD, ESQ., ADVANCED INVENTORY MANAGEMENT, INC. d/b/a ESUTURES.COM, ANTHONY IADEROSA JR., FRED SYLVESTER, and HUSSEIN ALI YASSINE, and states:

## **NATURE OF THE ACTION**

1. Plaintiff brings this action against Defendants – two law firms, four lawyers, three of their clients, and one individual – which arises out of witness tampering, bribery, arson, witness intimidation, extortion, mail fraud, wire fraud, intentional destruction of evidence, and perjury committed during the course of civil litigation related to the recovery of gambling losses.

2.      The facts and claims in this case are similar to *United States v. Eisen*, 974 F. 2d 246, 251 (2d. Cir. 1992), in which the Second Circuit Court of Appeals affirmed criminal RICO convictions against four lawyers and three private investigators "arising from a law firm's fraudulent conduct" during the course of civil litigation, including witness tampering, bribery, and mail fraud, "among other crimes."

## JURISDICTION, PARTIES, AND VENUE

3.      In this action, Plaintiff asserts federal claims for civil RICO per 18 U.S.C. §1964(c) and (d), witness intimidation per 42 U.S.C. §1985(2), and pendent state law claims for fraudulent and negligent concealment, conspiracy to commit fraudulent and negligent concealment, conspiracy to defraud, and negligent retention.

4.       This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §1964 and 28 U.S.C. §1343.

5.      Venue is proper in this judicial district pursuant to 18 U.S.C. §1965 and 28 U.S.C. §1391 because QPWB, EM3, Schumann, Cohen, AIM, Iaderosa, and Sylvester are subject to personal jurisdiction in this judicial district.

6.      Plaintiff, JOHN WEBB ("Webb"), is an individual over the age of eighteen, is domiciled in Palm Beach County, Florida, and is otherwise *sui juris*.

7.      Defendant, QUINTAIROS, PRIETO, BOYER & WOOD, P.A. ("QPWB"), is a Florida corporation with its principal place of business located at 9300 S. Dadeland, Blvd., 4th Floor, Miami, FL 33156.  QPWB is a nation-wide law firm with offices in over twenty (20) states, including Illinois, Texas and Florida.

8.    Defendant, MAXSON MAGO & MACAULAY, LLP ("EM3"), is an Illinois Limited Partnership and law firm with its principal place of business located at 77 W. Wacker Drive, Suite 4500, Chicago IL 60601.

9.    Defendant, ANTHONY SCHUMANN ("Schumann") is an individual over the age of eighteen, is domiciled in Illinois, is an attorney licensed to practice in Illinois, and is otherwise *sui juris.*

10.    Defendant, MICHAEL COHEN ("Cohen") is an individual over the age of eighteen, is domiciled in Illinois, is an attorney licensed to practice in Illinois, and is otherwise *sui juris.*

11.    Defendant, SARA ELIZABETH DILL ("Dill") is an individual over the age of eighteen, is domiciled in London, United Kingdom, is an attorney licensed to practice in Illinois, Florida, and Wisconsin, and is otherwise *sui juris.* Upon information and belief, Dill is currently a partner at a single-member firm, Anethum Global, and previously ran the law firm, Law Offices of Sara Elizabeth Dill, which listed addresses in Miami, Florida and Chicago, Illinois on its letterhead.

12.    Defendant, STEVEN A. WOOD ("Wood") is an individual over the age of eighteen, is domiciled in Texas, is an attorney licensed to practice in Texas, and is otherwise *sui juris.*

13.    Defendant, ADVANCED INVENTORY MANAGEMENT, INC. d/b/a eSutures.com ("AIM"), is an Illinois corporation with its principal place of business located in Will County, Illinois.

14.    Defendant, ANTHONY IADEROSA ("Iaderosa") is an individual over the age of eighteen, is domiciled in Will County, Illinois, and is otherwise *sui juris.*

15.     Defendant, FRED SYLVESTER ("Sylvester") is an individual over the age of eighteen, is domiciled in Will County, Illinois, and is otherwise *sui juris.*

16.     Defendant, HUSSEIN ALI YASSINE ("Yassine") is an individual over the age of eighteen, is, upon information and belief, domiciled in Texas, and is otherwise *sui juris.*

## FACTUAL ALLEGATIONS

### A. This Dispute Originally Arose Out of the Iaderosa Defendants' Failure to Pay Webb Over $500,000 in Gambling Winnings

17.     The origin of the dispute between the parties arose out of online sports gambling between Webb on one hand, and AIM, Iaderosa and Sylvester (hereinafter the "Iaderosa Defendants"), as well as several parties not named as defendants in this action such as Silex Capital, LP ("Silex") and Trident Holdings, LLC ("Trident"), on the other hand. Specifically, the Iaderosa Defendants failed to pay Webb approximately $516,000 in gambling winnings in January 2016.

18.     At all material times, the Iaderosa Defendants operated an illegal online sportsbook through the websites Action321.com and Lock1in.com.

19.     At all material times, the Iaderosa Defendants laundered the proceeds of their illegal gambling operation through Lakeside Bank, a Chicago-based bank where Iaderosa sits on the board of directors.[1]

20.     Between 2013 and 2016, Webb wagered on sporting events with the Iaderosa Defendants through Action321.com and Lock1in.com.

---

[1] Coincidentally, a former Lakeside Bank board member, Bill Cellini, was convicted in 2011 of conspiracy to commit extortion and aiding and abetting in the solicitation of bribe.

21.     During that time, Webb sent wire transfers for gambling deposits to the following Defendants, including dates and amounts (the following is not an exhaustive list of gambling deposits paid by Webb):

      a.  Trident, October 17, 2013 ($18,495);

      b.  Trident, October 31, 2013 ($26,755);

      c.  Trident, November 12, 2013 ($35,000);

      d.  Trident, October 29, 2014 ($24,139);

      e.  Silex, October 16, 2015 ($20,050);

      f.  Silex, November 18, 2015 ($55,475);

22.     Webb also sent cash for gambling deposits to AIM via FedEx on the following dates (the following is not an exhaustive list of gambling deposits paid by Webb):

      a.  October 23, 2013;

      b.  November 8, 2013;

      c.  November 21, 2013;

      d.  January 13, 2014;

      e.  January 12, 2015;

      f.  January 12, 2016

23.     Webb won approximately $8,572,298 in wagers and lost approximately $8,394,327 in wagers with the Iaderosa Defendants between 2013 and 2016.

24.     On or about January 20, 2016, AIM sent a package via FedEx and represented it contained $156,000 of Webb's winnings.

25.     Within a day after the FedEx Package was sent, Webb won another $360,000 in wagers with the Iaderosa Defendants.

26.     When the Iaderosa Defendants realized they owed Webb an additional $360,000 (for a total of $516,000), they directed FedEx to stop delivery and return the package containing the $156,000 to the Iaderosa Defendants.

27.     The Iaderosa Defendants also never paid Webb the additional $360,000 in winnings.

28.     The Iaderosa Defendants' failure to pay approximately $516,000 in gambling winnings prompted Webb to file suit in Palm Beach County, Florida (the "Florida Case") to recover gambling deposits (not gambling losses) he made with Iaderosa Defendants.[2]

29.     On February 26, 2017, before filing the Florida Case, Ryan Kadyszewski, Esq., as counsel for Webb, sent the Iaderosa Defendants a civil theft demand letter, which is attached hereto as **Exhibit A.**

30.     On or about March 9, 2016, Dill responded to Mr. Kadyszewski's letter and stated she "represented Iaderosa and all companies owned by him," which necessarily includes AIM since the initial demand letter was addressed to AIM (as well as Iaderosa, Trident, and Silex). A copy of Dill's March 9, 2016 correspondence is attached hereto as **Exhibit B.**

31.     Dill did not ultimately represent the Iaderosa Defendants in the Florida Case.

32.     Instead, QPWB represented the Iaderosa Defendants in the Florida Case, and continues to represent them in the Will County Case and the Rock Island Case (defined *infra*) through the filing of this Complaint.[3] QPWB, EM3, Schumann, Cohen and Dill are collectively referred to herein as the "Iaderosa Lawyers."

---

[2] *Webb v. Iaderosa, et al.*, Case No. 2016-CA-003978, Fifteenth Judicial Circuit, Palm Beach County, Florida.

[3] The Iaderosa Defendants are also currently represented by Cohen and the EM3 firm in the Will County Case and the Rock Island Case. However, Cohen previously represented the Iaderosa Defendants while he was employed by the QPWB Firm, which began at the inception of the Will County Case through March 18, 2020, which is when Cohen filed an appearance on behalf the EM3 firm in the Will County Case. Cohen and the EM3 firm also represented the Iaderosa Defendants in the Kankakee Case from mid-2020 until the conclusion of the Kankakee Case in 2022.

33.     Dill's involvement in the Florida Case consisted of writing a single letter and, as a result, her name quickly dropped off Webb's radar after the Iaderosa Defendants retained the QPWB firm and the parties litigated the Florida Case.

34.     Dill's name did not resurface until five (5) years later at deposition in July 2021, as explained in more detail, *infra.*

35.     The Florida Case was eventually dismissed with prejudice in 2017 for lack of personal and subject matter jurisdiction, but the Florida judge suggested Illinois law may provide a viable cause of action.

**B.  Lawson Sues the Iaderosa Defendants in the Will County Case Pursuant to the LRA for Triple the Amount of Webb's Losses**

36.     After the judge dismissed the Florida Case and suggested reviewing Illinois law, Webb's mother, Sandra Lawson ("Lawson"), filed suit in Will County, Illinois, in April 2017.  *See Lawson v. Iaderosa, et al.,* Case No. 17 L 224, Twelfth Judicial Circuit, Will County, Illinois (the "Will County Case").[4]

37.     Lawson sued the Iaderosa Defendants under the Illinois' Loss Recovery Act, 720 ILCS 5/28-8(b) (the "LRA") for triple the amount of gambling losses sustained by Webb.

38.     The LRA provides that a person who loses a bet may sue the winner for the amount of the loss and must do so within six (6) months.  *See* 720 ILCS 5/28-8(a).  If the loser of the bet does not file an action within six (6) months, "***any person*** may initiate a civil action against the winner… [and] the court shall enter a judgment of ***triple the amount [of the losses***] so determined."  *See* 720 ILCS 5/28-8(b) (emphasis added).

---

[4] Webb also sued the Iaderosa Defendants for fraud in the Will County Case related to misrepresentations on their gambling websites, Action123.com and Lock1in.com, that it was a "legal and licensed" online casino.

39.     The general policy behind the LRA is to deter illegal gambling, and the case law interpreting the LRA clearly provides that the loser may not conspire with a third party to bring a suit for treble damages on the loser's behalf. *See Kizer v. Walden*, 65 N.E. 116 (1902) (noting that "[i]f it turned out that the gambling brother conspired to bring his own suit in his brother's name, then the suit could not be maintained because the statute provided a six-month window"); *Staninger v. Tabor*, 103 Ill. App. 330, 334 – 35 (1902) (holding that "in a suit brought to recover treble the amount of the losses, that the defendant should be allowed to prove, if he can, that while the suit is being prosecuted in the name of a third party it is really and truly the suit of the loser, and that he and the plaintiff have conspired together for the purpose of mulcting the defendant into the heavy penalty provided by the statute."); *Cole v. Applebury*, 136 Mass. 525, 531 – 32 (1884) (finding that the provision allowing a third party to sue for three times the loss "is not for the benefit of the [third party], but for the punishment of the successful gamester and for the suppression of gaming.").

40.     Accordingly, what started as a dispute over approximately $516,000 in gambling proceeds turned into a potential ***liability in excess of $25,000,000*** for the Iaderosa Defendants by virtue of Lawson's LRA claim for treble damages on Webb's approximately $8,394,327 in gambling losses to the Iaderosa Defendants.

41.     This outsized liability, which represents ***fifty-times (50x)*** the original amount the Iaderosa Defendants failed to pay Webb in gambling winning, was likely the primary motivation for the criminal conduct in which the Iaderosa Lawyers and Iaderosa Defendants engaged during the course of the Kankakee Case and the Will County Case, as alleged in detail, *infra*.

**C. Yassine Sues Webb in the Kankakee Case Pursuant to the LRA to Recover Three Times the Iaderosa Defendants' Gambling Losses; the Iaderosa Defendants Intervene in the Kankakee Case**

42.     In August 2017, approximately four (4) months after Lawson filed the Will County Case, Yassine filed suit against Webb pursuant to the LRA in Kankakee County, Illinois. *See Yassine v. Webb*, Case No. 17 L 79, Twenty First Judicial Circuit, Kankakee County, Illinois (the "Kankakee Case").

43.     Webb and Yassine have known each other for decades. However, Webb married Yassine's mother in 1997, and since that time Webb and Yassine have had an on-again, off-again relationship.

44.     In the Kankakee Case, Yassine sought to recover three times the amount of the Iaderosa Defendants' gambling losses to Webb (approximately $24,000,000), for which Webb was liable under the LRA.

45.     The practical effect of the Kankakee Case is that it prevented anyone in the Iaderosa Defendants' orbit, such as a family member or friend, from suing Webb for triple the amount of the Iaderosa Defendants' losses.

46.     Yassine was represented in the Kankakee Case by Tony Brasel, Esq.

47.     At the time the Kankakee Case was filed, Yassine was an inmate in federal prison at Big Spring Correctional Center, in Big Spring, Texas.

48.     Not long after Yassine filed the Kankakee Case, the Iaderosa Defendants petitioned the court to intervene in that action, purportedly "to prevent the determination that my client engaged in illegal gambling … [and] to defend against those allegations." *See* Transcript of December 21, 2017 Hearing on Petition to Intervene at 17 – 18 (attached as **Exhibit C**).

9

49.     The trial court judge, the Honorable Adrienne Albrecht, currently an appellate judge on the Illinois Third District Appellate Court, granted the Petition to Intervene based on the "unique circumstances" presented by the Iaderosa Defendants (i.e. to defend against allegations of illegal gambling), but mandated that they "shall not interfere with the control of the litigation or cause undue delay" and reiterated "I will allow your clients to participate although they may not control or delay the litigation." *See* Exhibit C at 20.

50.     The Iaderosa Defendants then moved to transfer the Kankakee Case to Will County based on *forum non-conveniens*, presumably because the trial court in Will County had, at the point, already dismissed Lawson's complaint and amended complaint.

51.     However, Judge Albrecht denied the motion to transfer venue on April 18, 2018. The Iaderosa Defendants appealed, and in January 2019, the Third District Appellate Court affirmed the trial court's order denying Intervenors' motion to transfer venue. *See Yassine v. Webb*, 2019 IL App (3d) 180299-U (3d Dist. 2019).

52.     Notably, in four years the Iaderosa Defendants were parties to the Kankakee Case, they took absolutely no actions to defend against Yassine's allegations that they engaged in illegal gambling despite the Iaderosa Lawyers' representations that they were prepared to offer evidence to rebut these claims.

53.     But the Iaderosa Defendants did no such thing and repeatedly invoked the Fifth Amendment[5] in response to discovery requests that sought information regarding gambling.

54.     Thus, the entire alleged basis for the Iaderosa Defendants' intervention in the Kankakee Case, to defend against allegations of illegal gambling, was a red herring.

---

[5] AIM did not invoke the Fifth Amendment, but instead claimed it had no knowledge or documents regarding any gambling activity. AIM's feigned lack of knowledge is a central fact in this case that is addressed in greater detail, *infra*.

55. Instead, it was ultimately revealed that the purpose of the Iaderosa Lawyers' and Iaderosa Defendants' intervention was to control the Kankakee Case and illegally obtain an assignment of Yassine's judgment, which they conspired to accomplish through fraudulent and criminal means.

### D. Davis Files the Rock Island Case Pursuant to the LRA to Recover Three Times the Amount Iaderosa Defendants' Gambling Losses, as well as Three Times the Amount of Webb's Gambling Losses

56. On or about May 18, 2018, while the Kankakee Case was on appeal related to the denial of the Iaderosa Defendants' motion to transfer venue, and while Lawson was facing a dismissal with prejudice of her LRA claim in the Will County Case,[6] Russell Scott Davis ("Davis") coordinated with the Iaderosa Lawyers and Iaderosa Defendants to sue Webb in Rock Island County, Illinois ("Rock Island I"), pursuant to the LRA for *the exact same gambling losses* Yassine sued Webb for in the Kankakee Case.[7]

57. The coordination between Davis, the Iaderosa Lawyers, and the Iaderosa Defendants is evidenced by the fact that Schumann hired Murnan (defined *infra*) to locate Webb for service of process in Rock Island I despite the Iaderosa Defendants having absolutely no involvement in the case at that time.

58. Davis was essentially a stand-in and a proxy for the Iaderosa Defendants in Rock Island I.

59. Rock Island I was removed to federal court based on diversity jurisdiction on June 11, 2018, which prompted Davis to voluntarily dismiss the action on September 24, 2018 and refile a new action Rock Island County on October 10, 2018, adding the Iaderosa Defendants to defeat

---

[6] The dismissal of Lawson's LRA claim with prejudice was reversed by Illinois' Third District Appellate Court in *Lawson v. Iaderosa, et al.*, 2020 IL App (3d) 180609 (3d Dist. 2020), which held that a family member is not precluded from filing suit to recover treble damages pursuant to the LRA.
[7] Davis also sued Richard Rendina and Rendina Companies, Inc. (collectively "Rendina") in the Rock Island Case.

diversity. *See Davis v. Rendina, et al.*, Case No. 18 L 138, Fourteenth Judicial Circuit, Rock Island County, Illinois ("Rock Island II" or the "Rock Island Case").

60.     Rock Island II included claims against the Iaderosa Defendants and other individuals for Webb's gambling losses, ***the exact same gambling losses*** Lawson sued the Iaderosa Defendants for in the Will County Case.

61.     Given the Will County Case and Kankakee Case were filed approximately one year before the Rock Island Case, all of Davis' claims against Webb and the Iaderosa Defendants would be precluded by the "first-to-file" rule.

