# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JOHNSON & JOHNSON, ETHICON, INC.,  :
ETHICON US, LLC, and JOHNSON &  :
JOHNSON HEALTH CARE SYSTEMS INC.,  :  Case No. 20-cv-3471
  :  Judge Dow
        Plaintiffs,  :
  :  **SEIZURE ORDER**
v.  :
  :  **FILED EX PARTE AND UNDER SEAL**
ADVANCED INVENTORY MANAGEMENT,  :
INC. d/b/a ESUTURES.COM, ANTHONY  :
IADEROSA JR., JASON EINHORN, MIKE  :
PHIPPS, and MUDASSAR SHAH,  :
  :
        Defendants.  :
-------------------------------------------------------------

Upon review of the Complaint of Johnson & Johnson, Ethicon, Inc., Ethicon US, LLC, and Johnson & Johnson Health Care Systems Inc. (together, "Ethicon" or "Plaintiffs"), the accompanying declarations and the exhibits annexed hereto, and the memorandum of law submitted in support of this Order, and for good cause shown, it is hereby:

ORDERED that the United States Marshals Services for the Northern District of Illinois, with assistance from, if needed or required, the Chicago Police Department; the Beecher Police Department; the Mokena Police Department; the Will County Sheriff's Office; the Cook County Sheriff's Office; the Federal Bureau of Investigation; and the U.S. Food and Drug Administration Office of Criminal Investigations, or any other law enforcement officers having jurisdiction, and in all cases assisted by one or more attorneys, private investigators, or employees or agents of Ethicon and employees or agents of UnitedLex Corp. ("UnitedLex") are directed and permitted, at any time between the hours of 8:00 a.m. and 11:00 p.m., to enforce this order and search, seize, copy, and sequester at any time, but no later than seven days (7) from the date of this Order, the

# EXHIBIT N

PLAINTIFFS' EXHIBIT 3

following items in the possession, custody, or control of Defendants Advanced Inventory Management Inc., also known as and doing business as eSutures.com, Anthony Iaderosa Jr., Jason Einhorn, Mike Phipps, and Mudassar Shah, (each a "Defendant" and together, "Defendants") located at the following locations:

- 9645 Willow Lane, Mokena, Illinois;

- 116 Bald Eagle Lane, Beecher, Illinois;

- 839 North Marshfield Avenue, Apartment 1W, Chicago, Illinois;

and any other residence, office, warehouse, truck, van, car, storage facility or other location in Defendants' possession, custody or control:

(a)    All products bearing any of the ETHICON Marks (as defined below);

(b)    All business records, invoices, correspondence, emails, instant messages, text messages, WhatsApp communications, electronic communications, photographs, bank records, cancelled checks, wire transfers, books of account, receipts, or other documentation relating or referring in any manner to the manufacture, promotion, publicity, advertising, receiving, acquisition, importation, return, shipment, purchase, sale, offer for sale, or distribution of any merchandise bearing any of the Ethicon Marks, whether such information is stored in a written or computerized form;

(c)    Any equipment and supplies used to manufacture, assemble, label or package any merchandise bearing any of the ETHICON Marks; and it is further

ORDERED that Ethicon's document and electronic services vendor UnitedLex shall act as substitute custodian for all documents and/or electronic evidence seized; and it is further

ORDERED that Ethicon's counsel and/or private investigators working on their behalf shall act as substitute custodian for all products and property seized (except with respect to all

2

documents and electronic evidence), and shall within seven days of completing the seizure account completely for all products and property seized pursuant to this Order, and shall compile a written inventory of all such products and property seized and shall provide a copy to the law enforcement authority conducting the seizure, who shall include such a copy with its return to the Court, but that any law enforcement officer or agency will be present solely to enforce this Order and allow for Ethicon's private investigators and attorneys to carry out the provisions stated in this Order, and no law enforcement officer or agency will take possession of any items or documents; and it is further

ORDERED that Ethicon's private investigators and attorneys and UnitedLex are authorized, under the supervision and with the assistance of law enforcement authority, to take all necessary steps to secure and remove the property described in this Order and located at the addresses or locations stated herein, including but not limited to using the appropriate force necessary, if it is apparent that entry is being denied, by utilizing a locksmith or law enforcement entry tools to gain entry for the purposes of searching the premises, or vehicle, or facility in the possession, custody or control of Defendants, and to inspect the contents of any rooms, closets, cabinets, safes, vehicles, containers, desks, electronic storage devices, computer drives, desktop computers, laptop computers, cellular or mobile telephones, smartphones, tablets, or documents, located on the premises or any storage rooms located within the same complex as the premises; and that Defendants and their employees shall provide all keys, passwords or codes needed to inspect the contents of any rooms, closets, cabinets, safes, vehicles, containers, desks, electronic storage devices, computer drives, desktop computers, laptop computers, or cellular or mobile telephones or smartphones or tablets or documents located on the premises or any storage rooms located within the same complex as the premises; and it is further

3

ORDERED that any computer files, documents, or other electronic items that are maintained in offsite or cloud-based computer or electronic storage, but are accessible by Defendants and their employees from the premises, shall be considered to be located on the premises, and Defendants and their employees shall provide to UnitedLex all information, including but not limited to all logins, usernames, passwords (including administrative passwords), codes, and addresses, to allow UnitedLex access to such computer files, documents, or other electronic items; and it is further

ORDERED that during the course of the seizure Ethicon's attorneys shall determine whether an item is covered by the preceding paragraphs and the law enforcement officers shall follow such attorneys' determination and ensure that no one attempts to interfere with the execution of this Order; and it is further

ORDERED that Defendants immediately upon receipt of this Order shall provide to Ethicon's attorneys a summary document or documents giving the location or locations of any merchandise bearing any of the ETHICON Marks that is in the possession, custody, or control of any of the Defendants so that merchandise can be seized pursuant to this Order; and it is further

ORDERED that Ethicon's attorneys may be accompanied by private investigators and/or computer technicians to obtain copies of documents to be seized that are stored in computerized form, and Ethicon's attorneys may, but are not required to, also bring with them still camera or video camera operators to record the seizure; and it is further

