## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JOHN WEBB,

              Plaintiff,

      v.

QUINTAIROS, PRIETO, WOOD &
BOYER, P.A., MAXSON MAGO &
MACAULAY, LLP, MICHAEL COHEN,
ESQ., ANTHONY SCHUMANN, ESQ.,
SARA ELIZABETH DILL, ESQ., STEVEN
A. WOOD, ESQ., ADVANCED
INVENTORY MANAGEMENT, INC. d/b/a
SYNERGY SURGICAL, ANTHONY
IADEROSA JR., FRED SYLVESTER, and
HUSSEIN ALI YASSINE,

              Defendants.

Case No. 24 cv 04082

Honorable Sunil R. Harjani

## <u>MEMORANDUM OPINION AND ORDER</u>

John Webb brought this action alleging the Defendants orchestrated a multi-year conspiracy intended to conceal illicit gambling operations, defraud him of gambling winnings, and obstruct his efforts to pursue claims against them in state court and defend against claims brought against him. Webb's eight-count Amended Complaint sets out federal claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*, as well as state-law claims for fraud, negligent misrepresentation, conspiracy to defraud, and negligent retention. Now before the Court are Defendants' motions to dismiss. For the reasons stated below, Defendants' motions [44] [45] [46] are granted.

### Background

This sprawling dispute arises out of a myriad of litigation actions all stemming from Webb's use of an alleged illicit gambling website from 2013 to 2016. Before addressing the merits

of the motions to dismiss, some background is necessary about the five underlying state court cases involving these parties and the Defendants' alleged misconduct. The Court takes the facts, as it must on a motion to dismiss, from the allegations of the Complaint and assumes the truth of those allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## I. State Court Cases

Between 2013 and 2016, John Webb wagered approximately $17 million—winning approximately $8.6 million and losing approximately $8.4 million—on an allegedly illicit online sportsbook controlled by Defendants Anthony Iaderosa, Fred Sylvester, and Advanced Inventory Management, Inc. (AIM), collectively referred to as the Iaderosa Defendants. Doc. [43] ¶¶ 17, 18, 20, 23. Webb contends that in January 2016, he was owed approximately $516,000 in total gambling winnings, which the Iaderosa Defendants did not pay him. *Id.* ¶¶ 24–27. As a result, Webb filed suit against the Iaderosa Defendants in Florida state court in April 2016 (Florida Case). *Id.* ¶ 28. The law firm Quintairos, Prieto, Wood & Boyer, P.A (QPWB) represented the Iaderosa Defendants in the Florida Case.[1] *Id.* ¶ 32. The Florida Case was ultimately dismissed with prejudice in 2017. *Id.* ¶ 35.

In April 2017, Webb and his mother, Sandra Lawson, sued the Iaderosa Defendants in Will County (Will County Case). Larson's claim was for triple the amount of gambling losses sustained by Webb under the Illinois Loss Recovery Act, 720 ILCS 5/28-8(b) (LRA), which Webb asserts resulted in the Iaderosa Defendants being potentially liable for more than $25 million. *Id.* ¶¶ 36–

---

[1] Webb alleges that QPWB also represents the Iaderosa Defendants in the Will County Case and the Rock Island Case. Doc. [43] ¶ 32. Webb also asserts that Cohen represented the Iaderosa Defendants when he was at QPWB and that he represented them with Maxson Mago & Macaulay, LLP (EM3) from mid-2020 until 2022 in the Kankakee Case; and that he represented them first with QPWB and later with EM3 in the Will County Case. *Id.* ¶ 32 n.3.

37, 40. Webb's claim against the Iaderosa Defendants was for misrepresentations about their gambling websites. *Id.* ¶ 65. This litigation is ongoing.

The third relevant litigation is an LRA claim brought by Hussein Yassine against Webb in Kankakee County in August 2017 (Kankakee Case), alleging liability of approximately $24 million for the Iaderosa Defendants' losses to Webb. *Id.* ¶¶ 42, 44. This represents triple the approximately $8 million Webb won from the Iaderosa Defendants (*i.e.* the Iaderosa Defendant's losses to Webb). *Id.* ¶ 23. Webb alleges that he has known Yassine for decades and the practical effect of this case was to prevent anyone in the Iaderosa Defendants' circle from suing Webb for triple the amount of the Iaderosa Defendants' losses. *Id.* ¶¶ 43, 45. When the Kankakee Case was filed, Yassine was in prison at the Big Spring Correctional Center in Texas. *Id.* ¶ 47. Webb alleges that the Iaderosa Defendants petitioned the Kankakee court to intervene to defend against allegations that they engaged in illegal gambling. *Id.* ¶ 48. The Iaderosa Defendants later voluntarily dismissed themselves from the Kankakee Case and a final judgment for approximately $24 million was entered in favor of Yassine. *Id.* ¶ 65.

On May 18, 2019, Russell Davis sued Webb in Rock Island County, for the Iaderosa Defendants' losses (Rock Island I), which Webb alleges were the same as the losses alleged in the Kankakee Case. *Id.* ¶ 56. Webb contends Davis was coordinating with the Iaderosa Defendants and their lawyers. *Id.* ¶¶ 56–58. This case was removed to federal court and Davis voluntarily dismissed the action on September 24, 2018. *Id.* ¶ 59. Davis filed a second case, this time alleging LRA violations against Webb and the Iaderosa Defendants, in Rock Island County (Rock Island II). *Id.* On July 16, 2023, the state trial court dismissed Davis' LRA claims against Webb, and others, because they were collaterally estopped based on Yassine's judgment in the Kankakee Case.