62.     In fact, on or about June 16, 2023, the trial court judge in the Rock Island Case dismissed Davis' LRA claims against Webb, Rendina, and related entities based on collateral estoppel, finding that Yassine's judgment in the Kankakee Case precluded Davis' claims. The court also ruled that Davis' LRA claims against the Iaderosa Defendants will be stayed pending the outcome of Lawson's claim in the Will County Case.

63.     However, the Rock Island Case is part of the Iaderosa Lawyers' and Iaderosa Defendants' scheme to manipulate the court system through unethical and illegal means to create a windfall for the Iaderosa Defendants in direct contravention of the LRA and Judge Albrecht's December 21, 2017 order.

64.     Specifically, the Iaderosa Lawyers and Iaderosa Defendants engaged in bribery and witness tampering (the details of which are set forth in more detail *infra*) and offered to pay Yassine a significant sum of money in exchange for false testimony about Webb and Lawson, which the Iaderosa Defendants intended to use to defeat Lawson's LRA claim in the Will County Case. If their scheme was successful, Davis' LRA claim against the Iaderosa Defendants in the

Rock Island Case would replace Lawson's LRA claim, a claim that the Iaderosa Defendants would never have to pay.

65. The following table summarizes the above-mentioned cases.

| | File Date | Parties | Claims | Status |
|---|---|---|---|---|
| **Florida Case** | 4/11/16 | **Pltf**: Webb<br><br>**Defs**: Iaderosa, A. Iaderosa, Sr., J. H. Iaderosa, K. Noble, AIM, Silex, Trident | Civil remedies for criminal practices, fraud, civil theft, conversion, unjust enrichment, and multiple conspiracy claims all related to gambling deposits (***not winnings***) | Dismissed with prejudice for lack of personal and subject matter jurisdiction |
| **Will County Case** | 3/17/17 | **Pltfs**: Lawson, Webb<br><br>**Defs**: Iaderosa, A. Iaderosa, Sr., J. H. Iaderosa, Slyvester, K. Noble, AIM, Silex, Trident | Lawson – a single LRA claim against Defendants for Webb's gambling losses;<br><br>Webb – a single fraud claim against Defendants related to misrepresentations that gambling websites were legal | Pending |
| **Kankakee Case** | 8/25/17 | **Pltf**: Yassine<br><br>**Def**: Webb<br><br>**Intervenors**: Iaderosa, A. Iaderosa, Sr., J. H. Iaderosa, AIM, Silex, Trident | -A single LRA claim against Webb for the Iaderosa Defendants' gambling losses;<br><br>-Intervenors purportedly intervened to defend against illegal gambling allegations, but took no actions in that regard for over four years | -Final Judgment in favor of Yassine for $24,168,894.00<br><br>-Intervenors voluntarily dismissed themselves on the eve of sanctions hearing re: Prison Visit and witness tampering |
| **Rock Island I** | 5/14/18 | **Pltf**: Davis<br><br>**Defs**: Webb, Von Esselborn, Wallisville, Rendina, Rendina Companies | LRA claims against Webb, Rendina, and related entities for the Iaderosa Defendants' gambling losses | Voluntary dismissed after Webb removed the case to federal court. |
| **Rock Island II** | 10/10/18 | **Pltf**: Davis<br><br>**Defs**: Webb, Von Esselborn, Wallisville Corp, | - LRA claims against Webb, Rendina, and related entities for the Iaderosa Defendants' gambling losses | - Dismissed based on collateral estoppel due to Kankakee Final Judgment for same wagers |

| | | Rendina, Rendina Companies, Iaderosa, A. Iaderosa, Sr., J. H. Iaderosa, AIM, Silex, Trident. | - LRA claims against the Iaderosa Defendants for Webb's gambling losses | - Stayed pending the outcome of Will County Case |
|---|---|---|---|---|

### E. The Iaderosa Lawyers' and Iaderosa Defendants' Criminal Intimidation Campaign

66.     Beginning in June 2018, in what can only be viewed as a coordinated intimidation campaign, the Iaderosa Lawyers and Iaderosa Defendants engaged in a series of criminal acts that were intended to intimidate Webb, his counsel, his 77-year-old mother, and his 5-year-old daughter, which was directly related to their claims against the Iaderosa Defendants.

### i.     Webb's Range Rover Was Fire-Bombed in His Driveway

67.     The first instance of witness intimidation came on June 2, 2018, when Webb's vehcile[8] was fire-bombed in his driveway.

68.     Approximately two months prior, on April 9, 2018, AIM asked its Chicago-based private investigator, Steve Simon of Acumen Probe (hereinafter "Simon"), to identify vehicles owned by Webb and his mother. *See* March 5, 2018 – April 23, 2018 Email Chain attached as **Exhibit D.**

69.     One of the vehicles Mr. Simon identified was a 2017 Red Land Rover, which was set ablaze in Webb's driveway on June 2, 2018, at approximately 2:30 a.m.  *See* West Palm Beach Fire Report attached as **Exhibit E**.

70.     AIM paid Simon for his investigation into Webb's vehicle three weeks after the fire-bombing in June 2018.

---

[8] The subject vehicle, a red 2017 Land Rover, was titled in Lawson's name but was effectively Webb's vehicle as he maintained possession of it and drove it at all material times.

71.     Moreover, the fire-bombing occurred at approximately 2:30 a.m. on a weekend when Webb was out of town, the vehicle was towed from the residence in the middle of the night without his knowledge, and it took the fire investigator two days to locate and speak to Lawson and Webb.

72.     Despite it taking several days for the fire investigator to contact and speak with Webb and Lawson, another private investigator hired by QPWB[9] on behalf of the Iaderosa Defendants, Mark Murnan ("Murnan") of Complete Legal Investigations, Inc. ("CLI"), who is based in West Palm Beach, Florida where Webb and Lawson reside, made an unannounced visit to the mother of Webb's daughter at her workplace almost immediately after the arson.

73.     Specifically, on June 7, 2018, a mere five (5) days after the firebombing, Murnan visited Rachel Spillane at the Children's Home Society of Florida, a children's charity, and stated, "John [Webb] must not have a good reputation in town because apparently someone torched his car" and asked "[i]s John working with the Feds?" *See* Excerpts of Slideshow Exhibits from the J&J Case[10] attached as **Exhibit F.**  Murnan also told Ms. Spillane he was attempting to locate Webb for service of a lawsuit (the initial complaint in Rock Island I).

74.     Accordingly, Murnan, the West Palm Beach investigator hired by the QPWB firm:

   a.   ***immediately*** knew about the arson, likely before Webb and Lawson were contacted by the fire investigator;

   b.   believed the vehicle was intentionally set on fire as retaliation for Webb not having a good reputation;

   c.   knew it was Webb's vehicle even though it was registered to Lawson; and

---

[9] Schumann filed an affidavit in support of a motion to quash subpoenas to Murnan and CLI in the Will County Case, in which he averred that QPWB hired Murnan and CLI.

[10] Johnson & Johnson, Ethicon, Inc. ("J&J") sued AIM, Iaderosa and others in federal court and asserted claims under the Lanham Act related to their sale of counterfeit, defective and bacterially contaminated surgical devices that were placed in patients' bodies during surgery. *See Johnson & Johnson, Ethicon, Inc., et al. v. Advanced Inventory Management, Inc., d/b/a eSutures.com, et al.*, Case No. 1:20-cv-03471, United States District Court, Northern District of Illinois, Eastern Division (the "J&J Case"). J&J repeatedly cited the Iaderosa Defendants' illegal gambling operation, the arson of Webb's vehicle, and witness intimidation in their filings.

      d.   relayed the foregoing to the mother of Webb's daughter days after the incident.

*See* Exhibit F.

75.    Moreover, Murnan, who was admittedly hired by QPWB and Schumann, was attempting to locate Webb for service of the initial complaint in Rock Island I despite the Iaderosa Defendants having absolutely no involvement in the case at that time.

76.    A salient fact regarding the firebombing of Webb's vehicle is that Webb and Lawson did not raise the issue in the Will County Case until September 2020, ***over two years after the arson,*** yet the Iaderosa Lawyers and Iaderosa Defendants were in possession of the police report and fire investigation report two months after the arson, and possibly had the initial fire rescue report as soon as two days after the arson, on June 4, 2018.

77.    Privilege logs from the J&J Case (the "J&J Privilege Logs") contain an entry on June 4, 2018, ***two days after the arson***, reflecting an email from Dill to Iaderosa, Cohen, Schumann and another QPWB attorney, Antwon Emery, Esq., "regarding an investigation," which included two "untitled attachments" and "voicemail 201806042108 from Anonymous Restricted.mp3.[11] *See* Excerpt of J&J Privilege Log attached as **Exhibit G.**

78.    The J&J Privilege Logs also demonstrate that ***two months after the arson***, on August 20, 2018, Dill sent three separate emails to Iaderosa, Cohen and Schumann regarding "investigation findings," which attached the West Palm Beach Fire Department report, the West Palm Beach Police Department report, as well as three images.[12]

---

[11] The voicemail entry in the privilege log contains a statement that "conversion errors by UnitedLex preclude ability to determine contents." It is therefore curious how AIM could claim privilege over a voicemail whose contents could not be determined. AIM nevertheless failed to provide a privilege log to Webb in the Will County Case regarding said voicemail.

[12] The photos of the severely burned Land Rover are included in the body of the Fire Investigation Report, which means the image attachments are mostly like different photos, especially since the report is in .pdf format, two images are in .png format, and one image is in .jpg format.

79. Coincidentally, the Murnan/CLI privilege log prepared by the Iaderosa Lawyers in the Will County Case, which relates to the same investigator who immediately knew of the arson, is devoid of detail beyond references to an "investigation."

80. Based on the foregoing, there is a high probability that Dill's 6/4/18 email and attachments, her 8/20/18 emails and attachments, and the CLI privilege log entries, all of which ambiguously refer to an "investigation," relate to the arson of Webb's vehicle, which is highly probative of the involvement and subsequent cover up by the Iaderosa Lawyers and Iaderosa Defendants.

81. When Iaderosa was asked in his July 2021 deposition about his request for information on Lawson's and Webb's vehicles, the fire-bombing, and related issues, he invoked his Fifth Amendment right against self-incrimination in response to all questions, which itself is evidence of his involvement. *See Ruiz-Cortez v. City of Chi.*, 931 F. 3d 592, 603 (7th Cir. 2019) ("[t]he only valid reason to invoke the Fifth Amendment is a reasonable fear that truthful answers may incriminate the witness. As we have said: 'To be privileged ... the answer one would give if one did answer it (and answer it truthfully) must have some tendency to subject the person being asked the question to criminal liability.'").

82. The Iaderosa Defendants have never affirmatively denied involvement in the arson of Webb's vehicle.

83. Following the arson of Webb's vehicle, Webb was contacted by the FBI as well as other federal law enforcement and regulatory agencies. Webb provided information regarding the arson and the Iaderosa Defendants and agreed to be a cooperating witness in their investigations.

ii.     **Witness Intimidation – Webb's 5-Year-Old Daughter's School**

84.     Not long after the arson of Webb's vehicle, the Iaderosa Defendants also caused a copy of the complaint in the Kankakee Case to be anonymously sent to the principal of St. Juliana Catholic School, Webb's daughter's school, who was ***5 years old*** at the time, with handwritten notes that cannot be construed as anything except intimidation (a copy of which is attached as **Exhibit H**).

85.     First, since elementary school enrollment records are not public, the most likely way the Iaderosa Defendants knew where Webb's daughter went to school was by hiring an investigator (likely Murnan) to follow them given Webb typically walks his daughter to school.[13]

86.     Next, the names of the Iaderosa Defendants, described as non-parties in the Kankakee Complaint, were crossed out. *See* Exhibit H.

87.     Third, Webb's social security number was handwritten on the top of the page[14] and his daughter's birthday was written on the bottom, along with "Rachel and I are concerned," presumably referring to Rachel Spillane, the mother of Webb's daughter. *See* Exhibit H.

88.     Last, Yassine's name is circled with a note that says, "google him then call me." However, the phone number listed is actually the cellphone number of Webb's attorney, Ryan Kadyszewski, Esq. *See* Exhibit H.

89.     There is absolutely no rational explanation or legitimate purpose for sending the foregoing to the principal of Webb's 5-year-old daughter's school, other than to harass and intimidate Webb and his family.

---

[13] Indeed, at some point in 2018, Webb attempted to confront an individual sitting in a car parked in front of his house in the early morning hours, but the car quickly sped away as Webb approached.
[14] The disclosure of Webb's social security number in the document was a violation of federal law. *See* 42 USC §408.

### iii. Witness Intimidation – Webb's Counsel's Ex-Wife

90.     The Iaderosa Defendants also intimidated Webb's counsel's ex-wife, Carmel Huseman.

91.      The same individual who made handwritten notes on the Kankakee Complaint sent to Webb's daughter's school also sent an intimidating letter to Webb's counsel's ex-wife, which was mailed from Knoxville, Tennessee on November 17, 2017, approximately three (3) months after the Kankakee Case was filed (attached as **Exhibit I**).

92.     Similar to including Webb's attorney's cell phone number on the Kankakee Complaint, the return address on the letter stated it was from John Webb from his home address. The substance of the letter was just three words: "mali creare subvertet."

93.     It is unknown exactly what was meant by the phrase, but sending anonymous cryptic documents to family members of counsel is beyond the pale and serves no legitimate purpose other than to harass and intimidate parties, their counsel, and their families, especially in light of the fire-bombing and the document sent to Webb's 5-year-old daughter's elementary school.

### iv. Witness Intimidation – Lawson

94.     The Iaderosa Defendants also caused intimidating documents to be mailed to Lawson on or about July 23, 2018, including a letter and copy of the Complaint from the Will County Case (attached as **Exhibit J**) with post-it notes on pages 1, 8 and 12 containing handwritten messages that stated:

   a.  "Lying on an official court filing is punishable by imprisonment, Sandra."

   b.   "Really, Sandra? Wow! What a (false) claim! Remember prison…"

   c.  "Wow. You're seeking damages, too? What did you do, Sandra? (prison…)."

*See* Exhibit J.

95.     The return address on Lawson's package was the Kankakee County Courthouse, 450 E. Court St., Kankakee, IL 60901. *See* Exhibit J.

96.     Lawson was 77 years old at the time the intimidating documents were sent to her. Like the documents sent to Webb's daughter's school and Plaintiffs' counsel's ex-wife, the ones sent to Lawson served no legitimate purpose other than to harass and intimidate.

     **v.**    **Witness Intimidation and Extortion – Rendina**

97.     On July 23, 2018, the same day the intimidating documents were sent to Lawson, intimidating documents were also mailed to Richard Rendina, a defendant in the Rock Island Case.

98.     The documents the Iaderosa Defendants sent to Rendina (attached as **Exhibit K**), at his office, included 25 double-sided pages that read: "RICHARD RENDINA: FLORIDA'S GAMBLIBNG MAN! NEWS IS SPREADING, RICHARD. STOP PISSING PEOPLE OFF, RICHARD. THE GLOVES ARE COMING OFF. THIS EMAIL (REVERSE SIDE) IS ON A TRAIN, RICHARD. NEXT STOP: THE CEOs OF ALL YOUR CHARITIES.[15]" *See* Exhibit J.

99.     Like the intimidating documents mailed to Lawson, the documents the Iaderosa Defendants sent to Rendina also contained post-it notes with handwritten messages, stating:

    a.   "Richard – Please post around your building. Thanks ☺"

    b.   "Richard, Your charities won't want to be connected to a gambling degenerate motherfucker. (I will show you) ☺"

*See* Exhibit K.

100.     The return address on Rendina's package was also the Kankakee County Courthouse. *See* Exhibit K.

---

[15] One of the charities is called The Rendina Family Foundation, which was founded in the memory of Richard Rendina's father, Bruce Rendina, who passed away from cancer in 2006 at the age of 52.

101.     The Iaderosa Defendants also sent an intimidating email to Rendina on August 16, 2018, stating "You know who this is, Gambling Man.  I'm cold calling all your clients to tell them about your gambling habit.  Make it stop and I'll stop." *See* Exhibit K.

102.     In addition to witness intimidation, the August 16th email also constitutes extortion.

103.     Sending intimidating and harassing documents to Webb's 5-year-old daughter's school, his 77-year-old mother (as well as fire-bombing her car), his counsel's ex-wife, as well as engaging in extortion and threatening party to the Rock Island Case and his cancer charity demonstrates the depths of the Iaderosa Defendants' depravity.

104.     Significantly, Webb subpoenaed Dill in the Will County Case for documents regarding the various instances of witness intimidation.  While she asserted attorney-client privilege and work product privilege objections, her response indicated she had responsive documents, which Judge Roger D. Rickmon ordered be produced to chambers for *in-camera* inspection on or about March 16, 2023.

105.     However, it is unclear whether Judge Rickmon ever reviewed the documents.

106.     The Will County Case was reassigned from Judge Rickmon to Judge Bennett Braun on or about January 5, 2024.

107.     Upon information and belief, the Iaderosa Lawyers were, at best, fully aware of their clients' illegal intimidation of witnesses and parties or, at worst, were involved in and assisted the Iaderosa Defendants in the illegal conduct.

**F.  The Prison Visit and the Assignment Agreement – Bribery and Witness Tampering**

108.     Approximately one month after the Iaderosa Defendants engaged in the above-cited instances of witness intimidation, the Iaderosa Lawyers and Iaderosa Defendants set their sights on bribing and tampering with Yassine while he was an inmate at Big Spring Correctional Center.

109. The first step in this conspiracy to commit bribery and witness tampering occurred when the Iaderosa Defendants' private investigator, David Luther of Luther Investigations, LLC ("Luther"), contacted Yassine's relatives to arrange a meeting with Yassine in prison.

110. Luther, a Houston-based investigator, was admittedly hired by the QPWB firm, a fact that cannot be overstated and is highly damning evidence of the QPWB firm's involvement in the conspiracy, as explained in greater detail *infra.*

111. Luther contacted Yassine's cousin, Manal Broeckelmann ("Manal"), and arranged an in-person meeting between Manal and Dill in Texas, which occurred in September 2018.