ORDERED that the computer technicians and private investigators may scan, image, or copy any paper or electronically stored information in the possession, custody or control of the Defendants so that the information may be searched following the seizure for relevant information; and it is further,

ORDERED that Ethicon shall, following the seizure, inspect the items seized bearing any of the ETHICON Marks, and if any items are found to be genuine, such items are to be returned; and it is further;

ORDERED that immediately upon receipt of this Order Defendants shall disclose to Ethicon's attorneys and investigators the following information concerning their purchases and/or sales of any SURGICEL® products (of any variety), any LIGACLIP® products (of any variety), and/or any ETHICON SECURESTRAP® products (of any variety), from January 1, 2018 to the present: (1) the price and quantity of each purchase or sale; (2) the product, including the specific type or variety of product; (3) the lot numbers; (4) the contact information, including names, addresses, email addresses, and telephone numbers of all associated individuals and/or companies from which Defendants have purchased or to whom Defendants sold the products; and it is further

ORDERED that Ethicon shall be responsible to the law enforcement officers for all of their fees and charges incurred in carrying out this Order and shall hold harmless the law enforcement authority and its employees for any and all claims, asserted in any court or tribunal, arising from any acts, incidents, or occurrences in connection with the seizure and possession of the Defendant's property, including any third-party claims; and it is further

ORDERED that anyone interfering with the execution of this Order or disobeying this Order is subject to arrest by law enforcement authority and subject to contempt of court; and it is further

ORDERED that Ethicon shall post an undertaking within three business days of the entry of this Order with the Clerk of the Court in the form of a bond in the sum of $50,000.00 as security for the payment of such actual and reasonable costs and damages as may be incurred or suffered by any party as a result of a wrongful seizure and for the payment of such costs and damages as

may be incurred or suffered by any party as a result of any undue harm caused by this Court's Order to Show Cause; and it is further

ORDERED that the parties shall appear for a hearing before this Court to confirm this Seizure Order on 6/30/2020 at 10:15 a.m.; such date not being sooner than ten (10) days from the date of this Order and not later than fifteen (15) days from the date of this Order, absent good cause or consent of all parties to set a different hearing date; and it is further

ORDERED that any Defendant intending to oppose confirmation of this Order shall file opposition papers with this Court and serve by email and mail upon Ethicon's counsel, Geoffrey Potter, Patterson Belknap Webb & Tyler LLP, 1133 Avenue of the Americas, New York, NY 10036, Gpotter@pbwt.com, on or before 6/24/2020, and reply papers shall be filed and served by email or otherwise on or before 6/29/2020, and if any Defendants fail to oppose confirmation of this Seizure Order in accordance with this paragraph, then with regard to such Defendants the seizure shall be deemed confirmed, Ethicon's bond shall be released, and Ethicon shall be released from any liability in connection with the seizure; and it is further

ORDERED that Defendants serve by email and mail upon Ethicon's counsel, Geoffrey Potter, Patterson Belknap Webb & Tyler LLP, 1133 Avenue of the Americas, New York, NY 10036, Gpotter@pbwt.com, five days before the confirmation hearing scheduled herein, copies, to the extent originals were not seized and sequestered, of all business records, inventory records, invoices, emails, text messages, instant messages, WhatsApp messages, photographs, contacts, bank records, wire transfers, correspondence, books of account, letters of credit, receipts or other documentation relating or referring in any manner to the manufacture, promotion, publicity, advertising, receiving, acquisition, importation, shipment, purchase, sale, offer for sale or distribution of any merchandise bearing any of the ETHICON Marks (as defined below), whether

such information is stored in a written or computerized form, and any merchandise bearing any of the ETHICON Marks that are in the possession, custody, or control of any Defendant; and it is further

ORDERED that all documents, records and communications (including without limitation all electronic documents and emails) seized pursuant to this Order shall, upon removal from the premises, be maintained solely in the possession and custody of UnitedLex, and UnitedLex shall not provide access to, or copies of, any such documents, records, and communications, to any party other than Defendants (including without limitation to Ethicon, Ethicon's counsel, or Ethicon's independent investigators) except as set forth in this Order or in any separate Order of this Court; and it is further

ORDERED that UnitedLex may review all documents, communications, computer files, and electronic data seized pursuant to this Order to identify documentation relating or referring in any manner to the manufacture, packaging, promotion, publicity, advertising, receiving, acquisition, importation, return, shipment, purchase, sale, offer for sale or distribution of any merchandise bearing or possibly bearing the ETHICON Marks and on a rolling basis shall provide those documents to counsel for Defendants, and counsel for Defendants shall have 24 hours to designate any of them as protected by the attorney-client privilege, work-product immunity, or any other applicable privilege or immunity ("Claimed Privileged Documents"), and no later than the end of the 24-hour period generate a log of all Claimed Privilege Documents in conformance with Fed. R. Civ. P. 26(b)(5)(A) (the "Privilege Log") and provide the Privilege Log to UnitedLex and Ethicon's attorneys; and it is further

ORDERED that following the 24-hour period, UnitedLex shall promptly provide to Ethicon's attorneys copies of all documents provided to Defendants' attorneys that are not included on the Privilege Log; and it is further

ORDERED that the seizure of any documents, records, or communications pursuant to this Order and the review of such documents, records, or communications by UnitedLex shall not be construed to effect or constitute the waiver of attorney-client privilege, work-product immunity, or any other privilege or immunity; and it is further

ORDERED that the following confidentiality provisions shall apply to all documents and all other materials obtained by Ethicon from Defendants (the "Material"), until such time as the Court enters a comprehensive confidentiality order in this case:

1.    Ethicon shall not disclose any Material to any persons, except the following, who shall treat such information as confidential in accordance with the terms of this Order:

(a)    The Court and its officers, and any court reporters employed in this action;

(b)    lawyers, legal assistants and support personnel at Ethicon's outside counsel and investigators and experts employed by Ethicon's outside counsel;

(c)    Ethicon's in-house attorneys, legal assistant and support people that work with them with a need to know, including those who deal with the various regulatory agencies;

(d)    Ethicon's corporate security employees and those employees who support Ethicon's anti-counterfeiting efforts;

(e)    Ethicon's customer service people employed in connection with Ethicon's consumer information line;

(f)    government agencies, including those responsible for law enforcement; and

(g)    fact witnesses or expert witnesses at trial or deposition.