*Id.* ¶ 62.  The court stayed the LRA claims against the Iaderosa Defendants pending the outcome of Lawson's LRA claims in the Will County Case. *Id.*

Finally, Webb brought this federal action alleging civil RICO violations and a civil RICO conspiracy, along with several state law claims on May 17, 2024.  After the Defendants' initial motions to dismiss, Webb opted to file the operative Amended Complaint, which the Defendants have again moved to dismiss.[2]

## II.    Alleged Misconduct

Turning to the alleged misconduct, Webb alleges that the Iaderosa Defendants and their lawyers engaged in a series of criminal acts to intimidate Webb and those around him.  First, Webb alleges that on June 2, 2018, a vehicle belonging to Larson was set on fire in his driveway. *Id.* ¶ 67.  Webb alleges that two months prior to this, AIM hired a private investigator to identify vehicles belonging to him and his mother. *Id.* ¶ 68.  Webb asserts that almost immediately after the alleged arson, another private investigator hired by QPWB and Schumann visited the mother of Webb's daughter at her workplace asking about the car and Webb. *Id.* ¶¶ 72–73, 75.  To connect this back to the Defendants, Webb contends that various emails on privilege logs produced by the Iaderosa Defendants and their lawyers reference an "investigation" during this time period and that there is a "high probability" these are references to the arson. *Id.* ¶¶ 76–80.

Webb also alleges various acts of witness intimidation, for example, he claims a copy of the Kankakee Case complaint with a handwritten note was sent to his daughter's school and a letter

---

[2] The parties contest whether this is the amended complaint or second amended complaint.  On July 31, 2024, the Court struck the original complaint filed in May because an attorney no longer representing the Plaintiff signed it.  Doc. [26].  Webb refiled the complaint with a new attorney signature and no other substantive changes on August 8, 2024. Doc. [27].  After the Defendants moved to dismiss this complaint, Webb filed for leave to amend, which the Court granted on October 1, 2024. Doc. [42].  As Webb titled the operative complaint, the Amended Complaint, and there were no substantive changes between the May and August complaints, the Court refers to the operative complaint as the Amended Complaint.

was sent to his counsel's ex-wife. *Id.* ¶¶ 84–93. Also, Webb asserts that the Iaderosa Defendants caused a letter and copy of the Will County Case complaint to be sent to Larson on July 23, 2018, which included handwritten messages referencing imprisonment as a punishment for lying on an official court document. *Id.* ¶ 94. Webb further states that on July 23, 2018, the Iaderosa Defendants sent Richard Rendina, a defendant in the Rock Island Case, intimidating documents with handwritten messages threatening to tell his charities about his gambling. *Id.* ¶¶ 97–99.

Next, Webb contends the Defendants either participated in or were aware of an attempt to bribe Yassine to sign a false affidavit to be used against Webb and Larson, and to assign his rights in the Kankakee Case to Defendants. Webb alleges that an investigator hired by QPWB contacted Yassine's cousin and coordinated a meeting with Sara Dill in Texas in September 2018. *Id.* ¶¶ 108–11.[3] Dill then met with Yassine at Big Spring Correctional Center on October 1, 2018. *Id.* ¶ 114. According to Webb, the purpose of this meeting "was to commit bribery and witness tampering by offering Yassine cash, a free immigration lawyer, a free tax lawyer, and a free litigation lawyer if he would sign an affidavit containing false statements about Webb and Lawson that would benefit the Iaderosa Defendants and potentially defeat Lawson's and Yassine's LRA claims in the Will County Case and the Kankakee Case, respectively." *Id.* ¶ 115.[4] But Yassine did not sign either the affidavit or the assignment agreement. *Id.* ¶¶ 134, 146. Webb also alleges, that AIM and its counsel

---

[3] Webb's only allegation against Wood is that he is an attorney at QPWB's Dallas office who filed the motion to quash Webb's deposition subpoena of this investigator and that upon "information and belief" that he was involved in coordinating the hiring of the investigator. Doc. [43] ¶ 200.

[4] Webb alleges that Yassine "testified (perhaps falsely) that he negotiated the Assignment Agreement directly with Cohen and Schumann" and that Cohen and Schumann were coordinating with Dill. Doc. [43] ¶¶ 137, 300.

falsely responded to interrogatories about this visit, by claiming no knowledge of it, and about its investigators. *Id.* ¶¶ 186–203.[5]

Lastly, Webb asserts that the Defendants violated a preservation order in the Will County Case that required the preservation of documents collected pursuant to the *ex parte* seizure order in *Johnson & Johnson, Ethicon, Inc., et al. v. Advanced Inventory Management, Inc., d/b/a eSutures.com, et al*., Case No. 1:20-cv-03471, NDIL (J&J Case). The Will County Court granted Webb's preservation motion on October 29, 2020, and the documents were destroyed by the third-party custodian in the J&J Case after the parties settled in February 2021. Doc. [43] ¶¶ 179–84.

## Legal Standard

"A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678). When deciding a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations in the complaint and draws all inferences in favor of the plaintiff. *Heredia v. Capital Management Services, L.P.*, 942 F.3d 811, 814 (7th Cir. 2019). However, a complaint must consist of more than

---

[5] Webb states that he did not know the information about meetings with Yassine or Dill's involvement with the state court cases until he obtained the information for the J&J Case, discussed *infra*.

"threadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

## Discussion

In this case, Webb brings two civil RICO claims (Counts I and II) and several claims under Illinois law: Fraud (Counts III, V), Negligent Misrepresentation (Counts IV, VI), Conspiracy to Defraud (Count VII), and Negligent Retention (Count VIII). The Court will address the federal civil RICO claims first.

### I. Civil RICO Claims

RICO permits private plaintiffs to sue under § 1964(c) for injuries to "business or property" caused "by reason of a violation of section 1962." 18 U.S.C. § 1964(c). Here, Webb alleges both a substantive RICO violation under § 1962(c) (Count I) and a RICO conspiracy violation under § 1962(d) (Count II). To establish a RICO violation, a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 336 (7th Cir. 2019). Webb fails to adequately allege several of these elements.