112. In emails obtained from AIM's private investigator Simon dated August 17 – 23, 2018, Dill, AIM, and Simon discussed obtaining a background dossier on Manal for Dill's upcoming trip to Texas to meet with Manal. *See* August 17 – 23, 2018 emails between Iaderosa, Dill and Simon attached as **Exhibit L.**

113. The purpose of Dill's September 2018 trip to Texas was so she could use Manal to arrange a visit with Yassine in prison.

114. On October 1, 2018, Dill visited Yassine at Big Spring Correctional Center in Big Spring, Texas (the "Prison Visit"), under false pretenses and in violation of federal law,[16] by claiming she was his attorney when, in fact, she represented the Iaderosa Defendants and knew Yassine was represented by Tony Brasel in the Kankakee Case.

115. The purpose of the Prison Visit was to commit bribery and witness tampering by offering Yassine cash, a free immigration lawyer, a free tax lawyer, and a free litigation lawyer if

---

[16] Visits by attorneys to federal prison inmates is governed by 28 CFR § 543.13, which, "permit[s] visits by the retained, appointed, or prospective attorney of an inmate or by an attorney who wishes to interview an inmate as a witness." Dill does not meet any of these definitions and knew at the time of the visit that Yassine was already represented by Mr. Brasel. Despite this knowledge, Dill contacted Yassine through Manal, maneuvered her way into the prison, and met with Yassine in violation of Illinois Rule of Professional Conduct 4.2.

he would sign an affidavit containing false statements about Webb and Lawson that would benefit the Iaderosa Defendants and potentially defeat Lawson's and Yassine's LRA claims in the Will County Case and the Kankakee Case, respectively.

116.    Indeed, on or about September 21, 2018, Dill left a voicemail for Manal regarding the potential Prison Visit in which she asks Manal to talk to Yassine about his willingness to meet with Dill.  Dill also suggested she would forego the Prison Visit if Yassine was not willing to work with the Iaderosa Defendants because of the "ethical reasons.[17]"  Specifically, Dill stated:

> Um, so, you know, I can certainly talk to him [Iaderosa] and see, um, what he thinks, um, and whether, you know, we're willing to do a trip down to talk to Mike [Yassine] or not. Um, and also just, you know, *the ethical reasons*.  Um, you know, *if [Yassine is] not sounding like he wants to move on this*, you know, then, you know, we'll probably *just say forget it, um, and we'll just keep fighting all the cases*.

117.    Dill knew the Prison Visit was not only unethical, but outright criminal.

118.    Dill also made material misrepresentations to Manal about the status of Yassine's Kankakee Case:

> I mean, does [Yassine] know that *his lawyer's actually lost all of the motions* and that's, I mean, that's what's so puzzling about this. Um, you know, I'm not sure what to do.  I mean, I can send him stuff, um, you know, if you think that would help, to send him some of the pleadings and the orders and everything else, to send to him via mail.

119.    As of September 21, 2018, the date of Dill's first voicemail to Manal, the only "motion" Yassine "lost" was the Iaderosa Defendants' Petition to Intervene, which was neither a motion nor was it against Yassine.  Dill was clearly attempting to malign Mr. Brasel by lying and

---

[17] Ill. Sup. Ct. R. 4.2 dictates that "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyers know to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order."

stating he "actually lost all of the motions," when a quick review of the Kankakee Case docket clearly demonstrates otherwise.

120. Further, Dill's statement in the September 21, 2018 voicemail that if Yassine was not willing to make a deal then "we'll just keep fighting all the cases," demonstrates the deal Dill intended to strike: the payment of money to Yassine in exchange for (false) information that Dill believed would end the Will County Case.

121. Stated more simply, Dill believed a deal with Yassine would result in the dismissal of the Will County Case, evidenced by Dill's statement that if Yassine was not willing to deal, then the Iaderosa Defendants would "just keep fighting" the case.

122. However, Yassine was incarcerated in federal prison at all material times, from 2012 – January 2021, and therefore had no first-hand knowledge regarding Webb's gambling with the Iaderosa Defendants (which occurred between 2013 – 2016), Lawson's LRA claim against the Iaderosa Defendants (which was filed in April 2017), or any information that could be used against Webb and Lawson.

123. Even assuming *arguendo* that Yassine somehow acquired relevant admissible information about Webb and Lawson that the Iaderosa Defendants could use to defeat the Will County Case (which Webb denies), there would be absolutely no reason for Dill to sneak into the prison and offer Yassine over $100,000 for said information when the Iaderosa Defendants could have simply taken his deposition for free.

124. Given Yassine's immigration status at the time of the Prison Visit (*see infra*), it would have been in the Iaderosa Defendants best interests to depose Yassine and secure such allegedly damning testimony before he was deported to Lebanon, assuming, that is, that such testimony was truthful (it wasn't).

24

125.    But after Dill's attempted deal with Yassine fell apart in mid-2019 (explained in more detail *infra*), the Iaderosa Defendants **never** sought to depose Yassine in the Will County Case at any time before his scheduled deportation in January 2021.

126.    It was only **after** Yassine exposed the nefarious Prison Visit in his discovery answers, and **after** Webb deposed Yassine in the Kankakee Case, that the Iaderosa Defendants sought to take his deposition in the Will County Case (but never actually deposed him).

127.    The Iaderosa Defendants' failure to seek such unfavorable and potentially dispositive testimony regarding Webb and Lawson only makes sense if the testimony was contingent on paying Yassine over $100,000 to fabricate it.

128.    The Iaderosa Defendants' failure to depose Yassine is also understandable in light of the fact that Dill's identity was not revealed until after Yassine exposed the criminal conspiracy and produced documents identifying Dill as the attorney who visited him in prison, a fact the Iaderosa Lawyers and Iaderosa Defendants spent considerable effort to keep a secret through false discovery answers in the Will County and Kankakee Cases, and a multitude of motions in the J&J Case, all of which were designed to prevent Webb from learning Dill's identity.

129.    Next, regarding his immigration status, Yassine was ordered to be deported to Lebanon upon the completion of his prison sentence in 2021, a fact the Iaderosa Lawyers and Iaderosa Defendants took advantage of in attempting to bribe him with a free immigration lawyer.

130.    Yassine's scheduled deportation also provided a false sense of security to the Iaderosa Lawyers and Iaderosa Defendants: if their bribery and witness tampering efforts proved unsuccessful, the primary witness to said crimes would be sent to a country plagued by political unrest and regional war, and Yassine would also be prohibited from returning to the US. More simply, the chance the Iaderosa Lawyers and Iaderosa Defendants would get caught for witness

tampering and bribery was significantly diminished by the fact Yassine was in federal prison and set to be immediately deported to Lebanon upon his release.

131.    To the surprise of the Iaderosa Lawyers and Iaderosa Defendants, Yassine was not, in fact, deported, and appeared in person at his July 27, 2021 deposition in Travis County, Texas.

132.    Yassine testified about the Prison Visit at his deposition in the Kankakee Case.  *See* Yassine's July 27, 2021 Deposition Transcript ("Yassine Dep").  Yassine was actually expecting his attorney Tony Brasel, not Dill, to be visiting him in prison ("Yassine Dep at 25); and testified that that Dill said the following: I'm here to solve all your problems (*id.* at 27); Dill was going to get Yassine a tax attorney to get rid of his tax liens and recoup some of his money frozen by the government (*id.*); Dill was going to get him an immigration lawyer because she knew he was going to get deported (*id.* at 29); Dill was going to get him a new litigation lawyer so he can fire Mr. Brasel (*id.*); Dill wanted Yassine to work with AIM's counsel, Schumann, and a new lawyer they were going to retain for him so they could control the Kankakee Case and dictate how it would move forward (*id.*); Dill wanted Yassine to sign an affidavit she brought into the prison stating that Webb and Lawson were lying, cheating, and colluding, and that there were no bets between Webb and the Iaderosa Defendants (*id.* at 30 – 31); and that Dill could get Yassine out of the SHU (solitary confinement) because she had good ties with the warden (*id.* at 32).[18]

133.    After Yassine indicated he would not sign an affidavit, Dill became enraged and slammed her notebook so hard that a guard came in to see if Dill was ok because he thought Yassine may have done something. Yassine Dep at 34 – 35.  Then she told Yassine: "[Webb] has

---

[18] Had Yassine signed the affidavit containing false statements about Webb and Lawson, Defendants could have used it to try to defeat Lawson's claims against them and erase a $25,000,000 liability since the Loss Recovery Act prohibits the loser of the bet from conspiring with a third party to bring suit on the loser's behalf for treble damages. *See Tabor*, 103 Ill. App. at 334 – 35.  Ironically, that is ***exactly*** what the Iaderosa Defendants attempted to do with the Assignment Agreement, discussed *infra*.

already fucked you. He's already fucked all your girlfriends. He's taken all your money, and you're going to get deported. You're going to get nothing and Mr. Iaderosa is here to help you. You're really going to turn this down?" *Id.* at 35. After Dill's outburst, Yassine knocked on the door and asked the guard to escort him back, and Dill told him if he changed his mind to give her a call. *Id.* at 36 – 37. After the visit to the prison, Dill repeatedly contacted Manal, asked for Yassine's cooperation, and stated they were willing to pay Yassine and help him if he would sign documents attesting to personal knowledge "that [Yassine] didn't know any facts about." *Id.* at 43.

134. While Yassine refused to sign the affidavit containing false statements about Webb and Lawson, he continued to negotiate with Dill and the Iaderosa Lawyers, but claimed he was only "creating a paper trail," suggesting he had no intention of executing the agreement. *See* Yassine Dep at 49. The document they were negotiating was the Assignment Agreement (a version of which is attached as **Exhibit M**).

135. However, based on documents produced by Dill after Yassine's deposition, it appears Yassine was actively participating with the Iaderosa Lawyers and Iaderosa Defendants in the conspiracy to violate Judge Albrecht's 12/21/17 order and the clear prohibitions of the LRA.

136. Yassine even hired another lawyer, Nhan Nguyen, Esq. ("Nguyen"), to negotiate the Assignment Agreement with the Iaderosa Lawyers and Iaderosa Defendants.

137. Yassine failed to disclose that he had hired Nguyen in his deposition and testified (perhaps falsely) that he negotiated the Assignment Agreement directly with Cohen and Schumann.

138. AIM, to date, has feigned ignorance of the Prison Visit and Assignment Agreement in response to Webb's discovery requests despite the fact that AIM's co-counsel, Dill, drafted and negotiated the Assignment Agreement, and AIM paid Dill for her (il)legal services.

139.    The Assignment Agreement required Yassine to assign any judgment obtained in the Kankakee Case to Iaderosa, which was tantamount to using Yassine as a pass-through entity so the Iaderosa Defendants could recover three times their own losses in direct violation of the LRA.  *See* Exhibit M; *see also Tabor*, 103 Ill. App. at  334 – 35 (noting, "in a suit brought to recover treble the amount of the losses, that the defendant should be allowed to prove, if he can, that while the suit is being prosecuted in the name of a third party it is really and truly the suit of the loser, and that he and the plaintiff have conspired together for the purpose of mulcting the defendant into the heavy penalty provided by the statute.").

140.    In exchange, Iaderosa agreed to pay Yassine $150,000, and agreed to hire and pay for tax, immigration and litigation lawyers on his behalf.  *See* Exhibit M.

141.    Dill left Manal another voicemail on April 2, 2019, regarding the Assignment Agreement in which Dill stated "I'm going to be sending over a somewhat revised agreement. Um, we're kind of meeting some of Mike's demands, but not all.  Uh, and, forgive kind of the formal tone that the email will have but this will be our final offer. Um, my client does not want to negotiate anymore, uh, I think like us he's worn down from this, um, and so he's said this is his final offer, uh, no other terms, everything."

142.    Again, there have never been any claims or even potential claims between Yassine and the Iaderosa Defendants, so the demands by Yassine and the offers from the Iaderosa Defendants could not have related to the settlement of any claim.

143.    Instead, the demands and offers related to the fraudulent scheme in which the Iaderosa Defendants stood ready to pay Yassine $150,000, as well as pay for three different lawyers, in exchange for false testimony that the Iaderosa Lawyers and Iaderosa Defendants intended to use to defeat Lawson's LRA claim in Will County Case.

144.    The Assignment Agreement also required, among other things, that Yassine "will consult with Iaderosa's counsel in the same or similar way that parties would pursuant to a joint defense or other similar litigation strategy agreement, including the agreement not to disclose the facts or circumstances or existence of this agreement without prior written consent of Iaderosa. Yassine also agreed not to "take any action in the Kankakee or other litigation that would be harmful, adverse to, or inconsistent with Iaderosa's interests." *See* Exhibit M.

145.    A significant aspect of the Assignment Agreement is the requirement "not to disclose the facts or circumstances or existence of this agreement without prior written consent of Iaderosa." *See* Exhibit M.

146.    Had Yassine signed the Assignment Agreement, this obligation would have prevented him from truthfully answering discovery in this matter.  For example, in his Interrogatories to Yassine in the Kankakee Case, Webb asked "[d]escribe in detail the circumstances surrounding an incident occurring in October 2018 during which one or more individuals allegedly visited you in Big Spring Correction Center to discuss the gambling transactions at issue in this lawsuit."

147.    A truthful answer to this question would reveal the circumstances regarding the Assignment Agreement and, absent Iaderosa's written permission, Yassine would be faced with the choice of lying in discovery or breaching the Assignment Agreement and losing $150,000, his immigration lawyer, his tax lawyer and his new litigation lawyer given that was the consideration for Yassine's obligations, which includes not disclosing the circumstances related to the Assignment Agreement.

148.    At its core, the Assignment Agreement reflected a bribe of cash and free lawyers from the Iaderosa Lawyers and Iaderosa Defendants to Yassine to violate an explicit prohibition of the LRA to create a financial windfall for the Iaderosa Lawyers and Iaderosa Defendants.

149.    The Assignment Agreement was also a clear violation of Judge Albrecht's December 2017 order entered in the Kankakee Case that prohibited the Iaderosa Lawyers and Iaderosa Defendants from controlling the litigation.  *See* Exhibit C.

150.    In fact, at a hearing on Webb's motions for sanctions in the Kankakee Case,[19] Judge Adrienne Albrecht announced in open court that she was referring Dill to the Illinois ARDC (Attorney Registration and Disciplinary Commission) and appropriate criminal authorities for her role in the witness tampering scheme.

151.    Not surprisingly, when Iaderosa was asked in deposition about Dill, the Prison Visit, the attempted bribery, the witness tampering affidavit, and the witness tampering Assignment Agreement, he invoked his Fifth Amendment right against self-incrimination in response to all such questions, which may only be asserted if "the answer one would give if one did answer it (and answer it truthfully) must have some tendency to subject the person being asked the question to criminal liability.'"  *See Ruiz-Cortez*, 931 F. 3d at 603.

152.    Last, after the negotiation of Assignment Agreement fell apart, Dill made another attempt at bribery and witness tampering by contacting Yassine's brother, Hadid Yassine ("Hadid"), in Lebanon and offering him $100,000.00.  Dill told Hadid that she would fly to Lebanon and meet him in person.  Dill stated that Hadid would have to sign a document to get the

---

[19] Two days before the evidentiary hearing on Webb's motions for sanctions in the Kankakee Case related to the Prison Visit, the Iaderosa Defendants filed a motion to voluntarily dismiss themselves as intervenors, which the court granted. Thus, the Iaderosa Defendants avoided a hearing and determination on the merits of Webb's sanctions motions for witness tampering and bribery, but Judge Albrecht nevertheless referred Dill to the ARDC and criminal authorities given the egregious nature of the Prison Visit and witness tampering scheme.

money, but she did not tell him anything about the document he would be signing and stated she would discuss it with him in person. She also told Hadid that she would assist with his immigration case and help him get him back to the United States where his wife and children reside. Dill also told Hadid that Webb and Yassine were bad people. Despite the promise of significant money and the potential to reunite with his family, Hadid declined Dill's offer because he "thought something didn't feel right about it."

### G. The J&J Case Provided the First Pieces of Evidence Proving the Crimes Committed by the Iaderosa Lawyers and Iaderosa Defendants, as well as Their Efforts to Cover It Up

153.    On or about June 15, 2020, J&J sued Iaderosa and AIM (and others) in the United States District Court, Northern District of Illinois, and asserted claims related to AIM's sale of counterfeit, defective, and bacterially contaminated surgical devices that were placed in patients' bodies during surgery.

154.    Due to the overwhelming evidence of counterfeiting and the public interest involved, the federal court approved the extraordinary remedy of an *ex parte* seizure ("Seizure Order"), which included a raid by federal and local authorities[20] of AIM's physical products, records, computers, and devices, including employees' personal devices and computers. *See* Seizure Order [DE#31 in the J&J Case[21]] attached as **Exhibit N**.

155.    In ordering the *ex parte* seizure, the federal court made damning and highly consequential findings: "(1) "[AIM and Iaderosa], or persons acting in concert with them, ***would likely destroy***, move, hide, or otherwise make inaccessible to the Court the matters that are subject to the proposed seizure order if Ethicon is required to proceed on notice;" (2) AIM fraudulently

---

[20] The June 2020 raid was the ***second raid*** of AIM by federal authorities. AIM was also raided in March 2019 related to an FDA investigation.
[21] All citations to "DE#" in this Complaint correspond with docket entry numbers in the J&J Case.

responded to a federal subpoena issued by J&J by knowingly and intentionally omitting large numbers of documents that were responsive to the subpoena; and (3) AIM asked its co-conspirator to delete discoverable evidence and electronic records. *See* Exhibit N at 10, 16, 21 (emphasis added).

156.    Iaderosa was conspicuously absent on the day of the raid and seizure per his counsel's instruction and, thus, his phone was not initially seized.

157.    Iaderosa eventually produced his cell phone to the court-appointed records custodian, UnitedLex, Inc., ("UnitedLex"), who discovered that Iaderosa had intentionally and selectively deleted 2,194 text messages with at least 129 different participants.

158.    Additionally, Iaderosa deleted at least 108 text messages ***after*** the Seizure Order was entered.  While U.S. Marshals were seizing AIM's computers and his employees' devices, Iaderosa seized on an opportunity to destroy evidence, cover up his crimes and thwart the J&J Case.   The 2,194 deleted text messages are not recoverable, and the substance of those communications can never be known.