2.      The provisions noted above relating to the Material shall not apply to any Material that:

(a)      is, was, or becomes public knowledge, as long as it became so not in violation of this Order,

(b)      is lawfully acquired by Ethicon from a person or entity, other than Defendants, that has the right to possess and disclose such Material;

(c)      was lawfully possessed by Ethicon prior to entry by the Court of this Order; or

(d)      Defendants subsequently agree in writing that the Material is not Confidential.

3.      Nothing in this Order relating to the treatment of the Material shall be taken as indicating that any of the Materials are in fact confidential or entitled to confidential treatment. Ethicon may at any time seek an order from the Court, on notice to counsel for Defendants, determining that specified Materials or categories of Materials are not entitled to be treated as confidential.

4.      All Material that is filed with the Court, and any pleadings, motions, or other papers filed with the Court disclosing any such Material, shall be filed in a sealed envelope and kept under seal by the Clerk of this Court until further order of the Court.

5.      A person who receives a subpoena or other request for production or disclosure of any of the Material from any person, other than a government agency or law enforcement agency, shall give prompt written notice to Defendants to enable them to take such action as they deem appropriate to protect the confidential status of the Material.  Requests for the Material from a government agency or law enforcement agency shall be complied with without notice to any of Defendants; and it is further

ORDERED that service by any person of this Order, the papers upon which it was granted, and the summons and complaint in this action shall be made at the time of the seizure by delivering

9

true copies thereof to any person of suitable age found at the premises or, if no persons are present, by leaving them in a conspicuous place at the premises, and that such service be deemed sufficient service.

The Court has granted the foregoing Seizure Order without prior written or oral notice to Defendants because it clearly appears from specific facts as follows:

(a)     The entry of any Order other than a seizure Order without notice will not serve to adequately achieve the objectives underlying the Trademark Counterfeiting Act of 1984;

(b)     Ethicon has not publicized the proposed seizure Order;

(c)     Ethicon has provided the United States Attorney for the Northern District of Illinois with notice of their application for a seizure Order pursuant to 15 U.S.C. § 1116(d)(2);

(d)     Ethicon has provided the Court with substantial evidence that Defendants have used counterfeit marks in connection with the sale, offering for sale, or distribution of goods, and the Court concludes that Ethicon is likely to succeed in so demonstrating;

(e)     Ethicon will incur immediate and irreparable injury if this Court declines to grant a seizure Order without notice;

(f)     The matters subject to said Seizure Order likely will be located at the locations to be searched;

(g)     The harm to Ethicon should this Court decide not to grant Ethicon's motion for a seizure Order outweighs any harm which Defendants may incur in the event this Court grants Ethicon's motion for a seizure Order; and

(h)     Defendants, or persons acting in concert with them, would likely destroy, move, hide, or otherwise make inaccessible to the Court the matters that are subject to the proposed seizure Order if Ethicon is required to proceed on notice.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court issues the foregoing Seizure Order based upon the findings of fact and conclusions of law set forth below.

### Findings of Fact

Ethicon is a purveyor of, among other things, surgical devices, including SURGICEL® Absorbable Hemostat, SURGICEL® FIBRILLAR™, SURGICEL SNoW®, LIGACLIP® Extra Ligating Clips, and ETHICON SECURESTRAP® devices.  (*See* Declaration of Ben Russo, dated June 9, 2020 ("Russo Decl.") ¶¶ 3-4; Declaration of Kurt Bally, dated June 10, 2020 ("Bally Decl.") ¶ 7; Declaration of Jeffrey Rauso, dated June 9, 2020 ("Rauso Decl.") ¶¶ 3-4; *see also* Declaration of Geoffrey Potter, dated June 15, 2020 ("Potter Decl.") Ex. 12).  Ethicon is the owner of the following well-established, famous and registered trademarks that appear on its products:

- Ethicon's "Surgicel" trademark, which was registered on the Principal Register of the United States Patent and Trademark Office on August 4, 1959, as U.S. Registration No. 682773.  (Russo Decl. ¶ 6; Potter Decl. Ex. 12).

- Ethicon's "SURGICEL SNOW" trademark, which was registered on the Principal Register of the United States Patent and Trademark Office on December 6, 2011, as U.S. Registration No. 4068018.  (Russo Decl. ¶ 8; Potter Decl. Ex. 12).

- Ethicon's "LIGACLIP" trademark, which was registered on the Principal Register of the United States Patent and Trademark Office on August 13, 1974, as U.S. Registration No. 0990939.  (Bally Decl. ¶ 11; Potter Decl. Ex. 12).

- Ethicon's "ETHICON SECURESCRAP" trademark, which was registered on the Principal Register of the United States Patent and Trademark Office on May 29, 2012, as U.S. Registration No. 4150544.  (Rauso Decl. 8; Potter Decl. Ex. 12).

- Ethicon's "Ethicon" trademark, which was registered on the Principal Register of the United States Patent and Trademark Office on June 3, 1958, as U.S. Registration No. 662658.  (Russo Decl. ¶ 11; Potter Decl. Ex. 12).

- Ethicon's **ETHICON** trademark, which was registered on the Principal Register of the United States Patent and Trademark Office on December 14, 1954, as U.S. Registration No. 599432.  (Russo Decl. ¶ 12; Potter Decl. Ex. 12).

11

- Ethicon's  trademark, which was registered on the Principal Register of the United States Patent and Trademark Office on October 29, 1996, as U.S. Registration No. 2011413. (Bally Decl. ¶ 17; Potter Decl. Ex. 12).

- Ethicon's  trademark, which was registered on the Principal Register of the United States Patent and Trademark Office on January 7, 2014, as U.S. Registration No. 4462925. (Bally Decl. ¶ 18; Potter Decl. Ex. 12).