### a. Injury

The initial issue with Webb's Amended Complaint is that he fails to allege a cognizable injury. "Injury to one's 'business or property' is an essential requirement for a civil RICO claim."[6] *Gress v. Reg'l Transportation Auth.*, 2024 WL 245185, at *6 (N.D. Ill. Jan. 23, 2024) (citations omitted). "Moreover, the term 'business or property ... retains restrictive significance'; a plaintiff may not recover under civil RICO for 'personal injuries suffered.'" *Id.* (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)); *Doe v. Roe*, 958 F.2d 763, 767 (7th Cir. 1992) ("[A] civil RICO

---

[6] Although earlier cases described this requirement as jurisdictional, the Seventh Circuit has recently clarified that it is instead a "non-jurisdictional element of the cause of action Congress supplied in § 1964(c)," meaning that a "plaintiff's failure to plead this element therefore requires dismissal under Rule 12(b)(6), not 12(b)(1)." *Ryder v. Hyles*, 27 F.4th 1253, 1256 (7th Cir. 2022).

action cannot be premised solely upon personal or emotional injuries."). "[I]njuries proffered by plaintiffs in order to confer RICO standing must be 'concrete and actual,' as opposed to speculative and amorphous." *Evans v. City of Chicago*, 434 F.3d 916, 932 (7th Cir. 2006), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013).

Here, Webb alleges he "has been injured in his business and property" in four ways: (1) "by virtue of the RICO Defendants' interference with Webb's cause of action in the Will County Case," (2) "interference with Webb's defense in the Kankakee Case which resulted in a judgment against him in excess of $24,000,000," (3) "the loss of the Range Rover that was destroyed by arson," and (4) "the extraordinary attorney's fees Webb spent in the Will County Case and Kankakee Case uncovering and exposing the crimes of the RICO Defendants."[7] Doc. [43] ¶ 321. All these allegations are insufficient as they fail to allege an injury to Webb's business or property.

Webb's injuries and arguments are similar to those raised in *Gress v. Regional Transportation Authority*, 2024 WL 245185 (N.D. Ill. Jan. 23, 2024). In *Gress*, the plaintiff alleged that the defendants' hiring process was an elaborate charade in which the defendants orchestrated giving jobs to their own children, instead of having a legitimate merits-based hiring process. *Id.* at *4. The plaintiff argued this was a civil RICO violation because it was a racketeering enterprise conducted to control the hiring process. The district court found that his injuries—not being hired for the job and his expenses for attending the interview—were insufficient to allege a RICO injury. *Id.* at *6–7. And even if they did, the complaint failed to plead such costs with particularity.

Webb's four alleged injuries likewise fail. First, Webb does not allege how he was injured by the Defendants alleged interference in the Will County cause of action. The Will County Case

---

[7] Also, in his response, Webb acknowledges that he is not alleging his gambling losses and posits that he could have alleged an injury to his gambling winnings as his business but did not. Doc. [51] at 21. The Court will not address injuries that Webb did not allege.

involves two claims against the Iaderosa Defendants: (1) Webb's fraud claim related to misrepresentation on their websites and (2) Larson's LRA claim. However, the Amended Complaint focuses on Larson's LRA claim and does not discuss how any of the alleged conduct impacts Webb's fraud claim regarding false statements on the gambling website. Webb specifically alleges that the Defendants' attempts to "suborn perjury and offer Yassine valuable consideration, including a six-figure monetary payment, for false testimony" were in an effort "to defeat Lawson's approximately $24,000,000 LRA claim against the Iaderosa Defendants in the Will County Case" and does not reference any impact on Webb's claim in that lawsuit. Doc. [43] ¶ 261. As such, Webb has not alleged any injury to himself, let alone an injury to his business or property, as it relates to any of Defendants' alleged interference in the Will County Case.

Next, Webb alleges that the Defendants' interference in the Kankakee Case resulted in a judgement against him. However, despite the lengthy recitation of alleged wrongs by the Defendants in the Kankakee Case, Webb does not explain how their conduct caused the judgment against him. A plaintiff must show that the "pattern of racketeering activity both factually and proximately caused its injury." *RWB Servs., LLC v. Hartford Computer Grp., Inc.*, 539 F.3d 681, 686 (7th Cir. 2008) (internal quotations omitted). According to Webb, the Defendants intervened in the Kankakee Case, then tried and failed to make a deal with Yassine to obtain an assignment of his claims. But the Kankakee case was brought by Yassine—Webb's son-in-law who is his "long-time friend[.]" Doc. [43] ¶ 43; Doc. [52] at 10. While Webb alleges that Defendants tried to interfere with this case, he also admits they were ultimately unsuccessful and withdrew. In the end, it was Yassine who got the LRA judgment against Webb. As such, Webb does not allege how the Defendants' intervention was an injury to his business or property.

Even if the Court were to consider this an injury to Webb's business or property, it is not clear how the Defendants' "factually and proximately caused" it, as Yassine brought the lawsuit on his own prior to their involvement. *RWB Servs.*, 539 F.3d at 686 (internal quotations omitted). Webb argues that the Defendants' efforts to cover up their conduct stripped him of the ability to raise their conduct as a defense to Yassine's claim. But Webb became aware of the alleged interactions with Yassine during his deposition on July 27, 2021, before the judgment in favor of Yassine was entered. Doc. [43] ¶ 132. Therefore, Webb was aware of the alleged interference with Yassine and could have raised this as a defense in the Kankakee Case before the final judgment. Thus, Webb failed to allege that the Defendants' conduct was the factual and proximate cause of judgment against him in the Kankakee Case and it cannot be the basis of a RICO injury to Webb.

Webb's third alleged injury is the loss of the Range Rover in a fire. Webb argues that because he used the vehicle it is his loss, but he provides no support for that position. As Webb alleges this vehicle was owned by his mother, it is her loss not his. Doc. [43] ¶ 67.