159.    AIM's and Iaderosa's illegal online casino and failure to pay Webb his winnings were cited throughout the J&J Case as evidence of their criminal enterprise.  Other criminal activity included Iaderosa using AIM employee Justin Agresti to purchase his cocaine, and committing tax fraud by paying bonuses to shell companies instead of to the employees themselves.   *See* Exhibit F at 117 – 31.

160.    Most notably, the seizure in the J&J Case resulted in a trove of documents relevant to the crimes committed by the Iaderosa Defendants in the Kankakee Case and Will County Case.

161.    For example, Webb learned of relevant emails obtained by J&J that were exchanged between Iaderosa/AIM and their private investigator Simon related to the arson of Webb's vehicle.

162.     In an email dated April 9, 2018 sent from his AIM email address,[22] Iaderosa asked Simon, "do you have a listing of vehicles [Lawson] owns." *See* Exhibit D.  On April 23, 2018, Simon replied and attached a report of two vehicles owned by Lawson (*id.*), one of which was a red 2017 Land Rover that was fire-bombed on June 2, 2018.

163.     The foregoing emails were the first time Webb obtained evidence linking AIM and Iaderosa to the fire-bombing of Webb's vehicle.

164.     Based on the emails between AIM and Simon that were discovered in the J&J Case, Webb subpoenaed AIM's investigator Simon and, in November 2021, obtained over 1,400 pages of documents that unquestionably demonstrated Dill was the lawyer who visited Yassine in prison. Emails obtained also demonstrated the Iaderosa Lawyers were communicating with Dill approximately one week after the Prison Visit.

165.     While Webb initially assumed the Prison Visit was a rogue operation conducted by AIM, Iaderosa, and Dill without the knowledge or involvement of their counsel of record, included in the Simon production was an email chain from the Iaderosa Defendants' counsel, Cohen, to Dill and Schumann transmitting a summons for discovery filed by Yassine seeking documents related to AIM.  The date of the original email from Cohen appears to have been deleted, but the email was forwarded by Dill to Iaderosa on October 9, 2018, eight (8) days after she tampered with Yassine in the Texas prison. *See* October 9, 2018 email chain attached **Exhibit O**.

166.     At the time the J&J Case was filed in June 2020, Webb had almost no information regarding the Prison Visit, had no evidence directly linking AIM and Iaderosa to the arson of Webb's vehicle, had no direct evidence linking AIM and Iaderosa to the various instances of witness intimidation set forth *supra,* did not know the identity of the lawyer who visited Yassine

---

[22] AIM's d/b/a is eSutures.com, which is also the domain for their company email addresses: @esutures.com

in prison, did not know of the existence of the Assignment Agreement, and did not know of the involvement of the Iaderosa Lawyers in the Prison Visit and other crimes.

167.    Unsurprisingly, AIM, Iaderosa and their lawyers spent considerable effort in the J&J Case to cover up evidence of their crimes and ensure information regarding Dill, the arson of Webb's vehicle, witness intimidation, and illegal gambling were not made publicly available for Webb to use in the Will County Case or Kankakee Case.

168.    For example, AIM and Iaderosa filed a motion to exclude documents improperly seized [DE# 98], filed a brief opposing confirmation of the Seizure Order [DE #172], filed a motion to suppress evidence that was not directly related to the counterfeit and contaminated surgical products at issue [DE #s 201 & 202], and even filed a counterclaim [DE #246] related to the scope of the Seizure Order, all of which were specifically designed to cover up the crimes committed by the Iaderosa Lawyers and Iaderosa Defendants in the Will County and Kankakee Cases, and to prevent evidence of said crimes from being made available to Webb.

169.    For example, in AIM's and Iaderosa's motion to suppress [DE #201], they sought to suppress:

    a.  Exhibit 181 – the March 5, 2018 email in which AIM and Iaderosa requested information from Simon regarding tax liens on Webb and Lawson;

    b.  Exhibit 182 – April 25, 2018 email from AIM to Lakeside Bank directing payment to the Law Office of Sara Dill;

    c.  Exhibit 183 – April 26, 2018 Invoice of Law Offices of Sara Elizabeth Dill[23];

    d.  Exhibit 207 – Lawson's vehicle registration and payment record from AIM to Simon for his work in locating Lawson's vehicles;

    e.  Exhibit 208 – the April 9 – April 23, 2018 email chain in which AIM and Iaderosa requested information from Simon regarding vehicles owned Webb and Lawson; and

---

[23] Exhibits 182 and 183 were under seal during the pendency of the J&J Case but were later unsealed, which Webb's counsel first discovered in late-February 2023.

34

      f.   Thirty-five (35) other Exhibits, many of which were filed under seal and unavailable to Webb.

170.    In their memorandum of law in support of motion to suppress [DE#202], AIM and Iaderosa complained that "without any factual relevance to any matter at issue in this case, [J&J] ha[s] included … assertions that Mr. Iaderosa and an unrelated private investigator are guilty of witness intimidation," a fact that would later turn out to be true.

171.    In their reply to their motion to suppress [DE# 236], AIM and Iaderosa asserted that the "Lanham Act does not permit the seizure of documents relating to alleged drug use, workplace parties, ***unfounded civil gambling allegations, law firm invoices***, or the alleged improper acquisition of non-counterfeit goods…"

172.    The court in the J&J Case entered an order denying the motion to suppress [DE# 260] and found the issues of illegal gambling and law firm invoices were discoverable:

> Defendants' complaint about the scope of the seizure order and the types of items seized focuses on evidence of "alleged drug use, workplace parties, ***unfounded civil gambling allegations, law firm invoices***, or the alleged improper acquisition of non-counterfeit goods." [236, at 5.] As the Court noted during the preliminary injunction hearing, Plaintiffs' focus on some of these issues takes the parties and the Court far afield from the core allegations and issues in dispute. With that said, ***some of these issues may bear on legitimate lines of inquiry***.

(Emphasis added).

173.    AIM's and Iaderosa's complaints of "law firm invoices" being improperly seized would prove to be consequential as Webb later learned, in February 2023, that the invoices were from Dill.

174.    The single Dill invoice obtained demonstrated she was co-counsel with Cohen and Schumann in the Will County Case, the Kankakee Case and the Rock Island Case from the day after summons were issued in the Will County Case in April 2017.

175.    The Dill invoice also demonstrated that the Iaderosa Lawyers were an integral part of the conspiracy to commit bribery and witness tampering via the Prison Visit. The Prison Visit would have been virtually impossible without the involvement of the Iaderosa Lawyers.

176.    Again, Webb did not even know Dill's name or identity at the time of the J&J Case and did not learn of it until over a year later, at Yassine's deposition in July 2021, and did not obtain documentary evidence linking AIM, Iaderosa, Dill and the QPWB Firm to the Prison Visit until it obtained documents from Simon in November 2021.

177.    There still likely remains a wealth of relevant evidence seized in the J&J Case that still remains under seal.

178.    Given AIM and Iaderosa ordered the court-appointed records custodian, UnitedLex, to destroy all electronic data seized as a part of the settlement with J&J (in direct violation of the Will County Court's Preservation Order, discussed in more detail, *infra*), this Court should consider unsealing the sealed evidence in the J&J Case.

## H. The Iaderosa Defendants Destroyed All Evidence Seized in the J&J Case in Direct Violation of the Will County Court's Preservation Order

179.    Shortly after he learned of the J&J Case and Seizure Order, Webb filed a motion in the Will County Case requiring the preservation of the electronic documents and data to ensure the seized materials were not destroyed by AIM and Iaderosa.

180.    The Will County Court granted the motion on October 29, 2020, and required the Iaderosa Defendants "to *preserve any and all document and/or communications that were seized pursuant to the ex parte seizure order*…. Defendants are also ordered to notify counsel for plaintiffs within 7 days of their receipt of any document and/or communications that are returned to them from that case." *See* "Preservation Order" attached as **Exhibit P** (emphasis added).

181.    In February 2021, AIM and Iaderosa settled the J&J Case and entered into a Consent Judgment that required J&J, as well as the records custodian, UnitedLex, to destroy all the evidence seized pursuant to the Seizure Order. *See* Consent Judgement (DE #370).

182.    Due to the procedure established by the Seizure Order for dissemination of documents to AIM for privilege review, and then production of non-privileged documents to J&J, UnitedLex was the only entity that retained a pristine copy of every document and piece of electronic data seized. UnitedLex confirmed in a declaration in the Will County Case that it did, in fact, destroy all electronic evidence it seized pursuant to the Consent Judgment.

183.    AIM has all but admitted it did not preserve the electronic data given it has made repeated disingenuous arguments in the Will County Case that the Preservation Order only required the preservation of electronic "devices," not the electronic data seized by UnitedLex, despite the plain language of the Preservation Order requiring the Iaderosa Defendants to "preserve any and all document and/or communications that were seized pursuant to the ex parte seizure order." *See* Exhibit P.  There is no mention of any "device" is the Preservation Order. *Id.*

184.    AIM's failure to preserve the electronic data per the Preservation Order, coupled with the Consent Judgment negotiated by AIM that required UnitedLex to destroy all electronic data it seized, demonstrates the great lengths AIM undertook to deprive Webb of crucial evidence that would tend to prove the crimes committed by the Iaderosa Lawyers and Iaderosa Defendants, and is wholly consistent with the findings made by this Court in the J&J Case that (1) "[AIM and Iaderosa], or persons acting in concert with them, ***would likely destroy***, move, hide, or otherwise make inaccessible to the Court the matters that are subject to the proposed seizure…." *See* Exhibit N at 10 (emphasis added).

I. **Webb and Lawson Filed Sanctions Motions Related to the Prison Visit and Other Crimes Committed by the Iaderosa Defendants, and Propounded Discovery**

185. In March 2021, Webb and Lawson filed two motions for sanctions in the Will County Case, and two almost identical motions for sanctions in the Kankakee Case (collectively the "Sanctions Motions") related to the crimes committed by the Iaderosa Lawyers and Iaderosa Defendants as outlined in sections E and F, *supra*.

186. Webb and Lawson propounded an interrogatory in the Kankakee Case to the Iaderosa Defendants regarding the Prison Visit. All Iaderosa Defendants, save for AIM, invoked the Fifth Amendment in response. AIM answered the interrogatory on or about July 15, 2021:

> 2. Please identify the attorney that visited Hussein Ali Yassine at Big Spring Correctional Center, Big Spring, Texas on or about October 1, 2018.
>
> **ANSWER:** AIM has no knowledge of an attorney that visited Hussein Ali Yassine at Big Spring Correctional Center, Big Spring, Texas on or about October 1, 2018.

187. AIM served a similar response to a similar interrogatory in the Will County Case denying knowledge of the Prison Visit, as well as any documents that relate to Yassine:

> 18. Identify any documents of which you are aware and that relate to Hussein Ali Yassine.
>
> **OBJECTION**: AIM objects to Interrogatory No. 18 as vague, irrelevant to the subject matter involved in the pending action, including the claims or defenses of any party, and in that it is not reasonably calculated to lead to the discovery of admissible evidence. Without waiving any objections, AIM answers as follows:
>
> **ANSWER**: None.

19.    Identify all persons who have visited Big Spring Correctional Center in Big Spring, Texas to speak to Hussein Ali Yassine at your direction or request since the inception of this lawsuit.

**OBJECTION**: AIM objects to Interrogatory No. 19 as vague, irrelevant to the subject matter involved in the pending action, including the claims or defenses of any party, and in that it is not reasonably calculated to lead to the discovery of admissible evidence. Without waiving any objections, AIM answers as follows:

**ANSWER**: None.

188.    The foregoing answers by AIM, which were signed by its counsel, proved to be categorically false.

189.    Although it was not known to Webb at the time AIM served its answer to the Prison Visit interrogatory (Webb did not even know Dill's name or identity at that time), evidence obtained thereafter demonstrated that:

    a.  Iaderosa used his AIM email address to correspond with Dill regarding her September 2018 meeting with Manal, the purpose of which was to arrange the Prison Visit with Yassine;

    b.  Iaderosa used his AIM email address to correspond with his Chicago investigator, Simon, and requested that Simon run a dossier on Manal prior to Dill's visit;

    c.  AIM paid Simon's invoices;

    d.  Iaderosa received an email from Dill, at his AIM email address, on October 9, 2018, one week after the Prison Visit, regarding a suit for discovery filed by Yassine seeking information related to AIM;

    e.  AIM's CFO, Anne Tuzik, testified at an evidentiary hearing on September 7, 2022 that Dill was working for AIM when Tuzik started at AIM in 2017, that Dill worked for AIM through mid-2019, and that AIM payed Dill's invoices.

    f.  The Iaderosa Lawyers not only had knowledge, but actually hired Luther to take the first overt act in arranging the Prison Visit, and had been working as co-counsel with Dill from the day after Webb filed the Will County Case in April 2017.

190.    Give the above, there is no plausible way AIM could truthfully assert that it had no knowledge of the Prison Visit.

191.    In March 2023, Webb obtained the J&J Privilege Logs, which demonstrated that Dill was intimately involved in all aspects of the Will County and Kankakee Cases and served as co-counsel for AIM with Cohen and Schumann.

192.    Prior to obtaining J&J Privilege Logs, Webb filed a brief in the Will County Case and raised the possibility that AIM might have been attempting to hide Dill's invoices in the J&J Case in an effort to conceal her identity and connection to AIM's counsel of record, but could not say for certain since the invoices were under seal:

> **"[i]t would be very telling if AIM was attempting to conceal law firm invoices of Sara Elizabeth Dill** when they filed their Motion to Suppress in August 2020, **especially considering Plaintiffs did not know Ms. Dill's identity at that time**, and did not learn of it until approximately eleven (11) months later.  However, the exhibits to the Motion to Suppress appear to remained sealed in the J&J Case, although this Court can surely order AIM to produce the exhibits related to law firm invoices." See Plaintiffs' Reply to Motion for Clarification (emphasis added).

193.    Webb's premonition proved true.

194.    After searching the federal docket further, Webb's counsel discovered a recently unsealed invoice from Dill, as well as an unsealed email from AIM's CFO Ann Tuzik to Lakeside Bank requesting a wire to pay. Dill's invoice. See April 26, 2018 Invoice of Law Offices of Sara Elizabeth Dill attached as **Exhibit Q**, and Ann. Tuzik's April 25, 2018 Email attached as **Exhibit R.**

195.    This single-page invoice revealed more information about Dill and her role as AIM's co-counsel than any discovery answer provided by AIM in the almost eight (8) years the Will County case has been pending.  For example:

    a.    Ms. Dill refers to emails and telephone calls from and with "co-counsel," demonstrating Dill viewed herself as co-counsel with Cohen and Schumann;

    b.    Dill was preparing memos for investigators two months before Webb's vehicle was firebombed, and around the same time Iaderosa requested his investigator locate

information regarding Webb's and Lawson's vehicles. At least one investigator, Mark Murnan, is tied to the arson of Webb's vehicle;

c. Dill was reviewing a "RMR [Richard M. Rendina] dossier" two months before Mr. Rendina received intimidating and extortionate communications from the Iaderosa Defendants;

d. Dill was reviewing and editing discovery answers, reviewing and editing motions, performing legal research, drafting memos, and regularly communicating with AIM's counsel via email and phone;

e. In matter of four weeks, Dill's billing entries indicate over **20 emails** and at least **6 phone calls** "with co-counsel;"

f. Dill billed approximately $10,000 in one month at a discounted hourly rate; and

g. Dill gave an additional discount and AIM paid her $8,812.50 on or about April 25, 2018.

*See* Exhibits Q & R.

196. Accordingly, there is no circumstance under which AIM could plausibly claim it did not have knowledge of the attorney who visited Yassine in prison, ***especially*** since AIM's counsel of record was directly involved in the Prison Visit conspiracy from day one.

197. AIM also deceptively answered the following interrogatory regarding private investigators and intentionally omitted Luther, the primary investigator used to facilitate the Prison Visit, and instead disclosed an investigator AIM did not use.

> 1. Please identify all private investigators you hired between January 1, 2017 through January 1, 2019, whose principal place of business is located in Texas. For the avoidance of doubt, this request includes all private investigators that may have been hired by a third party on your behalf or at your direction.
>
> **ANSWER:** Interrogatory No. 1 requests information that is protected from disclosure by attorney client and work product privileges. A privilege log has been provided.

198. The privilege log provided by AIM disclosed Mark Paschall (misspelled "Paschell"), and the only documents logged were an engagement letter and memo cancelling the

engagement. Thus, AIM disclosed an investigator it did not use and intentionally concealed the identity of its actual investigator:

**INTERVENORS' PRIVILEGE LOG**

**Production Volume: AIM_00001 AIM_00004**

| Bates No. | Author / Sender | Recipient (s) | Privilege | Description |
|---|---|---|---|---|
| AIM_00001 to AIM 00002 | Anthony L. Schumann (Attorney[1]) | Mark Paschell (Investigator[2]) | Work Product and/or Attorney-Client | Engagement Letter |
| AIM_00003 to AIM_00004 | Mark Paschell (Investigator) | Anthony L. Schumann (Attorney) | Work Product and/or Attorney-Client | Investigator internal memo cancelling engagement |
| | | | | |
| | | | | |
| | | | | |

[1] All persons identified as "Attorney" herein were engaged by one or more Intervenors to provide professional legal services to one or more Intervenors regarding this or related litigation.

[2] All persons identified as "Investigator" were engaged by counsel for Intervenors as investigative agents regarding this or related litigation.

199.     However, after Webb learned that the Iaderosa Lawyers engaged Luther to help facilitate the Prison Visit, Webb sought to depose Luther in Texas.