Collectively, this Order refers to these trademarks as the "ETHICON Marks."

Ethicon has used and is currently using the ETHICON Marks in commerce and in connection with its sale of its surgical devices and plans to continue such use in the future. (Russo Decl. ¶ 13; Rauso Decl. ¶ 13; Bally Decl. ¶ 19). Ethicon prominently displays them in its advertising and promotional materials. (Russo Decl. ¶ 13; Rauso Decl. ¶ 13; Bally Decl. ¶ 19).

Ethicon has engaged and continues to engage in activities designed to promote its surgical devices and the business and goodwill associated with its trademarks, and to expand the use and reputation of its trademarks, trade dress, logos, copyrights, and property throughout the United States. (Russo Decl. ¶ 16; Rauso Decl. ¶ 14; Bally Decl. ¶ 20). The ETHICON Marks are invaluable assets to Ethicon. (Russo Decl. ¶ 17; Rauso Decl. ¶ 15; Bally Decl. ¶ 21).

Defendants Advanced Inventory Management Inc. d/b/a eSutures.com, Anthony Iaderosa Jr., Jason Einhorn, Mike Phipps, and Mudassar Shah (collectively, "eSutures") have imported into the United States, and then sold in U.S. commerce, substantial quantities of counterfeits of Ethicon surgical devices, including SURGICEL® Absorbable Hemostat, SURGICEL® FIBRILLAR™, LIGACLIP® Extra Ligating Clips, and ETHICON SECURESTRAP® devices. (Potter Decl. Ex. 13; Declaration of Denise Dacey, dated June 11, 2020 ("Dacey Decl.") ¶ 32; Declaration of Daniel Burkley, dated June 10, 2020 ("Burkley Decl.") ¶ 50; Rauso Decl. ¶¶ 19-20; Declaration of Cameron McLain, dated June 9, 2020 ("McLain Decl.") ¶ 10).

A. eSutures' Counterfeiting of Ethicon SURGICEL® Devices

Ethicon first became aware of counterfeit SURGICEL® devices in the United States when it received a complaint from a neurosurgeon at the University of Kentucky Medical Center. (Potter Decl. ¶ 4). Ethicon retrieved a sample of the offending product, and through a series of tests and outside analysis, confirmed that the packaging was counterfeit and that the product itself was counterfeit, critically defective, and bacterially contaminated. (Burkley Decl. ¶ 13; Dacey Decl. ¶ 7; Declaration of Benjamin D. Fitz, dated June 10, 2020 ("Fitz Decl.") ¶¶ 10-15; Potter Decl. Ex. 16). The counterfeits do not contain the antimicrobial, hemostatic and absorption properties of authentic SURGICEL® products, so they pose a serious danger to patient health and safety, including subjecting patients to risks of infection, foreign body granuloma and surgical adhesions. (Fitz Decl. ¶¶ 7, 11, 14-16).

Ethicon initiated a lawsuit in the U.S. District Court for the Middle District of Florida against the supplier of the counterfeit SURGICEL® to the University of Kentucky (the "Florida Action"). Through seizures and other discovery, Ethicon traced the distribution of the counterfeits to a company known as M/S Medserve ("Medserve") and its principal, Pritamdas Arora, located in Delhi, India. (Potter Decl. ¶¶ 5-12 & Exs. 1-5). Ethicon initiated an investigation and eventually filed suit against Medserve and Mr. Arora in Indian court. (*Id.*). In the Florida Action, the U.S. District Court issued a Letter of Request in support of a seizure against Medserve and Mr. Arora. (*Id.*). The Indian court granted Ethicon's request for an *ex parte* seizure, which Ethicon executed on October 14, 2019. (*Id.*).

During the seizure against Medserve, Ethicon discovered hundreds counterfeit SURGICEL® devices in the process of being assembled on the floor of Mr. Arora's apartment. This included hundreds of empty counterfeit SURGICEL® packets, and similar amounts of third-

party gauze cut in shape resembling SURGICEL®. (*Id.* ¶¶ 13-14). The counterfeit packets closely resembled authentic SURGICEL®, including replicating Ethicon's trademarks on the packets. (*Id.*). The third-party gauze matched the counterfeit SURGICEL® located at the University of Kentucky Medical Center. (*Id.*; Burkley Decl. ¶ 41).

Ethicon seized documents showing that eSutures purchased from Medserve and imported into the United States substantial quantities of the counterfeit SURGICEL® devices. (Potter Decl. Ex. 13). Ethicon also seized documents showing that Medserve has been alerted that its counterfeit SURGICEL® was causing infections in patients. (Potter Decl. Exs. 31-33).

### B. eSutures Fraudulently Responds to Ethicon's Subpoenas

Before the Medserve seizure, discovery from the Florida Action indicated to Ethicon that eSutures had business connections with Mudassar Shah, who appeared to be involved in the counterfeiting of SURGICEL® devices. (Potter Decl. ¶ 25). In the Florida Action, Ethicon served third-party subpoenas on eSutures concerning the counterfeits, including a request for "all documents and communications from January 1, 2016 to the present concerning Mudassar Shah." (*Id.* ¶ 26 & Ex. 7). Ethicon informed eSutures that it had identified Mr. Shah as a counterfeiter. (*Id.*).

Unbeknownst to Ethicon at the time, Mr. Shah – a Defendant in this action – is a full-time, salaried employee of eSutures. (*Id.* ¶ 32 & Ex. 10). Defendant Shah receives monthly wire payments from eSutures labeled "salary." (*Id.*). He has an eSutures.com business email address. (Potter Decl. Ex. 37). And Defendant Shah holds himself out as a salaried eSutures employee in his counterfeit transactions. For example, in October 2019 he wrote to a potential Illinois-based customer: "i m employee of Esutures.com," explaining "i m working for them since 2 years" and "they pay me monthly sallery to my bank account in pakistan." (Potter Decl. Ex. 17). Defendant

Shah explained that he does "purchasing from all over the world" for eSutures. (*Id.*). When asked by the gray-market distributor if Shah would provide the same services for him, Shah responded "no bro ..[.] since i m a permanent employee …i dont need to look around," and "[Defendant] Anthony [Iaderosa Jr.] is my best friend and my boss also." (*Id.*).