Lastly, Webb's attorneys' fees in the Will County Case and Kankakee Case are not injuries for the purpose of civil RICO. As the Seventh Circuit explained in *Evans v. City of Chicago*, attorneys' fees are not losses under civil RICO. 434 F.3d at 931. In *Evans*, the plaintiff alleged that the named police officer defendants' racketeering activities forced him to incur additional attorneys' fees to defend himself against charges which were later withdrawn. The Seventh Circuit found that as a pecuniary loss stemming from a personal injury, "attorney fees due to alleged malicious prosecution or false imprisonment do not provide a plaintiff with standing under the civil RICO statute." *Id.* Here, Webb alleged that the RICO Defendants hindered his defense against claims for which he was eventually found liable and caused him to pay additional attorneys' fees. While Webb alleges that some of the RICO defendants tried to usurp the judgment against him, he

also alleges that those attempts were ultimately unsuccessful and that it is Yassine who has the judgment against him. As such, this conduct is similar to, or if anything less egregious, than the alleged conduct of the officers in *Evans* where the plaintiff was vindicated of the charges that he was forced to defend against, as opposed to Webb who was found liable. Thus, Webb's attorneys' fees are not injuries for a civil RICO claim.

Further, even if the Court were to put aside Webb's failure to plead an injury to his business or property, his allegations are conclusory and speculative. As in *Gress*, where the court found that the plaintiff did little more than speculate about his job prospects, here Webb asks the Court to speculate on the outcome of various state court matters and conclude that things could have gone in his favor without the Defendants' conduct. 2024 WL 245185, at *7 (finding the court could not conclude that plaintiff had a legitimate expectation in the job and "his being denied such a 'speculative and amorphous' benefit, without more, does not constitute injury to business or property.") (quoting *Evans*, 434 F.3d at 932). Such speculation cannot form the basis of a RICO injury.

The Court also recognizes that the remedy granted by Congress through civil RICO is limited. While courts have repeatedly sympathized with plaintiffs who allege egregious conduct by defendants, such sympathies do not change the law. *Ryder v. Hyles*, 27 F.4th 1253, 1257 (7th Cir. 2022) ("The nature of the alleged personal injuries does not, however, transform them into injuries to any business or property."); *Doe*, 958 F.2d at 770 (the Seventh Circuit expressed that it was "sympathetic to Doe's argument that permitting recovery in this case might help to deter the reprehensible conduct" of an attorney demanding a sexual relationship in exchange for legal fees but noting that "Congress never contemplated that sexual services would be construed as property" so it could not be the basis of recovery). Here, despite Webb's allegations of misconduct by the

11

Defendants, those allegations are not injuries recognized under the civil RICO statute and thus his claims must be dismissed.

Although, the Amended Complaint could be dismissed on this ground alone, since Webb may amend, the Court will address other issues raised by the Defendants.

### b. Enterprise

Without an enterprise, there can be no RICO claim. RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" 18 U.S.C. § 1961(4). An association-in-fact enterprise has three structural features: a "purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). To allege a common purpose, the plaintiff must identify actions undertaken on behalf of the enterprise, as opposed to actions taken by the defendants to advance their individual self-interest. *United Food & Commercial Workers Unions & Emp'r Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 854 (7th Cir. 2013). So, alleging a "run-of-the-mill commercial relationship" among the defendants is insufficient. *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655–56 (7th Cir. 2015). A plaintiff must allege "a truly joint enterprise where each individual entity acts in concert with the others to pursue a common interest." *Id.* at 656. The plaintiff must show that each RICO defendant "conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (emphasis in original). The common purpose must be "separate from the predicate acts themselves." *James Streibich Revocable Tr. of 2002 v. Flagstad*, 2021 WL 1546439, at *3 (N.D. Ill. Apr. 20, 2021) (quoting *United States v. Masters*, 924 F.2d 1362, 1367 (7th Cir. 1991)). It is the enterprise element that prevents "every conspiracy to commit fraud that

requires more than one person to commit" from becoming a RICO violation. *Bible*, 799 F.3d at 656 (quoting *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 676 (7th Cir. 2000)).

Webb alleges that AIM, Iaderosa, Sylvester, Trident, and Silex are an associated-in-fact enterprise with a common purpose to operate an illegal online sportsbook and gambling operation across the United States and that QPWB, Cohen, Schumann, and Dill became part of the enterprise in mid-to-late 2017 because of their involvement in visiting Yassine in prison and the scheme to cover up that visit. Doc. [43] ¶¶ 286, 289, 290. Webb brings the RICO claims against QPWB, Cohen, Schumann, Dill, AIM, Iaderosa, and Sylvester. *Id.* ¶¶ 285, 323.

A complaint must be dismissed if the plaintiff fails to allege how the actors were associated or that they were not acting together for a common purpose. In *Rao v. BP Products North America, Inc.*, the Seventh Circuit affirmed the dismissal of a RICO claim when the plaintiff failed to allege how the different actors were associated and did not suggest that they were acting together for a common purpose. 589 F.3d 389, 400 (7th Cir. 2009). The allegations included how: (1) three of the individual defendants forced plaintiff to sell his share of the gas station, (2) an unnamed BP employee told plaintiff he would lose his franchises if he sought help, and (3) BP allowed an individual defendant to force plaintiff to purchase land so that BP would not have to purchase plaintiff's gas stations at fair market value. *Id.* The Seventh Circuit agreed with the district court that these allegations failed to indicate how the actors were associated and failed to set forth a pattern of related acts in connection with the enterprise's conduct. *Id.*

Similarly, here, the Amended Complaint does not plausibly allege a common purpose between the Defendants and the actions undertaken by them on behalf of the enterprise. First, it is unclear what Webb alleges is the common purpose of the enterprise. Initially he alleges that the common purpose of the enterprise was to "operate an illegal online sportsbook and gambling

13

operation" but when alleging the racketeering activity, he alleges the purpose was to intentionally defraud him and to intimidate his family and witnesses "in the hopes Webb and Lawson would drop their claims against the Iaderosa Defendants[.]" Doc. [43] ¶¶ 286, 297. As Webb does not allege a single common purpose for the Defendants' actions, there is nothing uniting all of the alleged conduct.