200.     Shockingly, Steven A. Wood of the QPWB Firm's Dallas office, filed a Motion to Quash Webb's deposition subpoena and openly admitted in the motion that the QPWB firm "retained Luther Investigations, LLC to perform background investigations of certain parties and/or witnesses related to the Will County Lawsuit. *Id.* at 2. In other words, Luther Investigations, LLC was retained to assist the undersigned law firm to defend against Petitioner's claims in the Will County Lawsuit." *See* Motion to Quash attached as **Exhibit S.** Mr. Wood even attached the affidavit of Schumann, in which he admitted he hired Luther to assist in the Will County Case. *Id.*

201.     Despite AIM's counsel's contrived attempt to limit Luther's involvement to only the Will County Case, Luther's primary role was to contact Yassine's relatives to set up a meeting with Dill to arrange the Prison Visit with Yassine, the plaintiff in the Kankakee Case. The Prison Visit also resulted in the Assignment Agreement, which relates directly and specifically to the

Kankakee Case. Thus, the assertions by Wood and Schumann assertions that Luther only worked on the Will County Case are directly contradicted by all available evidence.

202. AIM nevertheless failed to disclose Luther in the Will County Case and provided an almost identical privilege log as the Kankakee Case, the only difference being AIM did not name Paschall; it only referred to him as an "investigator." However, the bates numbers and document descriptions identically match the Kankakee privilege log document descriptions.

**ADVANCED INVENTORY MANAGEMENT, INC.'S PRIVILEGE LOG**

Production Volume: AIM_00001 AIM_00004

| Bates No. | Privilege | Description |
|---|---|---|
| AIM_00001 to AIM 00002 | Work Product | Engagement Letter between Attorney[1] and Investigator |
| AIM_00003 to AIM 00004 | Work Product | Investigator[2] internal memo cancelling engagement |

---

[1] "Attorney" was engaged by Advanced Inventory Management, Inc. ("AIM") to provide professional legal services to AIM regarding this or related litigation.
[2] "Investigator" was engaged by Attorney as investigative agents regarding this or related litigation.

1

203. The admission by the QPWB firm that it hired Luther conclusively demonstrates that AIM and its counsel intentionally omitted Luther from its interrogatory answers in the Will County and Kankakee Cases in an effort to cover up AIM's involvement in and knowledge of the Prison Visit, and *especially* the involvement the Iaderosa Lawyers.

204. Additionally, AIM hired attorney Kyle Pozan, Esq. ("Pozan"), to answer discovery on behalf of AIM since AIM's principal, Iaderosa, was asserting his Fifth Amendment rights.

205. However, in another act of crafty deception, Cohen and Schumann worked with Pozan, who had relatively no background in this case or relationship to AIM, to create search terms to locate responsive documents. The search terms were intentionally designed to avoid detecting responsive documents.

206. As one example, Webb discovered an email from AIM's investigator (Exhibit O), which was sent from Cohen to Schumann and Dill that attached a lawsuit by Yassine and contained

Yassine's name in the body of the email. Dill forwarded that email to AIM on October 9, 2018, one week after the Prison Visit, which AIM then forwarded to its investigator Simon. The email was the very first document that evidenced a communication between Dill and AIM's counsel of record.

207.    AIM predictably failed to produce the October 9, 2018, email in response to Webb's production request and, in January 2022, Judge Rickmon ordered AIM to determine why the email had not been produced since Cohen represented that "Yassine" was one of their search terms.

208.    When Pozan attempted to locate the missing October 9, 2018 email, he had the relevant email in his possession given it had already been produced by Webb. Pozan therefore knew *exactly* how to find the email using a Boolean search. He could have searched by date, by Dill's email address, or he could have searched for unique words used in the emails like "Manal," or "Arabic."

209.    Yet despite having the benefit of this information, Pozan (likely in concert with Cohen and Schumann) formulated search terms *to require* the phrases "Advanced Inventory Management" OR "AIM," even though it was abundantly clear neither of those phrases appeared anywhere in the subject email.

210.    Thus, the search was designed to avoid finding the subject email, as well as any other emails from Dill that may be in AIM's possession.[24]

211.    In fact, AIM has conveniently never once used "Sara Elizabeth Dill," "Sara Dill," "Dill," "Anethum Global" (Dill's purported law firm), or Dill's email addresses in any document searches, despite AIM and its counsel being fully aware of Dill, their co-counsel (not) of record.

---

[24] At a hearing on February 18, 2022, AIM's counsel stated he looked into the matter of the missing October 9, 2018 emails and concluded it was ***deleted by AIM*** pursuant to a purported document retention policy.

212.    In addition to spurious search terms specifically formulated to avoid detecting responsive documents, AIM's counsel also carefully controlled what documents and information Pozan was permitted to review, and Cohen and Schumann specifically prevented Pozan from seeing any documents ***they*** deemed privileged.

213.    There was no valid justification for Cohen and Schumann to withhold privileged documents from Pozan given he is an attorney who was hired to represent AIM with respect to discovery.

214.    In September 2022, Judge Rickmon in the Will County Case began to catch on to the duplicitous tactics employed by the Iaderosa Lawyers regarding AIM's discovery answers and purported lack of documents and information:

> THE COURT: All right. In the response here it talks about Mr. Pozan reviewed the non-privileged and response results.
> MR. COHEN: Yes, your Honor.
> THE COURT: Where are the privileged documents?
> MR. COHEN: The privilege documents are --
> THE COURT: Isn't it the client's privilege to assert?
> MR. COHEN: It is AIM's privilege to assert, your Honor, yes.
> THE COURT: So you didn't give the privilege documents to the client who has the right to assert the privilege.
> MR. COHEN: AIM has the privileged documents, yes, your Honor. But we are talking about --
> THE COURT: Says Mr. Pozan reviewed the non privileged responsive results.
> MR. COHEN: That's correct, your Honor.
> **THE COURT: Did Mr. Pozan review the privileged responsive results?**
> **MR. COHEN: No, your Honor.**
> **THE COURT: Why not? He is the client. He represents the client, doesn't he? Isn't that what you have been telling me for almost a year, that he was hired to come in and take care of AIM's response to these requests?**
> **MR. COHEN: The privilege review would have been on Mr. Schumann at his level. Mr. Pozan was hired as an attorney for a limited purpose of assisting AIM in answering discovery.**
> **THE COURT: Uh-huh. And I have been told that he did a diligent search and that AIM shouldn't be blamed because he looked at everything and now he finds out there is stuff he hasn't even seen.**
> **MR. COHEN: Certainly, your Honor, privileged documents Mr. Pozan --**

> **THE COURT: We are kind of in a difficult area because you represent two masters, don't you? Mr. Iaderosa and AIM. So who are you representing now, Mr. Iaderosa or AIM?**
>
> MR. COHEN: We represent, your Honor -- Mr. Schumann and I represent Mr. Sylvester, we represent Mr. Iaderosa, we represent AIM, we represent Silex and Trident.
>
> THE COURT: Okay. You can answer the question, if you remember it. Who did you work with to put this together?
>
> THE WITNESS: I'm sorry, your Honor, would you please repeat that?
>
> THE COURT: The question was who did you work with to put this answer together?
>
> THE WITNESS: I worked with AIM's attorneys Michael Cohen and Anthony Schumann.

*See* Transcript of September 7, 2022 Hearing in the Will County Case at 65 – 67 (emphasis added)

> THE COURT: Well, there will be some in camera filings. I mean, one of the concerns I have now is Mr. Pozan, who seemed to be a very credible witness, he wasn't really acting in the role of a traditional attorney vis-a-vis. He was putting together requests for you gentlemen to search databases, but I did, **but you also kept from him privileged documents. I'm going to look at them.**
>
> MR. COHEN: And that's fair, your Honor.
>
> THE COURT: You are going to do a Bates stamped privilege log, produce the records in camera, to the extent they are attorney-client. The good thing is I am not going to be trying this case.

*Id.* at 189 (emphasis added).

215. Not surprisingly, AIM never produced a privilege log with as ordered on September 7, 2022 (and as required by Illinois Rule 201(n)). Instead, the issue turned in a morass of competing orders, which were submitted and re-submitted to Judge Rickmon, none of which were ever entered.

216. This was a consistent pattern in the Will County Case – Judge Rickmon routinely made oral rulings and written orders that he did not enforce against the Iaderosa Lawyers and Iaderosa Defendants.

217.    While Judge Rickmon at times took the Iaderosa Defendants' criminal conduct seriously, at other times he seemed annoyed and "worn out" by the complicated nature of the issues.

218.    As one example, at a hearing on March 16, 2023, Judge Rickmon, perhaps in jest, stated "I am tempted to just take everything under advisement and hold it until I retire and dump it on someone else." *See* Transcript of March 16, 2023 Hearing at 35.  At that same hearing Judge Rickmon stated "We have a whole bevy of motions. I looked at none of them because I am tired of this. … You know, I have a rule that I read everything. I even read Murphy's stuff, but I just – you gentlemen have worn me out on this case. I am fatigued…." *Id.* at 3.  The motions at issue at the March 16, 2023 hearing included motions related to production of Dill's cellphone records, a subpoena to Dill for documents related to the Prison Visit and other criminal conduct, and Dill's failure to provide a privilege log despite the requirements of Illinois Rule 201(n).

219.    Judge Rickmon eventually ordered the production of all emails between AIM's counsel of record and Dill for an 18-month period as well as a privilege log, but AIM has never produced a privilege log for the documents it withheld from Pozan, which could contain far more documents than just emails with Dill.

220.    Moreover, concerning the missing October 9, 2018 email, Cohen represented to the court in February 2022 that the email is "not in AIM's possession, custody or control and this could not have been produced. My understanding is, and we're looking to this the further, that they were deleted pursuant to a document protection [retention] policy and we can provide further information about."

221.    On September 7, 2022, seven (7) months later, Pozan, as well as AIM's CFO, Anne Tuzik, testified about the so-called email retention policy that AIM relied on to justify deleting a highly probative email:

> Pozan: "it was AIM's informal policy to allow their employees to use their company e-mails for personal matters so long as it did not interfere with the normal operation of the company's e-mail systems."

*See* Transcript of September 7, 2022 Hearing in the Will County Case at 130.

> Q: Anne [Tuzik], are AIM employees permitted to use AIM e-mail for personal business?
> A Yes.
> Q Are AIM employees required to retain their e-mails used for personal business?
> A No.

*Id.* at 175 – 76.

222.    The court correctly noted, ***"[i]t is somewhat convenient that the e-mail policy affords a very convenient explanation of why they are deleted***. …Mr. Iaderosa said that's our policy, delete it, okay? That's convenient." *See* Transcript of September 7, 2022 Hearing in the Will County Case at 128 (emphasis added).

223.    Moreover, the purported email policy is also a disingenuous ploy by Iaderosa to cast his AIM emails as being "personal" to shield AIM from its obvious involvement in the Prison Visit, and to justify AIM's failure to answer discovery truthfully or produce documents responsive to Webb's discovery request.

224.    Additionally, Webb even served QPWB with a subpoena for documents related to the Prison Visit on May 2, 2022, but QPWB never responded to such subpoena despite confirmation from Schumann that it had been served.

225.    Webb could fill far more pages detailing the myriad discovery violations and abuses by AIM and its counsel, but the foregoing is illustrative of the overall deceptive nature of AIM's

discovery responses specifically intended to avoid implicating AIM, and especially the Iaderosa Lawyers, in the Prison Visit, and to avoid truthfully responding to discovery.

**J.    After a Year of AIM Denying Knowledge of Dill and Prison Visit, Dill Comes Out of the Woodwork and Files a Self-Serving Declaration in the Will County Case**

226.    On or about January 27, 2022, Webb and Lawson obtained Dill's cell phone records via a subpoena to T-Mobile.[25]

227.    On February 10, 2022, two-weeks after Webb obtained Dill's phone records, and approximately one year after Webb filed his Sanctions Motions related to Dill's illegal Prison Visit, Dill, through her counsel Stephanie Stewart, Esq. ("Stewart"), came out of the woodwork and made a surprise appearance in the Will County Case and a filed motion to quash the T-Mobile subpoena.

228.    It is telling that Dill waited until Webb obtained her phone records to appear, especially since her phone records were a crucial and unimpeachable piece of evidence that linked Dill and the Iaderosa Defendants' counsel of record.

229.    Two months later, on April 11, 2022, Dill filed what Judge Rickmon characterized as a "self-serving" declaration in which she attempted to whitewash and sanitize the Prison Visit as being ethical, legal and legitimate. *See* April 11, 2022 "Declaration" of Sara Elizabeth Dill attached hereto as **Exhibit T.**

230.    If the Prison Visit was truly above-board, as Dill portends in her Declaration, it is notable that Dill did not file a declaration or otherwise attempt to defend herself or her clients against Webb's sanctions motion in the Kankakee Case related to the Prison Visit.

---

[25] Webb's counsel inadvertently failed to serve notice of the subpoena on the Iaderosa Defendants, and the issue was thoroughly litigated in the Will County Case, which resulted in Judge Rickmon denying the motions to quash filed by Dill and the Iaderosa Defendants and ordering the production of Dill's phone records to chambers for *in-camera* review.

231.    Instead, the Iaderosa Defendants summarily dismissed themselves from the Kankakee Case on the eve of the evidentiary hearing to determine Webb's sanctions motion for bribery and witness tampering.  After being intervenors for four (4) years, the Iaderosa Defendants quickly exited the Kankakee Case to avoid a finding that they and the Iaderosa Lawyers committed witness tampering.  Judge Albrecht nevertheless referred Dill to the ARDC based on the allegations in the sanctions motion.

232.    Additionally, Dill's Declaration puts her and the Iaderosa Defendants in diametrically opposed positions regarding the criminality of the Prison Visit: Dill maintains the visit was above-board and legal while her clients necessarily believe truthful answers to questions regarding the Prison Visit would "have some tendency to subject [them] … to criminal liability." *See Ruiz-Cortez*, 931 F. 3d at 603.

233.    Coincidentally, Dill has since absconded to London where she only maintains a Post Office Box address, so Webb has been unable to serve her with a deposition subpoena in the Will County Case, and Dill's counsel refused to accept service of her behalf.[26]

234.    Yassine's cousin Manal, who met with Dill to arrange the Prison Visit and is the least interested witness in the case[27], refuted almost all the substantive assertions in Dill's Declaration.

235.    For example, in paragraph 4 of her Declaration, Dill averred, under oath, that Manal provided the following factual background information: Webb is also known as "Dick Smith;" Yassine and Webb "were business partners;" Webb stole over $1,000,000.00 from Yassine; Webb

---

[26] Dill's counsel refused to accept service of a deposition subpoena despite filing an appearance in the Will County Case, filing the Declaration and various motions, and appearing at multiple hearings to argue on behalf of Dill, not to mention Dill was co-counsel for the Iaderosa Defendants for years. Dill herself even appeared remotely and was ready to testify at an evidentiary hearing in September 2022 regarding the Prison Visit, but she has apparently changed her position, does not want to testify, and has taken steps to conceal her whereabouts.

[27] Manal testified "I don't like him [Webb]," "we just didn't connect," "he wasn't nice [and was] condescending to me." *See* Manal Depo at 64 – 65.

"forged letters to gain access to property;" and that Yassine informed Manal "that the litigation was going to be a vehicle for Webb to pay back the money he had stolen from Yassine." *See* Exhibit T ¶4.

236. However, Manal directly contradicted the assertions in paragraph 4 of Dill's Declaration, which Dill represented were assertions made by Manal.

237. Manal testified that she had no knowledge as to who Dick Smith is, did not know about the $1,000,000.00, had no knowledge whether Webb and Yassine were business partners, had no knowledge of Webb allegedly forging letters to gain access to property, and did not know anything about the litigation being a vehicle for Webb to pay back Yassine; Manal had no knowledge of any repayment arrangement. *See* May 18, 2023 Deposition Transcript of Manal Broeckelmann ("Manal Depo") at 202 – 03, 231.

238. Without detailing each and every factual allegation in Dill's Declaration, below is a summary of Dill's averments in her Declaration and Manal's testimony discrediting them:

| **Dill Declaration (*See* Exhibit T)** | **Manal Testimony (*See* Manal Depo)** |
| --- | --- |
| **Paragraph 6:** Manal explained the conspiracy between Yassine and Webb; indicated that Yassine wanted out of his arrangement with Webb because he did not trust Webb to pay; indicated that Yassine wanted to hire a new lawyer and end the civil litigation; indicated that Webb promised Yassine an immigration attorney but failed to do so. | **p. 204:** "everything in paragraph 6 is incorrect." <br> **p. 222:** Prior to meeting Yassine in prison, Dill said she was offering to help Yassine, the help being to "provide him with attorneys, immigration attorney." <br> **p. 232**: "the first discussions of providing lawyers for [Yassine] … came from Sara Dill." |
| **Paragraph 7:** Manal reached out to me and indicated Yassine was interested in a settlement with Iaderosa; Manal said Yassine did not want Webb to know and was afraid of the repercussions; Manal stated that Yassine did not view Brasel as his attorney and wanted to fire him and have Manal hire a new lawyer, settle the litigation and act as a witness for Iaderosa. | **p. 199:** Manal had no knowledge that Dill "wanted to make a settlement offer to [Yassine] related to his lawsuit against Webb." <br> **p. 223:** "Sara [Dill] was the first one to mention that she wanted to go meet [Yassine]." Yassine did not "request that meeting before" Dill visited him in prison. <br> **p. 206:** "I don't remember" saying that Yassine "did not want Webb to know … |

| | because he was afraid of repercussions," adding "I would have remembered something like that."<br>**p. 205**: "I don't remember saying that Yassine did not view Brasel as his lawyer…."<br>"I don't remember" stating "that Yassine was ready to fire Brasel and help [Manal] hire." |
|---|---|
| **Paragraph 8:** Manal indicated that Yassine requested that I visit him in prison to discuss a settlement. | **p. 223:** Manal answered "No," to the question "Did you suggest that Sara Dill go to meet [Yassine] in Big Spring [prison]?"<br>**p. 224:** Manal answered "No" to the question "Did you tell Sara Dill – were you the first person to bring up the possibility that Dill would meet [Yassine] in prison?" |
| **Paragraph 9:** Yassine "could have terminated the [prison] visit at any time, but he did not." | **p. 213:** Manal answered "Yes" to the question "Did [Yassine] tell you that Sara Dill slammed her notebook on the floor so hard that a guard came into the room they were meeting in?" |
| **Paragraph 10:** Manal "requested that I provide a new power of attorney to Yassine …to permit [Manal] to assist with more of Yassine's legal troubles." | **p. 206:** "I did not request to provide a new power of attorney to Yassine. Sara [Dill] requested that they provide a new power of attorney."<br>**p. 238:** "Sara [Dill] was supposed to draft that [power of attorney] document…[b]ecause she told me that I needed a specific power of attorney. And the one that I have was not good enough for what her and [Yassine] were doing." |
| **Paragraph 12:** Manal "indicated that Yassine wanted to provide evidence about Webb and the conspiracy…." | **p. 207:** "I didn't know what was going on with them, so I couldn't have said" that "Yassine wanted to provide evidence about Webb and the conspiracy between Webb and the lawyers." |
| **Paragraph 13:** Manal "requested that part of the funds be sent directly to the lawyers that she would independently retain to represent Yassine…." | **p. 234:** Manal answered "No" to the question "Does that [quotation of Dill's Declaration beginning three lines down in paragraph 13] accurately describe the information that you gave to Sara Dill?"<br>Manal answered "No" to the question "Did you tell Sara Dill that you would independently retain lawyers to help Yassine with respect to immigration." |

| | |
|---|---|
| **Paragraph 14:** After the March 2019 Assignment Agreement was negotiated, "Yassine's representatives indicated that he was demanding significantly more money and different terms to enter the [A]ssignment [A]greement." | **p. 229 – 30:** "After that deadline passed [to reach an agreement on the Assignment Agreement, Dill said] "we missed a deadline so the negotiations was going to have to change. … [Yassine] was offered an amount and that amount was going to have to be negotiated because the deadline was missed. That was my understanding." |

239.    A significant admission in Dill's Declaration is that, prior to visiting Yassine in prison, it was her understanding the Yassine wanted "to settle the litigation ***and act as a witness for*" the Iaderosa Defendants**. *See* Exhibit T ¶7 (emphasis added).