In fact, Defendant Shah was the employee who primarily managed eSutures's relationship with Medserve. (*See, e.g.*, Potter Decl. Exs. 19-22, 24-30). He was personally involved in all or nearly all of eSutures's purchases of counterfeit SURGICEL® from Medserve. (*Id.*). Defendant Shah had extensive written communications about the counterfeits, both with other eSutures employees and with Medserve. (*Id.*). eSutures failed to produce all such documents in its subpoena response. (*Id.* ¶ 30).

Instead, eSutures produced a total of 68 pages of documents in response to Ethicon's two subpoenas, including only 28 pages of documents concerning Mr. Shah. (*See id.* ¶¶ 28-29 & Exs. 8, 9). None of those documents had anything to do with the counterfeiting or Medserve, and none of them gave any indication that Mr. Shah is an eSutures employee or mention his eSutures email address. (*Id.* ¶ 30).

Moreover, eSutures agreed to provide to Ethicon the SURGICEL® devices it had in stock, so Ethicon could test them to see if they were counterfeit. (*Id.* ¶ 31). eSutures sent Ethicon four ten-count boxes of SURGICEL® devices and a few loose packets, all of which were authentic. (*Id.*). However, at the time eSutures was in possession of several hundred units of counterfeit SURGICEL® devices from Medserve that eSutures knew to be counterfeit. (*See* Potter Decl. Exs. 13, 30). eSutures withheld those counterfeits from Ethicon. (*Id.* ¶ 31).

On August 12, 2019 – the same day that Ethicon served the subpoena – eSutures received from Medserve a shipment of 300 units of counterfeit SURGICEL® devices. (Potter Decl. Ex. 13).

15

Defendant Shah made this purchase from Medserve on behalf of eSutures. (Potter Decl. Exs. 13, 30). But unlike prior batches, the counterfeit packaging of this batch was so poorly done that it was immediately obvious that it was not genuine product. Shortly after responding to the subpoena, eSutures complained to Medserve about the quality of these counterfeit SURGICEL® devices. For example, Defendant Shah forwarded to Medserve the following complaint from Defendant Einhorn: "The packaging is very suspicious. really bad print job . . . . Plastic is not original. No ethicon seal." (Potter Decl. Ex. 30).

In short, in responding to Ethicon's subpoenas, eSutures produced innocuous documents and products while withholding large numbers of documents and products concerning its counterfeiting. eSutures's response to Ethicon's subpoenas was fraudulent and intended to conceal its counterfeiting.

Moreover, after fraudulently responding to Ethicon's subpoena, eSutures sent a series of WhatsApp messages to Medserve, attempting to arrange a sale of the obviously fake counterfeits to one of Medserve's distributors in Dubai. (Potter Decl. Ex. 30). From the available documents from the Medserve seizure, it appears that eSutures was likely unsuccessful, and that the obvious counterfeits remain in eSutures's possession. (*See id.*).

C. eSutures's Manufacture and Sale of Counterfeit SURGICEL® FIBRILLAR™ Devices

Ethicon has on two occasions received SURGICEL® FIBRILLAR™ devices sold by eSutures, and confirmed them to be expired product in counterfeit packaging.

First, a U.S. company, Davol Inc., had purchased SURGICEL® FIBRILLAR™ from eSutures for competitive research purposes. In response to a subpoena, Davol produced the SURGICEL® FIBRILLAR™ devices to Ethicon along with the paperwork proving that it had

purchased them from eSutures. (Potter Decl. Ex. 39). Ethicon received the device five months after Davol purchased it. (*Id.*). According to the packaging, the device was well within its expiration date when Ethicon received and tested it. (Burkley Decl. ¶ 47). Ethicon's testing confirmed that the packaging of the SURGICEL® FIBRILLAR™ was counterfeit based on several anomalies. (*Id.* ¶ 50). The device inside the counterfeit packaging was yellowed with age, but despite the discoloring, testing showed it to be authentic, demonstrating that the expiration date on the counterfeit packaging was false. (*Id.* ¶¶ 49-50).

Second, Ethicon's investigators made a test buy directly from eSutures, and again received authentic SURGICEL® FIBRILLAR™ in counterfeit packaging. This test purchase was made in Pakistan through Defendant Shah. (Declaration of Rao Zaman, dated June 9, 2020 ("Zaman Decl.") ¶¶ 4, 7). Ethicon's investigators contacted Defendant Shah, who arranged to have the purchase occur at a billiards hall he owns, "Shah Snooker Club" in Pakistan. (Zaman Decl. ¶ 5). Defendant Shah has posted on Facebook pictures of himself at his snooker hall wearing his eSutures.com uniform. (*Id.* ¶ 8). Per Defendant Shah's instructions, Ethicon's investigators met his cousin at the snooker hall, who telephoned Defendant Shah to confirm the sale, and then sold SURGICEL® devices to the investigators for cash. (*Id.* ¶¶ 6-7). Once again, Ethicon tested and confirmed that the packaging of the SURGICEL® FIBRILLAR™ was counterfeit, while the device itself was authentic. (Burkley Decl. ¶ 37).

In addition to being expired, because the counterfeit SURGICEL® FIBRILLAR™ was removed from its original sterile packaging, the counterfeits are no longer sterile. An outside lab has confirmed that the counterfeit repackaged SURGICEL® FIBRILLAR™ sold by Medserve is bacterially contaminated. (Potter Decl. Ex. 16).