This lack of common purpose between the Defendants is carried over into the allegations regarding various acts by the Defendants. Webb alleges that the Iaderosa Defendants wired or mailed or directed to be mailed intimidating documents to his counsel's ex-wife, the principal of his daughter's school, Larson, Rendina, and to the office of Rendina's companies, which he also alleges amounts to extortion of Rendina. *Id.* ¶¶ 298 (a)–(d), (f), (o). Also, he claims that the Iaderosa Defendants either committed or directed the commission of the arson of a vehicle on his driveway. *Id.* ¶ 298 (n). Then he alleges that Dill committed mail fraud by sending a copy of the assignment agreement to Yassine, and wire fraud when she communicated with Yassine's cousin and Yassine about the status of the Kankakee case and the assignment agreement. *Id.* ¶¶ 298 (e), (g), (h). Also, Webb alleges that Dill committed bribery and witness tampering because of her visit to Yassine in prison. *Id.* ¶ 298 (p). But like in *Rao*, these "allegations do not indicate how the different actors are associated and do not suggest a group of persons acting together for a common purpose or course of conduct." *Rao*, 589 F.3d at 400. Instead, he appears to allege a scheme of witness intimidation by the Iaderosa Defendants and separate conduct about Dill making a deal with Yassine in prison. How these disparate acts involving different actors and different alleged victims connect to a common purpose is unclear. Further, most of the Defendants are not alleged to have committed any of the racketeering acts, so their association with the enterprise is tenuous. This is particularly true given that many of them are attorneys hired by the Iaderosa Defendants to

represent them in Webb's cases; the mere fact "that the defendants had a commercial relationship," is not enough to allege an association in fact. *Walgreen*, 719 F.3d at 855. To the extent Webb is claiming that all of these disparate acts connect to the common purpose of running an illicit gambling organization, such connections are not alleged because, beyond setting the stage for the initial lawsuits, Webb's Amended Complaint does not focus on alleging an illicit gambling operation and is instead focused on the various ways he accuses the Defendants of hindering his litigations. Therefore, Webb fails to allege how the Defendants were associated and acting towards a common purpose.

Moreover, many of Webb's allegations are conclusory. Webb broadly asserts that the Defendants "regularly communicated and coordinated" and that actions were taken "with the full knowledge and acquiescence" of various Defendants and that they "all coordinated and worked in concert to advance the interests and common purpose of the enterprise[.]" Doc. [43] ¶¶ 300, 305, 312. Further, Webb lumps Sylvester into the Iaderosa Defendants in the Amended Complaint but it is unclear what role he had and what actions he took. Doc. [43] ¶ 17. These are just some examples of sweeping statements in the Amended Complaint and are insufficient to allege a RICO enterprise.

These are similar to the conclusory allegations the district court found insufficient in *Flagstad*, 2021 WL 1546439. In *Flagstad*, the plaintiff alleged that the individual defendant acted in concert with the corporate defendants which the individual defendant controlled for the purpose of enriching the individual defendant. *Id.* at *4. The district court found that the complaint failed to plausibly allege the existence of an association-in-fact enterprise with a purpose separate from the predicate acts, and that a defendant's personal enrichment through fraud was not a purpose on behalf of the enterprise distinct from the defendants' motives to commit fraud. *Id.* The court found

the plaintiff's allegation that the defendants acted in concert was conclusory. The fact that the individual defendant in *Flagstad* was at the center of the complaint's allegations was not enough when the allegations all included different actors for each event and did not suggest how the actors were associated or working together for a common purpose. The existence of a commercial relationship did not imply a joining together to create a distinct entity for RICO purposes. Similarly, here Webb's allegations about how the Defendants acted in concert to achieve a common goal are conclusory. Webb failed to allege a common purpose or motives for the Defendants beyond the predicate acts. Thus, Webb failed to adequately allege a RICO enterprise.

### c. Pattern of Racketeering Activity

Another element missing from the Amended Complaint is the pattern of racketeering activity. "A section 1962(c) claim also requires that there be a 'pattern' of racketeering activity, which is an element distinct from the enterprise requirement." *Rao*, 589 F.3d at 399 (quoting *Boyle*, 556 U.S. at 947). "A pattern requires the commission of at least two predicate acts of racketeering activity occurring within ten years of each other." *DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011). A plaintiff must allege both the predicate acts and the continuity of the pattern.

### i. Racketeering Activity

Predicate acts of "racketeering activity" include the commission of various enumerated crimes. 18 U.S.C. § 1961(a). Here, Webb alleges sixteen predicate acts: five instances of mail fraud, three instances of wire fraud, witness tampering by destroying documents, transmission of wagering information, engaging in an illegal gambling business, laundering proceeds of the enterprise, engaging in monetary transactions in property derived from unlawful activity, arson, extortion, and bribery/witness tampering related to the October 1, 2018, prison visit. Doc. [43] ¶ 298. As Webb seeks to "plead RICO's pattern element through predicate acts of mail or wire fraud

. . . the heightened pleading requirements of Fed. R. Civ. P. 9(b) apply and require [him] to do more than allege fraud generally." *Menzies*, 943 F.3d at 338. Webb must plead the who, what, when, where, and how of the alleged fraud. *Id.*

Further, when a plaintiff brings RICO claims against multiple defendants, as Webb has here, he must "plead sufficient facts to notify each defendant of his alleged participation in the scheme." *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 726 (7th Cir. 1998), *holding modified in separate part by Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961 (7th Cir. 2000). In *Goren*, the complaint alleged that the defendants knew there was no basis for certain statements, "that [there were] unspecified misrepresentations regarding" the products, and that the defendants conducted or participated in the conduct of the enterprise through a pattern of racketeering. *Id.* at 730. The Seventh Circuit found that the complaint's "conclusory allegations fail[ed] to specify the time, place and content of any of the misrepresentations attributed to these defendants and therefore [fell] short of the particularity demanded by Rule 9(b)." *Id.* Specifically, in that case, except for one defendant, "the amended complaint simply treats all the defendants as one; such 'lumping together' of defendants is clearly insufficient to state a RICO claim under § 1962(c)." *Id.* Similarly, the district court in *Flagstad*, found that the plaintiff failed to sufficiently plead the corporate defendants liability, when alleging "that the 'mails and wires were used on numerous occasions in furtherance of' defendants' scheme and that defendants communicated with one another and financial institutions through the use of 'electronic mail and/or telephone' and 'internet banking platforms' to fraudulently apply for and obtain bank loans, execute cash transfers, and create fraudulent loans between defendants." *Flagstad*, 2021 WL 1546439, at *8.