240.    First, there was no litigation "to settle" between Yassine and the Iaderosa Defendants as neither asserted any claims against the other,[28] and no potential claims between them existed; and they did not know of each other's existence until the Will County and Kankakee Cases were filed.

241.    Next, given the absence of any claims to settle, Dill went into the prison with the purported understanding that Yassine wanted to act as a witness for the Iaderosa Defendants. Accordingly, Dill's offer of money and free lawyers to Yassine is directly connected to, and was consideration for, Yassine's testimony as a witness, which is further evidence of the witness tampering scheme.

242.    However, if Yassine truly had damning information regarding Webb and Lawson that could have ended the Will County Case, the Iaderosa Defendants could have simply deposed Yassine and for free instead of offering to pay him $150,000 and pay for three different lawyers.

---

[28] The only purported "settlement" was an offer to pay Yassine money and provide him free lawyers in exchange for illegal assignment of Yassine's judgment in the Kankakee Case to the Iaderosa Defendants, which directly contravenes the LRA, which itself can be considered attempted bribery.

243. But the Iaderosa Defendants never sought to depose Yassine in the Will County Case until long after the witness tampering scheme had been revealed and Dill had been identified, yet they never actually took his deposition.

244. Additionally, now having the benefit of Dill's Declaration, the representations by the Iaderosa Defendants' counsel in the Kankakee Case regarding the Prison Visit are far more egregious. For example, when Webb filed his Sanctions Motions and propounded discovery a year prior, AIM not only feigned ignorance of the Prison Visit, but its counsel repeatedly accused Webb in filings and in open court of forging Yassine's discovery answers in the Kankakee Case, suggesting the Prison Visit was all a fiction drummed-up by Webb.

245. For example, in response to Webb's Sanctions Motion in the Will County Case, the Iaderosa Defendants incorrectly assumed Yassine had been deported to Lebanon, accused Webb of forging Yassine's signature on his discovery responses regarding the Prison Visit, and generally derided the allegations of a female attorney visiting Yassine in prison:

    a. Webb's Motion … is based solely upon responses to requests to admit and interrogatories provided, but only to Webb, *from Lebanon*. Not only are these discovery responses incompetent and inadmissible to support Webb's allegations for multiple reasons, ***Yassine's purported signature on these documents is clearly forged***. *See* Defendants' Response to Webb's Second Motion for Sanctions at 2 (emphasis in the original).

    b. ***If Yassine's forged discovery responses are to be believed, an unidentified attorney representing the Defendants visited Yassine in prison without his attorney, Mr. Brasel's, consent*** with a "settlement offer. . . relating to [his] lawsuit against John Webb. … Defendants have no need to defend against Yassine's request for a judgment, since such request is solely against Webb.[29] *Id.* at 7 (emphasis added).

    c. Even if this Court does not flatly reject Webb's presentation of ***obviously forged Discovery Responses*** to this Court, this Court nonetheless cannot consider the Discovery Responses. *Id.* at 8 (emphasis added).

---

[29] Coincidentally, despite the Iaderosa Defendants' suggestion that had no reason to make a settlement offer since the Kankakee Case was between Yassine and Webb, Dill's self-serving declaration specifically states the purpose of the Prison Visit was to make Yassine a "settlement offer," yet there were no claims to settle with the Iaderosa Defendants.

    d.   At best, [Yassine's discovery answers] purport to establish that a "female attorney" visited Yassine in prison and "indicated that she represented" the Defendants. Motion at Ex. A, 1.; Motion at Ex. B, ¶¶ 1 – 3. ***Webb does not provide any information regarding the identity of the person who allegedly visited Yassine, much less establish that such person was acting on behalf of any of the Defendants***. To the extent the Discovery Responses are genuine and otherwise admissible (which they are not), the statements of the unidentified "female attorney" lack a proper foundation and are classic hearsay, making them inadmissible. *Id.* at 9 (emphasis added).

    e.   At worst, Webb has presented this Court with ***fabricated documents, purportedly from a deported felon*** who he has clearly colluded with to file this case, in an attempt to obtain default judgments. *Id.* (Emphasis added).

246.    AIM's counsel of record also represented to the court in the Kankakee Case that the "sole support" for Webb's allegations regarding the Prison Visit are forged discovery answers.

MR. COHEN: It appears that ***Mr. Yassine's interrogatory responses and request to admit responses were forged***; that the -- the signature on them were forged.

MR. COHEN: Your Honor, just to be very clear, what we're looking to go into is the – ***the interrogatory and request to admit responses. That is the sole support for those sanctions motions***, so I just want to make sure that we are permitted to go into those, because that is the, again, crux of the support for that sanctions motion.

*See* Transcript of July 22, 2021 Hearing in the Kankakee Case at 7, 44 – 45 (emphasis added).

247.    Cohen's misrepresentation regarding the "sole support" for the Prison Visit was made by AIM's counsel with the ***full knowledge*** that:

    a.   Dill was the "unidentified female attorney" who visited Yassine Big Spring Correctional Center on October 1, 2018;

    b.   Dill had been co-counsel with Cohen and Schumann from April 2017 through at least mid-2019, and was fully involved in all aspects of the Will County Case and Kankakee Case;

    c.   Schumann, Cohen and the QPWB firm hired Luther to contact Yassine's relatives in an effort to arrange Dill's Prison Visit with Yassine;

d. Schumann and Cohen were, at best, fully aware that Dill intended to visit Yassine in prison on behalf of the Iaderosa Defendants and, at worst, were fully involved in arranging the Prison Visit;

e. Dill drafted and negotiated the Assignment Agreement with Yassine. The Assignment Agreement was a product of the Prison Visit in which the Iaderosa Defendants agreed to accept an illegal assignment of Yassine's judgment;

f. AIM served false interrogatory answers denying knowledge of the Prison Visit and the identity of the female attorney who visited Yassine;

g. AIM had served a false interrogatory answer and disclosed an investigator it did not use, and intentionally omitted and concealed the identity of Luther, the investigator hired by Schumann and Cohen who did significant work to arrange the Prison Visit.

248. None of the foregoing information was known to Webb at the time he filed his Sanctions Motions, including Dill's identity, due to AIM's misleading, deceptive and fraudulent discovery answers.

249. Webb also did not have any knowledge that the Iaderosa Lawyers were involved in the conspiracy to commit bribery and witness tampering. Indeed, Yassine's counsel made the following statement at a July 22, 2021 hearing in the Kankakee Case:

> MR. BRASEL: This was an attorney [later revealed to be Dill] that we believe was from Washington, D.C. I'm going to give them the benefit of the doubt that they didn't do it, and I firmly believe that. *I just can't believe that Mr. Cohen and Mr. Schumann* -- I know Mr. Schumann better, but I've got to know Mr. Cohen. They seem like reputable people. *I can't believe that they would have done that*. Can I believe that their client hired somebody to go do that? I can believe that, but I don't think I hold those guys accountable for that.

*See* Transcript of July 22, 2021 Hearing in the Kankakee Case at 13.

250. Webb's counsel shared Mr. Brasel's sentiment as they had no reason to believe, in July 2021, that QPWB, Cohen, and/or Schumann were involved in the Prison Visit.

251. But Mr. Brasel's and Webb's counsel's belief that Cohen and Schumann were not involved in the Prison Visit eventually proved to be false.

252.    Instead of being truthful regarding Dill and the Prison Visit, the Iaderosa Lawyers went to great lengths in the Will County and Kankakee Cases to deny knowledge of and involvement in the Prison Visit, to deflect with baseless forgery allegations, and to suggest the Prison Visit was a fabricated ploy concocted by Webb and Yassine so Webb could seek a default judgment sanction against the Iaderosa Defendants in the Will County Case.

253.    It was only after Webb obtained Dill's phone records, which provided a direct link between Dill and AIM's counsel of record, that the Iaderosa Lawyers and AIM changed their strategy of denying the Prison Visit and knowledge of Dill.  But instead of AIM admitting it themselves, AIM and its counsel coordinated with Dill to file the "self-serving" Declaration in attempt to whitewash the Prison Visit after AIM and its counsel were caught perjuring themselves about it.

254.    AIM has yet to affirmatively admit knowledge of Dill and the Prison Visit. AIM amended its interrogatory answer the Will County Case denying knowledge the Prison Visit to simply cite Dill's Declaration.  AIM carefully avoided any admission of direct knowledge regarding the Prison Visit.

255.    But after diligently working for over (3) years, from the summer of 2020 through 2023, to obtain evidence from third parties, filings in the J&J Case including recently unsealed exhibits, the J&J Privilege Logs, and via several orders by Judge Rickmon in the Will County Case,[30] Webb learned that the Iaderosa Lawyers has been intimately involved in the conspiracy to commit bribery and witness tampering from the first overt act – hiring Luther in mid-2018 to contact Manal to arrange the Prison Visit.

---

[30] In February 2023, Judge Rickmon ordered AIM's counsel to produce all correspondence with Dill from January 1, 2018 through June 30, 2019 to chambers for *in-camera* review. ***AIM's counsel produced over 4,000 pages of correspondence with Dill*** despite maintaining it had no knowledge of Dill or the Prison Visit.

256.     The involvement of the Iaderosa Lawyers in the Prison Visit, and their subsequent cover-up via false discovery answers and intentionally misleading assertions in filings and in open court, is what makes this case truly indefensible, especially considering the crimes occurred in the midst of pending litigation in an effort to affect the outcomes of the Will County and Kankakee Cases.

257.     Had AIM and Iaderosa secretly hired Dill to bribe and tamper with Yassine without disclosing it to their counsel of record, it may be excusable for counsel to deny knowledge of the Prison Visit on behalf of AIM since they would only be able to answer with information that was provided to them.

258.     But such was clearly not the case. AIM's counsel of record had direct, first-hand knowledge of and involvement in the Prison Visit from the moment the scheme was set in motion in 2018.

### K. The Iaderosa Lawyers and Iaderosa Defendants Engaged in Crimes and Cover-Ups to Obtain a Windfall Recovery under the LRA.

259.     The Iaderosa Lawyers and Iaderosa Defendants engaged in a myriad of crimes and made intentional misrepresentations in the Will County and Kankakee Cases in an effort to cover up those crimes.

260.     Since Yassine provided discovery answers and testified in deposition regarding the facts of the Prison Visit, the coverup was primarily intended to avoid implicating the Iaderosa Lawyers in the Prison Visit.

261.     The criminal conspiracy between the Iaderosa Lawyers and Iaderosa Defendants can be summarized as follows:

   a.  bribe Yassine with cash and free lawyers in exchange for an assignment any judgment obtained against Webb (over $24,000,000) in the Kankakee Case;

    b.  suborn perjury and offer Yassine valuable consideration, including a six-figure monetary payment, for false testimony to defeat Lawson's approximately $24,000,000 LRA claim against the Iaderosa Defendants in the Will County Case;

    c.  use Davis' LRA claim against the Iaderosa Defendants in the Rock Island Case (which is virtually identical to Lawson's LRA claim) to recover three times the amount of Webb's losses to the Iaderosa Defendants;

    d.  if Yassine's claim in the Kankakee Case was not promising or became problematic, defeat Yassine's claim in the Kankakee Case based on the false statement that it was Rendina, not Webb, who gambled with the Iaderosa Defendants; and

    e.  use Davis' LRA claims against Rendina in the Rock Island Case to recover three times the amount the Iaderosa Defendants losses to Webb (which is virtually identical to Yassine's LRA claim), for a total of over $48,000,000.00 to the proprietors of the illegal online casinos and who sparked this entire dispute by refusing to pay Webb over $500,000 in gambling winnings.

262. The Iaderosa Lawyers and Iaderosa Defendants intended to use the affidavit of false statements Dill presented to Yassine during the Prison Visit, as well as the Assignment Agreement, to accomplish the purpose of foregoing conspiracy.

263. Specifically, the false statements in the affidavit that Dill presented to Yassine were that Webb did not place any wagers with the Iaderosa Defendants, that it was Rendina who placed all the wagers, and that Webb colluded with Lawson to bring an LRA claim on his behalf.

264. Any of the foregoing false statements, if assumed to be true, would be sufficient to defeat Lawson's LRA claim in the Will County Case.

265. The false statements related to Rendina being the only individual who gambled with the Iaderosa Defendants, if assumed to be true, would be sufficient to defeat Yassine's LRA claim in the Kankakee Case since Yassine was suing for the Iaderosa Defendants' losses to Webb. If Webb never wagered with the Iaderosa Defendants, there would be no losses for which Yassine could sue.

266. Shortly after the Prison Visit in which Dill presented the false affidavit, the Iaderosa Lawyers and Iaderosa Defendants were also negotiating the Assignment Agreement and the assignment of Yassine's potential $24,000,000 judgment, which would set up two alternative options to collect treble damages for the Iaderosa Defendants' losses – either in the Kankakee Case against Webb or in the Rock Island Case against Rendina.

267. Stated more simply, the affidavit of false statements and the Assignment Agreement were hedges, to use a gambling term, that put the Iaderosa Lawyers and Iaderosa Defendants in a win-win situation.

268. For example, had Yassine executed the Assignment Agreement and signed the false affidavit, the Iaderosa Defendants would have had the option to pursue a judgment against Webb in the Kankakee Case or, if issue arose in the Kankakee Case or with the Kankakee Judge, or if Webb declared bankruptcy or become insolvent, they could have had Yassine's claim dismissed based on the false affidavit and pursued the same claims against Rendina in the Rock Island Case.

269. If they were successful in defeating both Lawson's and Yassine's LRA claims based on the false affidavit, the only remaining LRA claims would be in the Rock Island Case where the Iaderosa Defendants' proxy and stand-in, Davis, had claims covering *all* the gambling losses by Webb and the Iaderosa Defendants, totaling approximately $48,000,000.00 in LRA claims.

270. As explained at the outset of this Complaint, the LRA permits "any person" to sue the winner of a bet for three times the amount of the wager if the loser does not file suit within 6 months, provided the third party's suit is not truly the suit of the loser of the wager. *See Tabor*, 103 Ill. App. at 334 – 35.

271.    The total wagers between Webb and the Iaderosa Defendants between 2013 – 2016 totaled over $16,000,000.00.  Thus, pursuant to the treble damages provision of the LRA, there exists over $48,000,000.00 in potential damages to recover.

272.    In essence, the Iaderosa Defendants sought to recover three times their own losses via an assignment of Yassine's LRA claim against Webb or, alternatively, through Davis' LRA claims against Rendina, as well as three times their own winnings by virtue of Davis' LRA claim against the Iaderosa Defendants, for a total of approximately $48,000,000.00, both of which are direct violations of the LRA.

273.    The Iaderosa Lawyers and Iaderosa Defendants also conspired to threaten and intimidate Webb, Webb's daughter, Webb's counsel's ex-wife, Lawson, Rendina, Rendina Companies' and Rendina's charity.

**L. The Intentional Misrepresentations Regarding the Prison Visit and Assignment Agreement by AIM and its Counsel Deprived Webb of Dispositive Defenses in the Kankakee Case**

274.    As thoroughly documented herein, AIM provided intentionally false discovery answers in the Kankakee Case regarding the Prison Visit and the resulting Assignment Agreement, which AIM and its counsel knew to be false since they were directly involved in the Prison Visit and Assignment Agreement.

275.    Specifically, the Prison Visit constituted attempted bribery and witness tampering, which is one of the gravest violations and justifies the ultimate sanction of dismissal.  *See Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 774 (7th Cir. 2016) (noting that "witness tampering is among the most grave abuses of the judicial process, and as such it warrants a substantial sanction.").

276.    Moreover, the Assignment Agreement is a direct violation of the LRA, as well as Judge Albrecht's December 2017 Order prohibiting the Iaderosa Lawyers and Iaderosa Defendants from attempting the control the case.

277.    Had AIM provided truthful answers in discovery regarding the Prison Visit and Yassine negotiating the Assignment Agreement with the Iaderosa Defendants, Webb could have used the Assignment Agreement and any related evidence to defeat Yassine's LRA claim and avoid a judgment in excess of $24,000,000.00.  *See e.g. Tabor,* 103 Ill. App. 330, 334 – 35.