17

eSutures procured expired SURGICEL® FIBRILLAR™, as well as expired SURGICEL SNoW®, at Medserve's request. Originally, eSutures attempted to provide Medserve with devices that had been expired for over a decade, but Medserve refused them, stating in a voice message that "we all have a common sense" and "we cannot kill anyone, we can never accept goods of 2007, 2008 – it is impossible." (Potter Decl. Ex. 22). eSutures shipped large quantities of expired SURGICEL® FIBRILLAR™ and SURGICEL SNoW® to Medserve in May 2019. (Potter Decl. Ex. 37). Although eSutures invoiced Medserve over $10,000 for those expired products, there is no record of Medserve paying that invoice. Instead, the records show that in August 2019, Medserve shipped back to eSutures a somewhat smaller quantity of supposedly non-expired SURGICEL® FIBRILLAR™. (Potter Decl. Ex. 13). In short, the evidence supports the conclusion that eSutures received back some of the counterfeit repackaged expired SURGICEL® FIBRILLAR™ as payment for supplying the expired goods to be made into counterfeits.

The evidence presented shows that eSutures worked closely with Medserve to take steps to ensure its supply of expired SURGICEL® devices went undetected, including falsifying paperwork to hide the expiration dates of the devices; falsely listing the devices as "samples" and "cotton foam"; listing a falsely low price for the items on the shipping invoice to avoid attention from customs; and shipping the items to India via a logistics company in China and Hong Kong. (Potter Decl. Exs. 19-21, 26-28, 37).

### D. eSutures's Sale of Counterfeit Ethicon LIGACLIP® Devices

While Ethicon was executing the seizure against Medserve in India, Medserve received from China a package of thousands of counterfeit Ethicon LIGACLIP® Extra Ligating Clips packed loosely in large, non-sterile plastic bags, delivered in full view of Ethicon's counsel and Indian law enforcement. (Potter Decl. ¶ 16). Ethicon's testing revealed several differences

between the supposed LIGACLIP® devices recovered from Medserve and authentic product, confirming the former to be counterfeit. (McLain Decl. ¶¶ 6-10). Moreover, the counterfeits when tested against authentic LIGACLIP® devices left larger clip gaps and pulled off more easily, meaning they pose a risk to patients. (*Id.* ¶¶ 13-14, 15-16, 20). And because the counterfeits were delivered in loose, non-sterile packaging, it is highly likely that the counterfeits are, like the other counterfeits recovered from Medserve, bacterially contaminated.

The counterfeits were not delivered with their counterfeit packaging, but Ethicon did recover a WhatsApp communication in which Medserve directly informed eSutures that it sells the "duplicate" – *i.e.*, counterfeit – LIGACLIP® devices in counterfeit Ethicon packaging:

> [T]here is one [duplicate] product which is available in the market and its report is perfectly fine. . . . There is a Chinese version of Ligaclip but nicely packed in Johnson & Johnson's packaging. It sells a lot in Pakistan and Dubai. . . . If you ever need duplicate Ligaclip, I can arrange for you as I know the guy who makes it and it is being sold in all Indian hospitals and it's a successful product also.

(Potter Decl. Ex. 29).

Shipping records show that eSutures purchased hundreds of these counterfeit LIGACLIP® devices from Medserve and imported them into the United States. (Potter Decl. Ex. 13).

E. <u>eSutures's Sale of Counterfeit ETHICON SECURESTRAP® Devices</u>

The Food and Drug Administration's Office of Criminal Investigation ("FDA OCI") has been conducting a criminal investigation of eSutures, and at the government's request Ethicon has been cooperating with that investigation. (Rauso Decl. ¶ 19-20). In December 2019, FDA OCI asked Ethicon to confirm that ETHICON SECURESTRAP® devices found in eSutures's warehouse were counterfeit. (*Id.*). Ethicon was able to do so based on the fake lot numbers that appeared on the counterfeit boxes and documentation that was missing from inside the boxes. (*Id.*). FDA OCI informed Ethicon that eSutures had purchased several dozens of these supposed

ETHICON SECURESTRAP® devices from a gray-market distributor in Turkey.  (*Id.*).  FDA OCI also informed Ethicon that eSutures had sold at least some of those ETHICON SECURESTRAP® products in the United States.  (*Id.*).

    F.    eSutures Shipped the Counterfeits to Employees' Homes to Evade Detection

eSutures purchased counterfeit Ethicon devices from Medserve beginning at least in October 2018, and had the first few shipments of counterfeits delivered to its sizable company warehouse, located at 9645 Willow Lane, Mokena, Illinois.  (Potter Decl. Ex. 13).  However, in April 2019, eSutures suddenly changed that practice.  It continued buying counterfeits from Medserve in bulk, but it had the deliveries sent to the personal homes of eSutures employees.  (*Id.*).  Moreover, for these deliveries, eSutures instructed Medserve to scrub its invoices of all references to eSutures, including removing the employees' company email addresses.  (Potter Decl. Ex. 24).  The obvious explanation, and the only plausible one, is that eSutures knew it was purchasing counterfeits and was actively attempting to avoid detection by Ethicon and the government.

For example, on April 11, 2019, Defendant Shah placed an order with Medserve on eSutures's behalf, and instructed that the shipment be shipped directly to Defendant Einhorn's home.  (Potter Decl. Ex. 24).  When Medserve prepared an invoice including eSutures's corporate phone number and the email address "Jason@esutures.com," Defendant Shah instructed Medserve in a voice memo to "Just strike off the email address and telephone number and instead write the [home] address and phone number of Jason."  (*Id.*).  Medserve then in fact shipped counterfeit SURGICEL® and LIGACLIP® products to Defendant Einhorn at his apartment at 839 North Marshfield Avenue, Apartment 1W, Chicago, Illinois, on April 12 and April 18, 2019.  (Potter Decl. Ex. 13).  Similarly, on June 8 and August 8, 2019, eSutures purchased counterfeit SURGICEL® products from Medserve and had them shipped to another eSutures employee,

Defendant Phipps, at his house at 116 Bald Eagle Lane, Beecher, Illinois. (Potter Decl. Ex. 24, 30). Private investigators have recently visited these home addresses for Defendants Einhorn and Phipps and confirmed they are still their respective residences. (Declaration of James Meredith, dated June 10, 2020 ("Meredith Decl.") ¶¶ 3-6).