Likewise, Webb's complaint improperly "lumps" together the defendants. Most of the predicate acts are alleged to have been done by groups of Defendants, either the "Iaderosa

Defendants" or the "AIM Gambling Enterprise." Doc. [43] ¶¶ 298 (a)-(d), (f), (j), (n)-(o). This does not provide sufficient facts to notify each defendant of their alleged participation in the scheme. Then, four of the predicate acts do not allege who committed them. Doc. [43] ¶¶ 298 (i), (k)-(m). The only individual who is alleged to have committed certain predicate acts is Dill. Doc. [43] ¶¶ 298 (e), (g)-(h), (p). Therefore, as established in *Goren*, the Amended Complaint is clearly insufficient because, except for Dill, it treats the Defendants improperly as a group.

### ii. Continuity

Further, even if the Court were to accept the predicate acts, Webb fails to plausibly allege continuity. To plead a pattern of racketeering activity, "a plaintiff must demonstrate a relationship between the predicate acts as well as a threat of continuing activity"—a standard known as the "continuity plus relationship" test. *Menzies*, 943 F.3d at 337. Pleading continuity plus requires: "(1) demonstrating a closed-ended series of conduct that existed for such an extended period of time that a threat of future harm is implicit, or (2) an open-ended series of conduct that, while short-lived, shows clear signs of threatening to continue into the future." *Id.* (quoting *Roger Whitmore's Auto Servs., Inc. v. Lake County, Ill.*, 424 F.3d 659, 673 (7th Cir. 2005)). A closed-ended series "asks whether there were enough predicate acts over a finite time to support a conclusion that the criminal behavior would continue." *Id.* (citing *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 779–80 (7th Cir. 1994)). Alternatively, a plaintiff can establish an open-ended series "by showing that a defendant's actions pose a specific threat of repetition; that the predicate acts form part of the defendant's ongoing and regular way of doing business; or that the defendant operates a long-term association for criminal purposes." *Id.*

### 1. Continuity Based on Open-Ended Conduct

Webb argues that his Amended Complaint establishes open-ended continuity. To determine whether such a pattern exists, courts focus "not on what acts occurred in the past but on whether a concrete threat remains for the conduct to continue moving forward." *Menzies*, 943 F.3d at 337. "A threat of continuity cannot be found from bald assertions[.]" *Vicom*, 20 F.3d at 783. Instead, a court must examine the "complaint for allegations of predicate acts, which by their very nature, pose a threat of repetition extending indefinitely into the future, or are part of an ongoing entity's regular way of doing business." *Menzies*, 943 F.3d at 343 (internal quotations omitted).

In *Menzies*, the Seventh Circuit addressed the plaintiff's request that the court "infer a future threat of repetition because" the fraudulent strategy was developed to be marketed "to many taxpayers and thus inherently presented a 'threat of repetition' capable of defrauding others." *Id.* at 342–43. The Seventh Circuit rejected this proposition because a "threat of continuity cannot be found from bald assertions." *Id.* at 343 (quoting *Vicom*, 20 F.3d at 783). When considering the complaint, the Seventh Circuit determined that the "risk of future fraud was drying up" as the allegations indicated the scheme was reaching its "natural ending point" because the individual behind the scheme had already been convicted for tax fraud. Therefore, it found that the plaintiff failed to plead a pattern of racketeering under an open-ended theory of continuity.

Courts also routinely reject open-ended continuity arguments when the allegations are based only on conduct between the plaintiff and defendants. In *Smietana v. Stephens*, the district court found that the plaintiff failed to allege open-ended continuity when allegations were conclusory and only involved conduct against the plaintiff. 2023 WL 3737720, at *10 (N.D. Ill. May 30, 2023). Similarly, in *Sciarrone v. Amrich*, the plaintiffs alleged that defendants had a retaliatory scheme with the goal of having them removed from their jobs. 2020 WL 2900938, at

*5 (N.D. Ill. June 3, 2020). As such, the district court found that the scheme had a natural endpoint that involved only the plaintiffs. *Id.* The court also found that an allegation of a termination of a non-plaintiff during the scheme was not sufficient to allege an open-ended continuity because it did "nothing to suggest that the Individual Defendants' misconduct would *continue* after the scheme ended." *Id.* (emphasis in original).

Here, Webb's argument regarding why there is open-ended continuity focuses on the alleged illicit gambling operation, despite the bulk of his complaint discussing misconduct related to various litigations. Webb merely states in conclusory fashion that the Defendants were running an illegal gambling operation that he participated in from 2013 through 2016, and then he argues that it is likely that it continued on. However, Webb's argument that the conduct is "still ongoing" is insufficient as it is nothing more than a "bald" assertion of continuity. *Menzies* 943 F.3d at 343. This assertion also conflicts with his allegation that gambling operations were active through "at least 2016" and that the websites are no longer active.[8] Doc. [43] ¶¶ 287, 288. Both of which set a natural ending point for the illicit gambling scheme.