278.    While Yassine disclosed the details of the Prison Visit in his July 2021 deposition and attempted to justify the Assignment Agreement as merely "creating a paper trial" (suggesting he was never serious about signing it), evidenced produced by Dill approximately one year later demonstrated that Yassine was fully and actively participating in the negotiations, and even hired a new lawyer to represent him on the Assignment Agreement, which Yassine failed to disclose in deposition or in discovery.

279.    Webb believed Yassine's testimony in the Kankakee Case because it was the first evidence of the Prison Visit and Webb had no reason to distrust Yassine, especially since AIM provided false discovery answers denying the Prison Visit.

280.    However, Yassine's testimony was intended to deceive Webb and shield himself from a dismissal of his LRA claim.

281.    In fact, the evidence suggests the primary reason Yassine did not execute the Assignment Agreement is because the Iaderosa Defendants used an artificial 5:00 p.m. deadline to change the terms and give Yassine less money, which is not surprising given the Iaderosa Defendants' failure to pay Webb legitimate gambling winnings.

282.    Yassine may still be be working with the Iaderosa Laywers and Iaderosa Defendants and may have very well made another agreement with them.  Yassine's counsel has refused to respond Webb's counsel's multiple requests for deposition dates in the Will County Case.

283.    Moreover, AIM's false discovery answers in the Kankakee and Will County Cases, which were signed by its counsel, have cost Webb significant attorney's fees and costs litigating the Sanctions Motions and related discovery issues.

## COUNT I
### Civil RICO – 18 U.S.C. §1964(c)

284.    Webb re-alleges and incorporates paragraphs 1 – 283 as if fully set forth herein.

285.    This Count is brought pursuant to 18 U.S.C. §1964(c) against QPWB, Cohen, Schumann, Dill, AIM, Iaderosa, and Sylvester (hereinafter "RICO Defendants").

286.    The RICO Defendants are an associated-in-fact enterprise with a common purpose to manipulate the court system in the Will County Case, Kankakee Case and Rock Island Case and subvert the law into a windfall for the Iaderosa Defendants through multiple and related crimes and frauds, as well as multiple acts of witness intimidation, bribery and witness tampering, an incidence of arson, and extortion, and the subsequent coverup of the foregoing in the Will County Case and Kankakee Case, as set forth in detail herein.

287.    The relationships among the RICO Defendants and the longevity of the relationships, lasting well over four (4) years, sufficient to pursue the enterprise's purpose are thoroughly alleged herein.

288.    The RICO Defendants agreed to, and did conduct and participate in, the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Webb.

289.    Pursuant to and in furtherance of their fraudulent scheme, the RICO Defendants knowingly and willfully committed multiple related acts of racketeering activity, as follows:

a.   Mail fraud (18 U.S.C. §1341) related to the intimidating documents mailed by or at the direction of the Iaderosa Defendants to Carmel Huseman on or about November 17, 2017 (*see* Exhibit I);

b.   Mail fraud (18 U.S.C. §1341) related to the intimidating documents mailed by or at the direction of the Iaderosa Defendants to the principal of Webb's then 5-year-old daughter's school in June 2018 (*see* Exhibit H);

c.   Mail fraud (18 U.S.C. §1341) related to the intimidating documents mailed by or at the direction of the Iaderosa Defendants to Lawson on or about July 23, 2018 (*see* Exhibit J);

d.   Mail fraud (18 U.S.C. §1341) related to the intimidating documents mailed by or at the direction of the Iaderosa Defendants to the office of Rendina Companies on or about July 23, 2018 (*see* Exhibit K);

e.   Mail fraud (18 U.S.C. §1341) related to the Assignment Agreement, at least one copy/version of which was mailed by Dill to Yassine at Big Spring Correctional Center between January – April, 2019 (*see* Exhibit M);

f.   Wire fraud (18 U.S.C. §1343) related to the electronic communications and transmission of intimidating and extortionate information by or at the direction of the Iaderosa Defendants to Rendina on or about August 16, 2018 via email (*see* Exhibit K);

g.   Wire fraud (18 U.S.C. §1343) related to an interstate telephone call and voicemail left by Dill to Manal on September 21, 2018, in which Dill intentionally misprepresented the status of the Kankakee Case and attempted to arrange the Prison Visit with Yassine;

h.   Bribery of a witness (18 U.S.C. §201) related to the October 1, 2018 Prison Visit by Dill, which occurred at a federal prison;

i.   Wire fraud (18 U.S.C. §1343) related to an interstate telephone call and voicemail left by Dill to Manal on April 2, 2019, in which Dill attempted to convince Yassine to sign the illegal Assignment Agreement;

j.   Arson (Fla. Stat. §806.01) related to the June 1, 2018 arson of Webb's vehicle by or at the direction of the Iaderosa Defendants while it was parked in Webb's driveway;

k. Extortion (Fla. Stat. §836.05) related to the electronic communications and transmission of intimidating and extortionate information by or at the direction of the Iaderosa Defendants to Rendina on or about August 16, 2018 (*see* Exhibit K);

l. Bribery/tampering with a witness (Texas Penal Code §36.05) related to the October 1, 2018 Prison Visit by Dill;

m. Illegal disclosure of Webb's social security number to public domain;

n. Laundering the proceeds of the Iaderosa Defendants' illegal gambling enterprise through Lakeside Bank from 2013 – 2016;

o. Larceny and theft of Webb's gambling winnings in 2016; and

p. Perjury related to the coverup of the Prison Visit by the Iaderosa Lawyers and Iaderosa Defendants, which occurred between 2021 – 2023.

290. The acts of federal mail fraud, wire fraud, and bribery, as well as state law arson, extortion, and bribery/witness tampering set forth above, all being enumerated offenses, constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5) and were all in furtherance of the fraudulent scheme detailed herein.

291. QPWB, Schumann, and Cohen regularly communicated and coordinated with Dill in their joint representation of the Iaderosa Defendants for well over two years (if one is to believe Dill's Declaration that her representation of the Iaderosa Defendants ceased in mid-2019), likely far longer. QPWB, Schumann, and Cohen were in direct email communication (and possibly phone communication) with Dill regarding most, if not all, of the crimes and frauds alleged herein.

292. As one striking example, QPWB, Schumann and Cohen admittedly hired Luther to initiate communications with Manal, which was the first overt act in furtherance of the criminal Prison Visit.

293. Dill built upon the work of QPWB, Schumann, Cohen and Luther and set up an in-person meeting with Manal in September 2018.

294.    Prior to the meeting, AIM and Iaderosa sought the assistance of their investigator Simon to obtain background information on Manal.

295.    As a result of her meeting with Manal, Dill arranged the Prison Visit with Yassine.

296.    Thereafter, QPWB, EM3, Cohen, Schumann, AIM, Iaderosa, and Dill spent considerable effort covering up the Prison Visit through patently false discovery answers, Dill's false Declaration, misrepresentations to the court in the Will County and Kankakee Cases via filings and oral statements, and through arguably legitimate motions in the J&J Case that were nevertheless intended to fraudulently conceal Dill's identity from Webb.

297.    The association-in-fact enterprise affected interstate commerce as hundreds of thousands of dollars (if not more) of attorney's fees have been paid by the Iaderosa Defendants to their counsel of record for work done in Florida, Illinois and Texas, including the hiring of multiple private investigators in multiple states, as well as payments to Dill in Washington D.C.

298.    The association-in-fact enterprise began in the summer of 2018 and lasted at least until Dill filed her Declaration on April 11, 2022, which is directly at odd with Iaderosa's and Sylvester's invocation of their Fifth Amendment right regarding the Prison Visit.

299.    Before April 11, 2022, QPWB, Cohen, Schumann, Dill, AIM, Iaderosa, and Sylvester all coordinated and worked in concert to advance the interests and common purpose of the enterprise.

300.    Each RICO Defendant managed the affairs of the enterprise and played some role on behalf of the enterprise.

301.    Moreover, QPWB, Cohen, Schumann and Dill represented the Iaderosa Defendants at the same time the Iaderosa Defendants committed the various instances of witness intimidation,

arson, bribery/extortion, as well as Dill's witness tampering Prison Visit on behalf of the Iaderosa Defendants, which was set into motion by QPWB, Cohen, and Schumann.

302. Thereafter, QPWB, EM3, Cohen, Schumann, and Dill went to great lengths to cover up the crimes of the enterprise in the Will County Case, the Kankakee Case, and the J&J Case as detailed herein.

303. AIM and Iaderosa also worked in concert with their attorneys to cover up the crimes of the enterprise by, as one example, ordering the destruction of the electronic data seized in the J&J Case, including the only pristine copy of such data in the hands of the records custodian, UnitedLex, which was in direct violation of the Preservation Order entered in the Will County Case.

304. Accordingly, each of the RICO Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

305. The victims of the RICO enterprise include Webb, Lawson, Webb's daughter, Carmel Huseman, Rendina, Rendina Companies, and the Rendina Family Foundation, as well as the general public through AIM's and Iaderosa's medical device counterfeiting operation and illegal gambling operation.

306. As a direct and proximate result of the RICO Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Webb has been injured in his business and property by virtue of the RICO Defendants' interference with Webb's cause of action in the Will County Case, interference with Webb's defense in the Kankakee Case which resulted in a judgment against him in excess of $24,000,000, the loss of the Range Rover that was destroyed by arson, and the

extraordinary attorney's fees Webb spent in the Will County Case and Kankakee Case uncovering and exposing the crimes of the RICO Defendants.

WHEREFORE, Webb requests that this Court enter judgment against the RICO Defendants as for damages in excess of $75,000.00, treble damages, an award of attorney's fees and costs, and any additional relief the Court deems just and proper.

## COUNT II
### Civil RICO – 18 U.S.C. §1964(d)

307.    Webb re-alleges and incorporates paragraphs 1 – 283, and 284 – 306 (Count I) as if fully set forth herein.

308.    This Count is brought pursuant to 18 U.S.C. §1964(d) against the RICO Defendants.

309.    As set forth in Count I above, the RICO Defendants agreed and conspired to violate 18 U.S.C. § 1962 (c). Specifically, the RICO Defendants conspired to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

310.    The RICO Defendants have intentionally conspired and agreed to directly conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The RICO Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described herein.

311.    The conduct alleged constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

312.    As direct and proximate result of the RICO Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Webb has been injured in his business and property in that:

a.    Webb was deprived of a dispositive defense (i.e. an assignment of Yassine's

judgment to the Iaderosa Defendants in violation of the LRA) in the Kankakee Case by overt acts committed in furtherance of the conspiracy, specifically, providing intentionally false discovery answers on behalf of AIM in the Kankakee Case regarding the Prison Visit and private investigators hired by AIM;

b. Webb's ability to prosecute his claim in the Will County Case was interfered with by overt acts committed in furtherance of the conspiracy, specifically, providing intentionally false discovery answers on behalf of AIM in the Will County Case regarding the Prison Visit and private investigators hired by AIM. The Sanctions Motions filed by Webb related to the Prison Visit and instances of witness intimidation resulted in a stay of the merits of the Will County Case for over two (2) years;

c. Theft and conversion of funds belonging to Webb;

d. Webb incurred extraordinary attorney's fees to uncover the crimes, frauds, and coverups in the Will County Case and Kankakee Case.

WHEREFORE, Webb requests that this Court enter judgment against the RICO Defendants as for damages in excess of $75,000.00, treble damages, an award of attorney's fees and costs, and any additional relief the Court deems just and proper.

## COUNT III
### Conspiracy to Intimidate Witness/Parties– 42 U.S.C. §1985(2)

313.    Webb re-alleges and incorporates paragraphs 1 – 283 as if fully set forth herein.

314.    This Count is brought pursuant to 42 U.S.C. §1985(2) against QPWB, Cohen, Schumann, Dill, Iaderosa, Sylvester, and AIM (hereinafter "1985 Defendants").

315.    The 1985 Defendants conspired together to intimidate parties to the Rock Island Case (Webb, Rendina, and Rendina Companies), and a witness (Lawson), while it was pending in the United States District Court, Central District of Illinois, in violation of 42 U.S.C. § 1985(2).

316.    The 1985 Defendants engaged in overt acts in furtherance of the conspiracy to intimidate parties and a witness including, but not limited to mailing threatening and intimidating documents to Rendina and Rendina Companies on or about July 23, 2018; mailing threatening and

intimidating documents to Lawson on or about July 23, 2018; and mailing threatening and intimidating documents to the principal of Webb's daughter's school.

317.    Lawson and Rendina were intimidated by the 1985 Defendants' actions described above.

318.    Specifically, Rendina hired private security for his family after receiving the threatening and intimidating documents.

319.    Moreover, Lawson waited several years to disclose that she received threatening documents out of fear of reprisal.  It was not until after the Sanctions Motions were filed and the other various crimes were brought to light did Lawson feel safe in disclosing that she, too, was intimidated by the threatening documents mailed to her in July 2018.

320.    The 1985 Defendants engaged in this conspiracy to intimidate parties and a witness because of the potential liability the Iaderosa Defendants faced in the Will County Case, and in an effort to intimidate Webb and Lawson from pursuing their claims so that Davis, a friendly party to the Iaderorsa Defendants, could maintain the LRA claim against the Iaderosa Defendants in the Rock Island Case.

321.    Webb was damaged as a result of the 1985 Defendants' conspiracy to violate 42 U.S.C. §1985(2).

WHEREFORE, Webb requests that this Court enter judgment against the 1985 Defendants for damages in excess of $75,000.00, an award of attorney's fees and costs, and any additional relief the Court deems just and proper.

## COUNT IV
### Fraudulent Concealment (Yassine)

322.    Webb re-alleges and incorporates paragraphs 1 – 283 as if fully set forth herein.

323.     Yassine knowingly and intentionally concealed and omitted material facts in his July 2021 deposition in the Kankakee Case when he failed to disclose his involvement in negotiating the Assignment Agreement, and his retention of attorney Nguyen to negotiate the Assignment Agreement on his behalf.

324.     Yassine also made false statements of material fact in his July 2021 deposition when he testified that he negotiated the Assignment Agreement directly with Cohen and Schumann, which contradicts evidence produced by Dill after the Kankakee Case concluded that attorney Nguyen was negotiating the Assignment Agreement Yassine's behalf, and was negotiating it with Dill (although QPWB, EM3, Cohen, and Schumann did have knowledge of the Assignment Agreement and negotiations).

325.     In addition, Yassine testified in his deposition that he negotiated the Assignment Agreement merely to create a "paper trail," suggesting he was never serious about entering into the agreement.

326.     However, Dill produced evidence after the Kankakee Case had concluded that demonstrated Yassine, through his attorney Nguyen, and his cousin Manal, was actively involved in negotiating the Assignment Agreement for approximately four (4) months.

327.     Manal's deposition testimony suggested that the primary reason Yassine did not execute the Assignment Agreement is because Iaderosa wanted to negotiate the cash payment to a lower amount since Yassine missed a 5:00 p.m. deadline.

328.     The concealment and omission of material facts in Yassine's deposition testimony was intended to induce Webb to falsely believe his testimony to be true.

329. Webb could not have discovered the truth through reasonable inquiry and relied upon Yassine's testimony during the Kankakee Case, specifically that he negotiated the Assignment Agreement directly with Cohen and Schumann.

330. Had Webb known Yassine hired a lawyer to negotiate the Assignment Agreement on his behalf, or that he was actively involved in the negotiations and, at all relevant times, intended to make a deal with the Iaderosa Defendants, Webb would have taken different steps in the Kankakee Case had he known the truth at that time.

331. Specifically, the Assignment Agreement contains an assignment of Yassine's judgment in the Kankakee Case to Iaderosa, which is strictly prohibited by the LRA. Had Webb known the truth regarding Yassine's involvement in the Assignment Agreement, he could have used that evidence to defeat Yassine's LRA claim and avoid a judgment in excess of $24,000,000.

332. Yassine intentionally omitted and concealed material facts he was under a duty to disclose to Webb pursuant to the Illinois Supreme Court Rules of discovery.

333. Webb suffered damages in reliance on the fraudulent concealment and omission of material facts in Yassine's deposition testimony including, but not limited to, a judgment in excess of $24,000,000 entered against Webb in the Kankakee Case, as well as significant attorney's fees attempting to uncover the crimes and fraudulent concealment of those crimes committed by Yassine.

334. Webb reserves the right to amend this count to add a claim for punitive damages.

WHEREFORE, Webb requests a judgment for damages in his favor against Yassine in excess of $75,000, plus costs, prejudgment interest, and any additional relief this Honorable Court deems just and proper, including an award of attorney's fees pursuant to the Court's inherent authority due to the egregious nature of the conduct alleged herein.

## COUNT V
### Negligent Concealment (Yassine)

335.    Webb re-alleges and incorporates paragraphs 1 – 283 as if fully set forth herein.

336.    This Count II is being pled in the alternative to Count I, Fraudulent Concealment against Yassine.

337.    Yassine negligently concealed and omitted material facts in his July 2021 deposition in the Kankakee Case when he failed to disclose his involvement in negotiating the Assignment Agreement, and his retention of attorney Nguyen to negotiate the Assignment Agreement on his behalf.

338.    Yassine also negligently made false statements of material fact in his July 2021 deposition when he testified that he negotiated the Assignment Agreement directly with Cohen and Schumann, which contradicts evidence produced by Dill after the Kankakee Case concluded that attorney Nguyen was negotiating the Assignment Agreement Yassine's behalf, and was negotiating it with Dill (although QPWB, EM3, Cohen, and Schumann did have knowledge of the Assignment Agreement and negotiations).

339.    In addition, Yassine testified in his deposition that he negotiated the Assignment Agreement merely to create a "paper trail," suggesting he was never serious about entering into the agreement.

340.    However, Dill produced evidence after the Kankakee Case had concluded that demonstrated Yassine, through his attorney Nguyen, and his cousin Manal, was actively involved in negotiating the Assignment Agreement for approximately four (4) months.

341.    Manal's deposition testimony suggested that the primary reason Yassine did not execute the Assignment Agreement is because Iaderosa wanted to negotiate the cash payment to a lower amount since Yassine missed a 5:00 p.m. deadline.

342.    The negligent concealment and omission of material facts in Yassine's deposition testimony was intended to induce Webb to falsely believe his testimony to be true.