G. eSutures Asks Its Co-Conspirator to Delete Discoverable Evidence

On October 4, 2019, Ethicon filed its second amended complaint in the Florida Action, adding Medserve and several additional members of the counterfeiting network as defendants. After receiving Ethicon's initial discovery requests, one of the new defendants reached out to eSutures. (Potter Decl. Ex. 18). It told eSutures it had been sued, and provided eSutures a copy of Ethicon's document discovery demands. (*Id.*). eSutures's reaction was to ask the other counterfeiter to delete the relevant electronic records that Ethicon was requesting. Defendant Shah wrote: "plzz dont tell them [Ethicon] my details … plz delete all." (*Id.*). He continued: "delete my texts and my number … from ur cell." (*Id.*).

H. eSutures's Other Unlawful Activity

In addition to the counterfeiting, Ethicon alleges that eSutures corrupts low-level employees of multiple U.S. surgery centers, bribing them to obtain heavily discounted product under their employers' names but secretly ship that product to eSutures. (Compl. ¶¶ 136-181). Ethicon has cooperated with the government's criminal investigation, and has conducted a separate investigation of its own. Ethicon has gathered evidence of multiple low-level surgery-center employees placing large orders of Ethicon devices, logging in with their employers' credentials but paying using their personal credit cards and home addresses. (Potter Decl. ¶ 22). In fact, Ethicon has obtained a copy of a $68,000 check that eSutures wrote personally to a surgery-center clerk – and not to her employer. (Potter Decl. Ex. 34).

## Conclusions of Law

Passed in response to "an 'epidemic' of commercial counterfeiting," *see* S. Rep. No. 98-526, 98th Cong., 2d Sess. 5 (1984), reprinted in 1984 U.S.C.C.A.N. 3627, 3631 (citing *Montres Rolex, S.A. v. Snyder*, 718 F.2d 524, 528 (2d Cir. 1983), *cert. denied*, 465 U.S. 1100 (1984)), the Counterfeiting Act permits a court to grant an *ex parte* order of seizure in "[c]ivil actions arising out of [the] use of counterfeit marks," including seizure of counterfeit goods and "records documenting the manufacture, sale, or receipt" of the counterfeit goods. 15 U.S.C. § 1116(d)(1)(A). As Congress explained in the Senate Report accompanying this bill, "[t]he reason for this provision is that many counterfeiters, once given notice that their fraudulent operations have been discovered, will immediately dispose of the counterfeit goods and make it impossible for the trademark owner ever to bring them to justice." 1984 U.S.C.C.A.N. at 3629.

A plaintiff must satisfy seven statutory criteria before a court can grant an *ex parte* order of seizure under Section 1116. *See* 15 U.S.C. § 1116(d)(4)(B). As demonstrated below and in the declarations and exhibits accompanying Ethicon's application, Ethicon has met each requirement.

> 1. An order other than an *ex parte* seizure order is not adequate to achieve the purposes of the Lanham Act (15 U.S.C. § 1116(d)(4)(B)(i)).

The Lanham Act's goals are to protect the manufacturer's marks and goodwill, to allow manufacturers to control the quality of their products, and to protect the American consumer from confusion as to the origin of products. Here, eSutures is engaged in wholesale distribution of substantial quantities of counterfeit, dangerous, and ineffective surgical devices. eSutures has also participated in the manufacture of counterfeit goods by selling expired product to be repackaged into counterfeit packaging, which it then sold in the United States. The only adequate means of

22

stopping eSutures, collecting the evidence of its counterfeiting, and tracing the distribution of these counterfeits is through an *ex parte* seizure.

As recognized by Congress in enacting the Counterfeiting Act, counterfeiters are more likely than not to dispose of or conceal the counterfeit goods when confronted with a trademark action. 130 Cong. Rec. H 12076, 12080 ("[M]any of those who traffic in counterfeits have become skilled at destroying or concealing counterfeit merchandise when a day in court is on the horizon."). Here, as shown in the findings of fact set forth above, eSutures took steps to conceal its counterfeiting from Ethicon and the government, such as falsifying shipping documents and having counterfeits delivered to employees' homes. And as also described above, eSutures has an established history of both flouting federal discovery and attempting to conceal, destroy, or remove evidence when it learns it has been caught. The Counterfeiting Act's provision for *ex parte* seizures was enacted for precisely this type of scenario.

> 2.    Ethicon has not publicized the requested seizure (15 U.S.C. § 1116(d)(4)(B)(ii)).

Ethicon has not publicized the requested seizure, except to give the requisite notice to the U.S. Attorney. (Potter Decl. ¶¶ 36, 37). Ethicon has moved for the papers in support of Ethicon's application for *ex parte* relief to be kept under seal by the Clerk of this Court pending the effectuation of the seizure order.

> 3.    Ethicon is likely to succeed in showing that the person against whom seizure would be ordered used a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services (15 U.S.C. § 1116(d)(4)(B)(iii)).

As shown in the findings of fact set forth above, the evidence shows that eSutures is distributing, selling, and offering for sale a variety of counterfeit Ethicon devices in counterfeit packaging that falsely bears Ethicon's registered trademarks. (*See* Findings of Fact §§ A, C, D,

and E, *supra*).  Ethicon is likely to succeed on its counterfeiting claims, and that is sufficient to satisfy this statutory criterion.

> 4.  An immediate and irreparable injury will occur if such seizure is not ordered (15 U.S.C. § 1116(d)(4)(B)(iv)).

Ethicon (and others) are being irreparably harmed as eSutures's dangerous and contaminated counterfeits are currently being distributed to, and used by, medical facilities in the United States.  Seizing the counterfeit product and the documentation concerning its sale and distribution is a necessary first step to prevent eSutures from continuing to sell the counterfeits, to identify others who may be involved, and to warn customers who may have purchased counterfeit product.  eSutures's counterfeits do not have the many characteristics that make Ethicon products useful, including their reliability and their antimicrobial, hemostatic, and absorption properties. (Fitz Decl. ¶¶ 11, 14; Burkley Decl. ¶¶ 14, 23, 31; Rauso Decl. ¶¶ 17, 21; McLain Decl. ¶ 20). Instead, the counterfeits create a host of serious risks to patients, including infection, bleeding, foreign body granuloma, and surgical adhesions.  (Fitz ¶¶ 7, 11, 14-16; Rauso Decl. ¶ 21; McLain Decl. ¶ 20).  Thus, until eSutures' counterfeits and the documentation concerning their sale and distribution are seized, Ethicon and the public will be irreparably injured.