As to Webb's allegations regarding Defendants' conduct in various litigations, such conduct has a natural ending point of the end of the litigation. Similar to the employment allegations in *Sciarrone* and the fraud allegations in *Menzies*, any conduct by the Defendants in the state court litigations has a natural ending point concurrent with those litigations because nothing suggests that the conduct would continue past the litigation. Further, as in *Smietana*, there is little threat of repetition because Webb's allegations are focused on specific instances of conduct taken against him in various litigations. 2023 WL 3737720, at *10. Thus, both the natural ending-

---

[8] And again, in his response, Webb references facts he did not allege in the Amended Complaint. Doc. [51] at 11 n.4. The Court only considers facts alleged in the Amended Complaint.

point and the limited scope of the scheme to the Defendants' conduct against him, prevents an open-ended continuity theory.

Moreover, to the extent Webb is arguing that the litigation conduct is furthering the alleged illicit gambling scheme by attempting to conceal Defendants' conduct, such an argument also fails as "acts to conceal the underlying wrongdoing in a RICO suit do not carry with them the threat of future harm and generally do not extend the duration of the underlying scheme." *Gamboa v. Velez*, 457 F.3d 703, 709 n.2 (7th Cir. 2006). In *Turow v. Glazier*, the plaintiff alleged that the scheme's goal was to convert the money and property in the trusts, so once that was completed, no additional fraudulent conduct was necessary, thus there was no threat of repetition. 2022 WL 3755138, at *11 (N.D. Ill. Aug. 30, 2022). The plaintiff argued that the scheme was ongoing because the defendants continued to own interests in the converted property and act to conceal their ill-gotten gains. However, such acts of concealment do not carry the threat of future harm and generally do not extend the duration of the underlying scheme. *Id*. Therefore, even if Webb had adequately alleged that the various state court litigations were an effort to conceal the illicit gambling operation, it would not extend the duration of the scheme. Thus, Webb failed to allege open-ended continuity.

### 2. Continuity Based on Closed-Ended Conduct

Likewise, Webb failed to adequately allege a closed-ended continuity. A closed-ended theory of continuity involves a course of criminal conduct that has ended but that the "duration and repetition of the criminal activity carries with it an implicit threat of continued criminal activity in the future." *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 473 (7th Cir. 2007) (quoting *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1022–23 (7th Cir. 1992)). The question for a closed-ended series of conduct is whether there were enough predicate acts over a finite time to support the conclusion that the criminal behavior would continue. The focus is on "the number and variety

of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Menzies*, 943 F.3d at 337 (quoting *Vicom*, 20 F.3d at 780). The analysis is whether the complaint adequately "alleged enough, quantitatively and qualitatively, to show a qualifying pattern of racketeering activity" and no one factor is dispositive. *Id.* at 342.

The Court starts with the duration of the alleged activity because it "is the single most important aspect of the closed-ended continuity analysis." *Vicom*, 20 F.3d at 781. The first predicate Webb alleges is the halting of the FedEx package in January 2016 containing his gambling winnings and the last is mail fraud against Dill in April 2019. Doc. [43] ¶ 298. The Seventh Circuit does not employ "a bright-line rule for how long a closed period must be to satisfy continuity," but they "have not hesitated to find that closed periods of several months to several years did not qualify as 'substantial' enough to satisfy continuity." *Roger*, 424 F.3d at 673. In *Roger*, the Seventh Circuit did not consider a period of two-years substantial enough. In contrast, a period of 10-years was found to weigh in favor of finding a closed-ended continuity. *See Turow*, 2022 WL 3755138, at *12. Here, Webb alleges the predicate acts in the scheme took place over three years, which does not weigh heavily in favor of finding closed-ended continuity.[9]

Turning to the remaining factors, Webb argues that there were seven victims of Defendants' scheme. Doc. [51] at 14. However, other than Webb, the allegations are that they received "intimidating documents" in the mail for the purpose of getting Webb to drop his lawsuit. Doc. [43] ¶ 298. A small group of victims caught in the same scheme is not an indication of closed-ended continuity. *See Roger*, 424 F.3d at 673 (finding that a single overarching scheme involving approximately twelve victims was not indicative of closed-ended continuity). As here, the victims

---

[9] The Court notes, the January 2016 predicate act does not allege who the actor was, and if it was eliminated this would make the relevant time period shorter.

were confined to a small group with a largely singular purpose to the scheme to pressure Webb to drop his claims, and even counting all the victims Webb claims, this cuts against the finding of a closed-ended continuity.

Moreover, the scheme was confined to a limited time period associated with Webb's illicit gambling and the resulting litigation. Webb's Amended Complaint focused on the Defendants' interference with his various legal actions, which have a built-in ending-point of the termination of the cases.[10] This limited period and defined ending-point also weighs against a finding of a closed-ended scheme. *See Roger*, 424 F.3d at 674 (finding there was no indication of other racketeering schemes before or after the closed period weighed against the existence of a closed-ended continuity); *Turow*, 2022 WL 3755138, at *13 (finding the alleged criminal activity had a built-in end point and the complaint did not suggest misconduct beyond the alleged scheme foreclosed the possibility of a closed-ended continuity). When "a complaint explicitly presents a distinct and non-reoccurring scheme with a built-in termination point and provides no indication that the perpetrators have engaged or will engage in similar misconduct, the complaint does not sufficiently allege continuity for § 1962(c) purposes even if the purported scheme takes several years to unfold, involves a variety of criminal acts, and targets more than one victim." *Gamboa*, 457 F.3d at 709. That is what Webb alleged here. Therefore, considering both the quantitative and qualitative components, Webb's allegations are deficient to plead a closed-ended continuity.

## II.    Civil RICO Statute of Limitations

As the Court is dismissing this case for failure to allege plausible RICO counts, it does not reach the Defendants' statute of limitations arguments. However, as the Defendants raised valid

---

[10] While the Court acknowledges that Webb had also alleged an illicit gambling operation, along with not being the focus of the majority of the Amended Complaint, those allegations are vague and conclusory.

concerns and the Court is granting leave to amend, the Court will briefly review the relevant standards.

"Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys, Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) (quoting *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009)). While a complaint can be dismissed if the plaintiff alleges facts sufficient to establish the defense, the Seventh Circuit has cautioned that it is "irregular" and that questions of timeliness should be reserved for summary judgment or trial if "there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense[.]" *Id.*

There is a four-year statute of limitations for civil RICO claims. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987). The cause of action starts to accrue when the plaintiff knew or should have known about the injury even if the plaintiff has not yet discovered the pattern. *Sidney*, 782 F.3d at 926. "Moreover, '[i]t is not the date on which the wrong that injures the plaintiff occurs, but the date—often the same, but sometimes later—on which the plaintiff discovers that he has been injured.'" *Id.* at 928 (quoting *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990)). Whether a plaintiff knew a RICO enterprise existed at this point is irrelevant, because "the four-year period for RICO claims begins to run when the plaintiff knew or should have known that she was injured, 'even if she has not yet discovered the pattern of racketeering.'" *Reeves v. Frierdich*, 202 F.3d 274 (7th Cir. 2000) (quoting *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1464–65 (7th Cir. 1992)).

In *Sidney*, the Seventh Circuit analyzed whether a civil RICO claim about a group of multi-employer benefit funds alleged that Abbott violated RICO by promoting a medication for off-label

uses was properly dismissed as time-barred. 782 F.3d at 924. The district court dismissed the RICO claims against Abbott for being time barred by the 4-year statute of limitations because a reasonable employer benefit fund would have discovered its injuries when it first reimbursed the cost of off-label prescriptions. The Seventh Circuit reversed the dismissal because it was not clear from the complaint that the funds had a duty or ability to monitor off-label prescriptions and when the plaintiffs became aware they were paying for off-label uses. *Id.* at 928. Further, there was "insufficient information to decide when a reasonable third-party purchaser should have discovered that it had paid more for off-label uses than it otherwise would have had to because of an illegal marketing scheme." *Id.* The Seventh Circuit acknowledged that both parties were sophisticated entities, but there was insufficient information in the record to determine whether the benefit fund should have uncovered its injuries when, as alleged, Abbott undertook significant effort to conceal its conduct. *Id.* at 929.

Based on *Sidney*, the Court would need to know when Webb became aware of his injury or should have been aware of his injury before deciding the claim is barred. As this is an affirmative defense and a plaintiff does not have the burden to plead around it, courts often decline to grant a motion to dismiss on these grounds. *See, e.g.*, *In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proc.*, 159 F. Supp. 3d 898, 912 (N.D. Ill. 2016) (declining to dismiss as untimely when the allegations in the complaint did not establish when the plaintiff actually became aware of its injury and lacked the information to determine when a reasonable plaintiff would be expected to be aware of their injury); *Turow*, 2022 WL 3755138, at *6 (denying the motion to dismiss RICO claims as untimely when the complaint did not contain details regarding whether a reasonable person should have discovered the injury given the information available to plaintiff); *McKinney v. Panico*, 2022 WL 4551695, at *7 (N.D. Ill. Sept. 29, 2022) (denying the

motion to dismiss when the court could not "conclude that the complaint's allegations are sufficient to establish a statute-of-limitations defense as to the RICO claims.").

### III.     State Law Claims: Counts III – VIII

Webb also brings numerous state law claims against Yassine, Iaderosa, AIM, QPWB, EM3, Schumann, Cohen, and Dill.  As the Court is dismissing the RICO claims over which it has original jurisdiction, the Court declines to exercise supplemental jurisdiction over Webb's state law claims at this time. *See* 28 U.S.C. § 1367(c); *Vargas v. Cook Cnty. Sheriff's Merit Bd.*, 952 F.3d 871, 876 (7th Cir. 2020) ("When the claims supporting federal jurisdiction drop out of the case, the usual practice is to relinquish jurisdiction over any remaining state-law claims.").  Therefore, the Court dismisses Counts III–VIII without prejudice.

### IV.     General Pleading Rules

As a final note, Rule 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Because "[l]ength may make a complaint unintelligible, by scattering and concealing in a morass of irrelevancies the few allegations that matter," *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003), district courts "have a right to dismiss a complaint that is so long that it imposes an undue burden on the judge, to the prejudice of other litigants seeking the judge's attention." *Kadamovas v. Stevens*, 706 F.3d 843, 844 (7th Cir. 2013).

Webb's Amended Complaint was 86 pages long and contained 386 paragraphs, much of this was prolonged and needlessly complex.  Webb included many irrelevant details and repeated the same information in multiple places.  It appears the strategy was to allege everything possible, without any coherent organization or consideration for the elements of a RICO claim, and attempt to see what would stick with the Court.  Nothing stuck.

26

In drafting any future amended complaints, the Court cautions Webb that unduly convoluted, inflammatory, and confusing allegations do not aid in his goal of proceeding on these claims. The Court is granting leave to amend because it is not yet futile. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519–20 (7th Cir. 2015) ("Unless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss."). But Plaintiff and his counsel are encouraged to consider their Rule 11 obligations. In particular, Plaintiff's counsel has a duty to ensure that: (1) the Complaint is not brought for an improper purpose, (2) includes claims that are not frivolous, and (3) the factual contentions will have evidentiary support after a reasonable opportunity for further investigation. Fed. R. Civ. P. 11(b). Plaintiff's counsel must also not simply tinker with the Amended Complaint in the hopes that the second time is the charm; the Court has identified serious defects in the Amended Complaint that require significant correction if re-presented to this Court.

## Conclusion

For the reasons stated above, Defendants' motions to dismiss [44] [45] [46] are granted. Plaintiff may refile an amended complaint if he can cure the deficiencies and such an amendment is consistent with his obligations under Federal Rule of Civil Procedure 11. If Plaintiff does not file an amended complaint by April 8, 2025, then the dismissal will automatically convert to a dismissal with prejudice.

**SO ORDERED.**

Dated: March 18, 2025

_____
Sunil R. Harjani
United States District Judge

27