343.    Webb could not have discovered the truth through reasonable inquiry and relied upon Yassine's testimony during the Kankakee Case, specifically that he negotiated the Assignment Agreement directly with Cohen and Schumann.

344.    Had Webb known Yassine hired a lawyer to negotiate the Assignment Agreement on his behalf, or that he was actively involved in the negotiations and, at all relevant times, intended to make a deal with the Iaderosa Defendants, Webb would have taken different steps in the Kankakee Case had he known the truth at that time.

345.    Specifically, the Assignment Agreement contains an assignment of Yassine's judgment in the Kankakee Case to Iaderosa, which is strictly prohibited by the LRA.  Had Webb known the truth regarding Yassine's involvement in the Assignment Agreement, he could have used that evidence to defeat Yassine's LRA claim and avoid a judgment in excess of $24,000,000.

346.    Yassine negligently omitted and concealed material facts he was under a duty to disclose to Webb pursuant to the Illinois Supreme Court Rules of discovery.

347.    Webb suffered damages in reliance on the negligently concealment and omission of material facts in Yassine's deposition testimony including, but not limited to, a judgment in excess of $24,000,000 entered against Webb in the Kankakee Case, as well as significant attorney's fees attempting to uncover the crimes and negligent concealment of those crimes committed by Yassine.

WHEREFORE, Webb requests a judgment for damages in his favor against Yassine in excess of $75,000, plus costs, prejudgment interest, and any additional relief this Honorable Court

deems just and proper, including an award of attorney's fees pursuant to the Court's inherent authority due to the egregious nature of the conduct alleged herein.

**COUNT VI**
**Fraudulent Concealment (AIM & the Iaderosa Lawyers)**

348.   Webb re-alleges and incorporates paragraphs 1 – 283 as if fully set forth herein.

349.   The Iaderosa Lawyers and AIM knowingly and intentionally concealed and omitted material facts in AIM's discovery responses in the Kankakee Case when they asserted that AIM had no knowledge of the October 1, 2018 Prison Visit or the identity of the attorney (Dill) who visited Yassine in prison.

350.   The Iaderosa Lawyers and and AIM also knowingly and intentionally concealed and omitted material facts in AIM's discovery responses in the Kankakee Case regarding private investigators retained by AIM. Specifically, AIM disclosed the name of an investigator it did not use (Mark Paschall) and intentionally omitted the name of their investigator Luther who performed significant work in furtherance of the Prison Visit.

351.   The knowing and intentional concealment and omission of material facts related to AIM's discovery answers in the Kankakee Case were intended to induce Webb to falsely believe the discovery answers to be true.

352.   Webb could not have discovered the truth through reasonable inquiry at the time of the Kankakee Case and relied upon AIM's discovery answers during the Kankakee Case, specifically that AIM did not have knowledge of Dill or the Prison Visit, and that Mark Paschall was the only investigator hired by AIM and Iaderosa.

353.   Had Webb known AIM hired Luther during the Kankakee Case, or that AIM and its counsel was intimately involved in all aspects of the Prison Visit and subsequent Assignment

Agreement, Webb would have taken different steps in the Kankakee Case had he known the truth at that time.

354.     Specifically, the Assignment Agreement contains an assignment of Yassine's judgment in the Kankakee Case to Iaderosa, which is strictly prohibited by the LRA.  Had AIM been truthful regarding the Prison Visit and the Assignment Agreement when it answered discovery requests in the Kankakee Case, Webb could have used that evidence to defeat Yassine's LRA claim and avoid a judgment in excess of $24,000,000.

355.     The Iaderosa Lawyers and and AIM intentionally omitted and concealed material facts they were under a duty to disclose to Webb pursuant to the Illinois Supreme Court Rules of discovery.

356.     Webb suffered damages in reliance on the fraudulent concealment and omission of material facts related to AIM's discovery answers including, but not limited to, a judgment in excess of $24,000,000 entered against Webb in the Kankakee Case, as well as significant attorney's fees attempting to uncover the crimes and fraudulent concealment of those crimes committed by The Iaderosa Lawyers and and AIM.

357.     Webb reserves the right to amend this count to add a claim for punitive damages.

WHEREFORE, Webb requests a judgment for damages in his favor against QPWB, EM3, Cohen, Schumann, Dill and AIM in excess of $75,000, plus costs, prejudgment interest, and any additional relief this Honorable Court deems just and proper, including an award of attorney's fees pursuant to the Court's inherent authority due to the egregious nature of the conduct alleged herein.

<u>**COUNT VII**</u>
**Negligent Concealment (AIM & the Iaderorsa Lawyers)**

358.     Webb re-alleges and incorporates paragraphs 1 – 283 as if fully set forth herein.

359.     This Count III is being pled in the alternative to Count III, Fraudulent Concealment against AIM and the Iaderosa Lawyers.

360.     The Iaderosa Lawyers and and AIM negligently concealed and omitted material facts in AIM's discovery responses in the Kankakee Case when they asserted that AIM had no knowledge of the October 1, 2018 Prison Visit or the identity of the attorney (Dill) who visited Yassine in prison.

361.     The Iaderosa Lawyers and and AIM also negligently concealed and omitted material facts in AIM's discovery responses in the Kankakee Case regarding private investigators retained by AIM. Specifically, AIM disclosed the name of an investigator it did not use (Mark Paschall) and omitted the name of its investigator Luther who performed significant work in furtherance of the Prison Visit.

362.     The concealment and omission of material facts related to AIM's discovery answers in the Kankakee Case were intended to induce Webb to falsely believe the discovery answers to be true.

363.     Webb could not have discovered the truth through reasonable inquiry at the time of the Kankakee Case and relied upon AIM's discovery answers during the Kankakee Case, specifically that AIM did not have knowledge of Dill or the Prison Visit, and that Mark Paschall was the only investigator hired by AIM and Iaderosa.

364.     Had Webb known AIM hired Luther during the Kankakee Case, or that AIM and its counsel was intimately involved in all aspects of the Prison Visit and subsequent Assignment Agreement, Webb would have taken different steps in the Kankakee Case had he known the truth at that time.

365. Specifically, the Assignment Agreement contains an assignment of Yassine's judgment in the Kankakee Case to Iaderosa, which is strictly prohibited by the LRA. Had AIM been truthful regarding the Prison Visit and the Assignment Agreement when it answered discovery requests in the Kankakee Case, Webb could have used that evidence to defeat Yassine's LRA claim and avoid a judgment in excess of $24,000,000.

366. The Iaderosa Lawyers and and AIM negligently omitted and concealed material facts they were under a duty to disclose to Webb pursuant to the Illinois Supreme Court Rules of discovery.

367. Webb suffered damages in reliance on the negligent concealment and omission of material facts related to AIM's discovery answers including, but not limited to, a judgment in excess of $24,000,000 entered against Webb in the Kankakee Case, as well as significant attorney's fees attempting to uncover the crimes and negligent concealment of those crimes committed The Iaderosa Lawyers and and AIM.

WHEREFORE, Webb requests a judgment for damages in his favor against QPWB, EM3, Cohen, Schumann, Dill and AIM in excess of $75,000, plus costs, prejudgment interest, and any additional relief this Honorable Court deems just and proper, including an award of attorney's fees pursuant to the Court's inherent authority due to the egregious nature of the conduct alleged herein.

### COUNT VIII
### Conspiracy to Commit Fraudulent Concealment
### (AIM, Iaderosa, their Counsel & Yassine)

368. Webb re-alleges and incorporates paragraphs 1 – 283, as well as paragraphs 348 – 357 (Count VI for Fraudulent Concealment), as if fully set forth herein.

369. QPWB, EM3, Cohen, Schumann, Wood, Dill, AIM, Iaderosa, and Sylvester, acted in concert for the purpose of accomplishing an unlawful purpose, or a lawful purpose by unlawful

means, by way of Dill's October 1, 2018 visit to Yassine at Big Spring Correctional Center for the purpose of committing bribery and witness tampering, as well as the subsequent intentional concealment of the Prison Visit via AIM's discovery responses in the Kankakee Case, as well as the Will County Case, which includes the intentional concealment of Luther, the private investigator who, on behalf of AIM, committed the first overt act in furtherance of the conspiracy – contacting Manal to arrange a meeting with Dill to set up the Prison Visit with Yassine.

370. Yassine was also involved in the conspiracy by virtue of his negotiation of the Assignment Agreement after the Prison Visit, which was an explicit prohibition under the LRA, as well as his false testimony regarding his negotiation of the Assignment Agreement with Cohen and Schumann, and his intentional concealment of the fact he hired attorney Nguyen to negotiate the Assignment Agreement on his behalf.

371. Myriad overt acts, both fraudulent and criminal, were committed by QPWB, EM3, Cohen, Schumann, Wood, Dill, AIM, Iaderosa, and Sylvester, in furtherance of the conspiracy, such as:

    a. QPWB, Schumann, and Cohen hiring Luther on behalf of their clients, AIM and Iaderosa, to contact Manal to arrange a meeting with Dill to set up the Prison Visit with Yassine;

    b. Dill's September 2018 meeting with Manal to arrange the Prison Visit;

    c. The October 1, 2018 visit by Dill to Yassine at Big Spring Correctional Center;

    d. Dill's drafting and negotiation of the Assignment Agreement with Yassine and his counsel Nguyen;

    e. QPWB, EM3, Cohen, and Schumann serving false discovery answers in the Kankakee Case and the Will County Case regarding the Prison Visit and private investigators;

    f. Cohen making false representations of fact to the Court in the Kankakee Case that the "sole support" for Webb's allegations regarding the Prison Visit was fraudulent

discovery answers forged by Webb. Cohen made this representation with the full knowledge that he, as AIM's counsel, was intimately involved in the Prison Visit;

g.  The concealment by AIM and Iaderosa of Dill's invoices in the J&J Case, which was intended to deprive Webb of information to identify the female attorney who visited Yassine in prison;

h.  AIM's and Iaderosa's intentional destruction of data seized in the J&J Case, which was ordered to be preserved in the Will County Case, as well as the Consent Judgment AIM and Iaderosa negotiated with J&J, which required the third-party records custodian, UnitedLex, to destroy the only pristine copy of AIM's electronic data. The data destroyed contained several probative emails related to the fire-bombing of Lawson's Land Rover, and likely contained additional probative evidence regarding the crimes set forth herein, yet it was forever destroyed by AIM, Iaderosa, and UnitedLex (per AIM's and Iaderosa's Consent Judgment requiring UnitedLex to do so).

372.    Webb suffered damages as a result of the conspiracy amongst QPWB, EM3, Cohen, Schumann, Wood, Dill, AIM, Iaderosa, Sylvester, and Yassine, including, but not limited to, a judgment in excess of $24,000,000 entered against Webb in the Kankakee Case, as well as significant attorney's fees attempting to uncover the crimes and fraudulent concealment of those crimes committed by QPWB, EM3, Cohen, Schumann, Wood, Dill, AIM, Iaderosa, and Sylvester.

373.    Webb reserves the right to amend this count to add a claim for punitive damages.

WHEREFORE, Webb requests a judgment for damages in his favor against QPWB, EM3, Cohen, Schumann, Wood, Dill, AIM, Iaderosa, Sylvester, and Yassine in excess of $75,000, plus costs, prejudgment interest, and any additional relief this Honorable Court deems just and proper, including an award of attorney's fees pursuant to the Court's inherent authority due to the egregious nature of the conduct alleged herein.

## COUNT IX
### Conspiracy to Defraud
### (AIM, Iaderosa, their Counsel & Yassine)

374.    Webb re-alleges and incorporates 1 – 283, as well as paragraphs 348 – 357  (Count VI for Fraudulent Concealment), as if fully set forth herein.

375.     The conspiracy between QPWB, EM3, Cohen, Schumann, Wood, Dill, AIM, Iaderosa, and Sylvester, was as follows: (1) bribe Yassine with cash and free lawyers in exchange for an assignment any judgment obtained against Webb (over $24,000,000) in the Kankakee Case, in direct violation of the LRA; (2) pay Yassine for false testimony to defeat Lawson's approximately $24,000,000 LRA claim against the Iaderosa Defendants in the Will County Case; (3) use Davis' LRA claim against the Iaderosa Defendants in the Rock Island Case (which is virtually identical to Lawson's LRA claim) to recover three times the amount of Webb's losses to the Iaderosa, for a total of approximately $48,000,000.00 to the proprietors of the illegal online casinos.

376.     There was also conspiracy between QPWB, EM3, Cohen, Schumann, Wood, Dill, AIM, Iaderosa, and Sylvester to engage in witness intimidation of Webb's then-5-year-old daughter, Webb's counsel's ex-wife, Lawson, and Rendina via intimidating documents that were mailed to the respective parties in the summer of 2018, as well as the arson of Webb's vehicle on June 2, 2018, all in an effort to intimidate Webb and Lawson into dropping the Will County Case.

377.     The foregoing demonstrates QPWB, EM3, Cohen, Schumann, Wood, Dill, AIM, Iaderosa, and Sylvester, acted in concert for the purpose of accomplishing an unlawful purpose, or a lawful purpose by unlawful means.

378.     Myriad overt acts, both fraudulent and criminal, were committed by QPWB, EM3, Cohen, Schumann, Wood, Dill, AIM, Iaderosa and Sylvester in furtherance of the conspiracy, such as:

   a.   Mailing intimidating documents to the principal of Webb's then-5-year-old-daughter's school;

   b.   Mailing intimidating documents to Webb's counsel's ex-wife;

   c.   Mailing intimidating documents to Lawson;

d. Mailing intimidating documents to Rendina;

e. The arson of Webb's vehicle;

f. QPWB, Schumann, and Cohen hiring Luther on behalf of their clients, AIM and Iaderosa, to contact Manal to arrange a meeting with Dill to set up the Prison Visit with Yassine;

g. Dill's September 2018 meeting with Manal to arrange the Prison Visit;

h. The October 1, 2018 visit by Dill to Yassine at Big Spring Correctional Center;

i. Dill's drafting and negotiation of the Assignment Agreement with Yassine and his counsel Nguyen;

j. QPWB, EM3, Cohen, and Schumann serving false discovery answers in the Kankakee Case and the Will County Case regarding the Prison Visit and private investigators;

k. Cohen making false representations of fact to the Court in the Kankakee Case that the "sole support" for Webb's allegations regarding the Prison Visit was fraudulent discovery answers forged by Webb. Cohen made this representation with the full knowledge that he, as AIM's counsel, was intimately involved in the Prison Visit;

l. The concealment by AIM and Iaderosa of Dill's invoices in the J&J Case, which was intended to deprive Webb of information to identify the female attorney who visited Yassine in prison;

m. AIM's and Iaderosa's intentional destruction of data seized in the J&J Case, which was ordered to be preserved in the Will County Case, as well as the Consent Judgment AIM and Iaderosa negotiated with J&J, which required the third-party records custodian, UnitedLex, to destroy the only pristine copy of AIM's electronic data. The data destroyed contained several probative emails related to the fire-bombing of Lawson's Land Rover, and likely contained additional probative evidence regarding the crimes set forth herein, yet it was forever destroyed by AIM, Iaderosa, and UnitedLex (per AIM's and Iaderosa's Consent Judgment requiring UnitedLex to do so).

379. Webb suffered damages as a result of the conspiracy amongst QPWB, EM3, Cohen, Schumann, Wood, Dill, AIM, Iaderosa and Sylvester, including, but not limited to, a judgment in excess of $24,000,000 entered against Webb in the Kankakee Case, as well as significant

attorney's fees attempting to uncover the crimes and fraudulent concealment of those crimes committed by QPWB, EM3, Cohen, Schumann, Wood, Dill, AIM, Iaderosa and Sylvester.

380.    Webb reserves the right to amend this count to add a claim for punitive damages.

WHEREFORE, Webb requests a judgment for damages in his favor against QPWB, EM3, Cohen, Schumann, Wood, Dill, AIM, Iaderosa and Sylvester in excess of $75,000, plus costs, prejudgment interest, and any additional relief this Honorable Court deems just and proper, including an award of attorney's fees pursuant to the Court's inherent authority due to the egregious nature of the conduct alleged herein.

## COUNT X
### Negligent Retention
### (QPWB)

381.    Webb re-alleges and incorporates paragraphs 1 – 283 as if fully set forth herein.

382.    QPWB knew or should have known that Schumann had a particular unfitness as an employee and partner of QPWB so as to create a danger of harm to third parties.

383.    QPWB knew or should have known of that particular unfitness at the time it retained, and continued to retain Schumann, to wit, after the October 1, 2018 Prison Visit and the subsequent cover up in the Will County Case and the Kankakee Case.

384.    QPWB's continued retention of Schumann despite actual or constructive knowledge of the crimes, frauds and coverups proximately caused Webb to suffer damages including, but not limited to, the judgment entered against him in the Kankakee Case in excess of $24,000,000, as well as the extraordinary attorney's fees spent in the Will County Case and Kankakee Case uncovering the crimes committed by the Iaderosa Defendants during the pendency of those cases, with the knowledge and involvement of their counsel, including Schumann.

WHEREFORE, Webb requests a judgment for damages in his favor against QPWB in excess of $75,000, plus costs, prejudgment interest, and any additional relief this Honorable Court deems just and proper, including an award of attorney's fees pursuant to the Court's inherent authority due to the egregious nature of the conduct alleged herein.

## JURY TRIAL DEMAND

Plaintiff, JOHN WEBB, demands a trial by jury on all issues so triable.

DREYER, FOOTE, STREIT,
FURGASON & SLOCUM, P.A.

DAVID A. YAREMA, P.A.

By /s/ David A. Yarema
　　 Attorneys for Plaintiff

Michael W. Huseman
ARDC# 06280259
DREYER, FOOTE, STREIT,
FURGASON & SLOCUM, P.A.
1999 West Downer Place
Aurora, Illinois 60506
(630) 897-8764
mhuseman@dreyerfoote.com

David A. Yarema
ARDC# 6337404
DAVID A. YAREMA, P.A.
2601 Brittany Drive
Nashville, TN 37206
(615) 651-8274
dave@yaremalaw.com
(Pending pro hac vice admission)