> 5.  The matter to be seized will be located at the place identified in the application (15 U.S.C. § 1116(d)(4)(B)(v)).

The requested seizure will take place at three locations: eSutures's corporate offices (including its warehouse) and the two residences, belonging to Defendants Einhorn and Phipps, to which eSutures had several hundred counterfeits shipped.  The documentary evidence that the counterfeits at issue were delivered to all three of these addresses.  (Potter Decl. Ex. 13).

24

As to the corporation, the address of the proposed seizure address matches public documentation of its location, including eSutures's website.[1]  (Declaration of Michael Houston, dated June 10, 2020 ("Houston Decl.") ¶¶ 2-3).  The residential addresses match those on Medserve's shipping paperwork.  (*See* Potter Decl. Ex. 13).  An investigator also personally visited and confirmed the current occupancy of those residences by Defendants Einhorn and Phipps, respectively.  (Meredith Decl. ¶¶ 5, 6).

> 6.    The harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered of granting the application (15 U.S.C. § 1116(d)(4)(B)(vi)).

eSutures has no legitimate interest in selling counterfeit Ethicon surgical devices, and therefore cannot suffer any harm from the seizure of such goods.  The individual defendants likewise have no legitimate interest in receiving or storing counterfeits, or documents concerning the counterfeits, at their personal residences.  Ethicon, on the other hand, has a very strong interest in protecting the public's health and safety, as well as its own trademarks and goodwill, from the counterfeits that Defendants are selling.  Indeed, the Ethicon trademarks are invaluable assets to Ethicon, and Ethicon takes great care to ensure that its customers receive products that are safe, reliable, and effective.  (Russo Decl. ¶¶ 17, 21-22; Rauso Decl. ¶¶ 15, 18; Bally Decl. ¶¶ 21, 23).  eSutures's counterfeits are none of those things.  If the counterfeits are not seized, Ethicon's reputation, goodwill, trademarks and business will be threatened with serious and irreparable injury.  (Russo Decl. ¶ 23; Rauso Decl. ¶ 21; Bally Decl. ¶ 24).

> 7.    Defendants would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on

---

[1] *See* https://www.esutures.com/contact/.

notice to such person (15 U.S.C. § 1116(d)(4)(B)(vii)).

As noted above, Congress determined in passing the Counterfeiting Act that counterfeiters "have become skilled at destroying or concealing counterfeit merchandise when a day in court is on the horizon." 130 Cong. Rec. H12076, at 12080. Here the evidence against eSutures shows that issuing an *ex parte* seizure order is necessary to protect evidence of counterfeiting that would otherwise be made inaccessible to the Court if notice were to be given to the Defendants prior to the seizure. The evidence presented by Ethicon shows that when eSutures has been given normal service of process and asked to participate in discovery, it has concealed all evidence of its counterfeiting and attempted to move or destroy that evidence.

First and foremost, as shown in the findings of fact set forth above, when Ethicon served eSutures with subpoenas pursuant to Federal Rule of Civil Procedure Rule 45, eSutures responded by fraudulently withholding responsive documents: all documents concerning the counterfeiting, all documents showing that Defendant Shah is an eSutures employee, and all of the several hundred counterfeit SURGICEL® devices it had in stock. Instead, eSutures hand-picked and produced only a small number of those non-incriminating items to Ethicon. eSutures's production was calculated to conceal all evidence of its counterfeiting while portraying that it was merely a legitimate supplier complying with the subpoena. And after concealing its counterfeits from Ethicon, eSutures attempted to sell them – the ones that were too obviously fake to sell in the United States – abroad.

As also described above, eSutures recently attempted to convince one of its co-conspirators to destroy evidence in order to subvert federal discovery. (*See* Findings of Fact § G, *supra*). In October 2019, eSutures learned that Ethicon had sued another member of the counterfeiting network and served discovery demands on it. eSutures's immediate reaction was to ask its co-

conspirator by WhatsApp to destroy all evidence concerning eSutures before responding to Ethicon's discovery request: "plzz dont tell them [Ethicon] my details … plz delete all . . . delete my texts and my number … from ur cell."  (Potter Decl. Ex. 18).

Moreover, eSutures used the mobile-phone application WhatsApp for the vast majority of its communications about the counterfeits.  WhatsApp is designed so that the messages are protected by end-to-end encryption, and are therefore recoverable only on the sender and receiver's mobile phones, and not from a server or other remote location.[2]  And it takes only seconds for a user to delete WhatsApp messages from his or her phone.[3]  Providing eSutures notice of this lawsuit before an *ex parte* seizure would allow them to immediately and irretrievably delete their incriminating WhatsApp messages.

Finally, upon the evidence presented, it is highly likely that by knowingly selling and helping manufacture counterfeit Ethicon surgical devices, eSutures engaged in criminal counterfeiting.  *See* 18 U.S.C. § 2320.  The evidence makes it likely that eSutures also committed the crime of selling misbranded medical devices, which is one of very few federal strict-liability crimes, and which carries substantial jail time when done knowingly.  21 U.S.C. § 331.  And, of course, both the corporate and individual Defendants are all subject to civil liability for their actions.  The incentives for eSutures to cover up its criminal behavior are clear, as is its history of flouting federal discovery and attempting to conceal or destroy evidence.  eSutures is precisely the type of defendant that Congress had in mind when it authorized *ex parte* seizure orders in the Counterfeiting Act.

---

[2] https://www.whatsapp.com/security/.

[3] https://faq.whatsapp.com/en/android/26000068/.

_____
UNITED STATES DISTRICT JUDGE

Issued:      June 16, 2020 at 10:15 a.m.